## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                                    SUPERIOR COURT

| | |
|---|---|
| DAVID TKHILAISHVILI ) | |
| JAMBULAT TKHILAISHVILI aka ) | |
| JAMES TKHILAISHVILI ) | |
| ) | |
| Plaintiffs, ) | CIVIL ACTION NO. 16-1268-BLS |
| v.    ) | |
| ) | |
| VAHAGN VICTOR TOROSYAN ) | |
| ) | |
| and    ) | |
| ) | |
| ALLIED HEALTH CLINIC, LLC ) | |
| ) | |
| Defendants. ) | |
| ) | |

### OPPOSITION TO PLAINTIFFS'
### MOTION FOR PRELIMINARY INJUNCTION

Defendants Vahagn Victor Torosyan ("Victor") and the Allied Health Clinic, LLC (the

"Clinic") respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction

(the "Motion").

### INTRODUCTION

On the record before it, the Court cannot grant the injunction requested here on a

preliminary, summary basis. Plaintiffs David Tkhilaishvili ("David") and James Tkhilaishvili

("James") are unlikely to succeed on the merits of this case. Defendant Victor was initially the

silent partner in the Clinic. Victor provided all the funds to get the Clinic up and running,

hundreds of thousands of dollars. No one else provided any funds. In return, the Clinic

operating agreement granted Victor the final authority to decide any dispute among the members

of the Clinic and provided that there could be no distributions on account of the membership

interests in the Clinic until Victor was repaid his investment.  The Clinic operating agreement

further provided that any manager could be removed and any member's interests in the Clinic

could be forfeited for violation of the duty of good faith and loyalty to the Clinic. Victor had

express and final contractual authority to decide that their many, serious violations of the duty of

good faith and loyalty to the Clinic required James' removal as manager of the Clinic and the

forfeiture of James and David's interests in the Clinic.  This is not a simple case of a freeze-out

in a close corporation.

Victor employed his express and final authority under the operating agreement

appropriately.  David and James converted funds of the Clinic for personal expenses.  Much

worse, David and James threatened to kill Victor and his family and burn down the Clinic unless

Victor surrendered his interests in the Clinic as well as his contractual rights to finally decide all

disputes and be repaid his investment before anyone else.  These threats must be taken seriously.

Victor reported these potential crimes to the Federal Bureau of Investigation.  He has testified

before a federal grand jury about them.  Victor was fully justified in exercising his express

contractual authority in the face of such flagrant violations of the duty of good faith and loyalty

to the Clinic.

There is no irreparable harm if the request for a preliminary injunction is denied.  Victor

has advanced over $500,000 to get the Clinic established and an additional $400,000 since the

Clinic opened to offset its continuing losses during its start-up phase.  All of these funds must be

repaid to Victor before there can be any distribution on David and James' interests.

Consequently, David and James' interests presently have little or no value.  Victor, an

experienced and successful businessman, is now working daily at the Clinic and highly

motivated to ensure the Clinic becomes profitable in order to save his investment. As a result of Victor's efforts, David and James' interests can only increase in value, should the Court decide (and it should not) to restore those interests to David and James. In contrast, granting the injunction would cause irreparable harm. It would place Victor in potential mortal danger. The reintroduction into Clinic operations of David and James, incompetents accused of and under investigation for serious crimes, would spell the end of the Clinic.

Finally, there is ultimately a remedy at law available to David and James—money damages for the value of their interests in the Clinic—in the unlikely event that the Court decides this case in their favor. Where there is a remedy at law, injunctive relief cannot be granted.

## STATEMENT OF FACTS

1.  David approached Victor in the latter part of 2014 about investing in the Clinic, a new Suboxone clinic to be established at 21 School Street Suite #1, Quincy, Massachusetts. David claimed he would be ruined unless Victor invested in the new Clinic and begged him to invest. David asserted that he and his brother, James, had many years of experience in running medical clinics including Suboxone clinics. Victor was to be a silent partner, not involved in the day-to-day development of the Clinic or its subsequent day-to-day operations. Believing that the Clinic would be a good investment and placing mistaken trust in David, Victor agreed to invest in the new Clinic. Affidavit of Vahagn Victor Torosyan (the "Torosyan Aff.") filed contemporaneously herewith, ¶¶6-8.

### *Contractual measures protect Victor's investment*

2.  To protect Victor's investment, the Clinic operating agreement provided that all significant transactions and the resolution of any disputes required the approval of the two Clinic managers, Victor and James, but that, in the event of any disagreement, Victor would ultimately

decide. Torosyan Aff. ¶¶18-19.

3.      The Clinic operating agreement, finally executed in September 2015, replaced a less formal letter agreement executed by David and Victor in December 2014. The letter agreement also contained the provision granting Victor final decision making authority, demonstrating that this power was an essential part of the contract between the parties from the very start. Torosyan Aff. ¶¶10-12.

4.      The members of the Clinic held a first organizational meeting of the Clinic on May 3, 2015. At the meeting, the members confirmed that the letter agreement between David and Victor was then the operating agreement of the Clinic. David and James were present at the meeting and signed the minutes. Torosyan Aff. ¶13; Affidavit of Kenton Fabrick (the "Kenton Aff.") filed contemporaneously herewith ¶4.

5.      The Clinic operating agreement also provided that Victor would have to be repaid his investment before there could be any distributions on the interests of any other members of the Clinic. Torosyan Aff. ¶22.

6.      In addition, the Clinic operating agreement provided that any managing member of the Clinic could be removed and any member's interests in the Clinic could be forfeited for violation of the duty of good faith and loyalty to the Clinic. Torosyan Aff. ¶¶20-21.

***David and James Mismanaged the Clinic***

7.      David commenced construction renovations for the Clinic, over Victor's objection, without a building permit from the City of Quincy. The City quickly shut the project down costing the Clinic approximately $40,000. Torosyan Aff. ¶23.

8.      David used the Clinic operating account as his own personal piggybank. David paid the credit card bills for another company David owned from the Clinic operating account,

misrepresenting to Victor that all the charges were for Clinic development. David improperly

paid for multiple personal cell phone accounts for himself and James and unknown parties.

Torosyan Aff. ¶ 24. Worse still, David stole $11,000 from the Clinic in two checks that he wrote

out to himself on the Clinic operating account and cashed. Torosyan Aff. ¶ 28.

9.      Meanwhile, James contributed nothing to the Clinic, despite the representations

made to Victor that James was skilled and experienced in developing and operating medical

clinics such that James should be the other managing member of the Clinic. Victor learned later

that James has no relevant prior experience with medical clinics. James has not been involved in

any meaningful capacity in the business of the Clinic. Torosyan Aff. ¶ 25; Kenton Aff. ¶¶6-7;

Affidavit of Richard Abreu (the "Abreu Aff.") filed contemporaneously herewith ¶3.

10.     Owing to David and James' incompetence, the Clinic opened in mid-November

2015 with a full complement of staff working full time, with few patients, and no revenue

because the Clinic had not been properly credentialed with insurance providers. This failure of

business judgment caused the Clinic to incur more than $300,000 in subsequent losses that

Victor has had to fund to keep the Clinic operating. Torosyan Aff. ¶¶49-52; Kenton Aff. ¶¶8-9.

### David and James made criminal threats to Victor

11.     At a meeting on August 22, 2015, David and James threatened to kill Victor and

his family and burn down the Clinic unless Victor gave up his contractual authority in the Clinic

operating agreement to make final determinations for all disputes and transactions. David and

James bragged that they had connections with the "Russian" mafia. Torosyan Aff. ¶ 31. David

repeated these threats in a phone call to Victor on August 23, 2015. Torosyan Aff. ¶ 32.

12.     On September 12, 2015, in a face-to-face meeting, James threatened to burn down

the Clinic unless Victor surrendered 10% of his interests to friends of James. Torosyan Aff. ¶ 33.

David demanded that Victor surrender his interests in the Clinic on November 4, 2015.
Torosyan Aff. ¶34.

13.     At a climactic and frightening face-to-face meeting on November 9, 2015 behind
a locked door at the Clinic, David and James again threatened Victor. David and James again
demanded that Victor surrender 10% of his interests in the Clinic. David and James demanded
that Victor give up his right to make final determinations of all disputes and transactions at the
Clinic. David and James demanded that Victor abandon his right to be repaid his investment
before there could be any distributions on David and James' interests in the Clinic. David
threatened Victor physically. James threatened to burn down the Clinic and make Victor
disappear unless Victor agreed to David and James' demands. Torosyan Aff. ¶¶36-37; Affidavit
of Levon Jyulnazaryan (the "Levon" Aff.) filed contemporaneously herewith ¶6-8.

14.     After this, Victor became very upset. He was afraid for his family and that his
investment in the Clinic, at that time over $550,000, might be lost. He was shocked that he had
been played for such a fool. On November 11, 2015, he sought the advice of counsel. Torosyan
Aff. ¶39.

15.     Victor met with the Federal Bureau of Investigation (the "FBI") on November 24,
2015. Victor met with the FBI and the United States Attorney on December 15, 2015. Torosyan
Aff. ¶¶40-41.

16.     On December 24, 2015, Victor received a letter from the FBI informing him that
he had been identified as a possible victim of a crime. Torosyan Aff. ¶42.

17.     Victor testified before a federal grand jury about David and James' potential
criminal activities on February 17, 2016. Torosyan Aff. ¶43.

### *Victor is trying to save the Clinic*

18.     By January 2016, the situation at the Clinic had become impossible.  The Clinic was incurring substantial losses.  Torosyan Aff. ¶¶49-52; Kenton Aff. ¶¶8-9.  David and James were threatening to kill Victor and his family and burn down the Clinic unless Victor surrendered his rights.  Torosyan Aff. ¶¶ 31-38.  There was no question in Victor's mind that David and James' misconduct amounted to a gross violation of the duty of good faith and loyalty to the Clinic and that the disputes had gone on long enough.  Victor exercised his express authority under the Clinic operating agreement to remove James as the other managing member of the Clinic and to declare David and James' interests in the Clinic forfeit.  Torosyan Aff. ¶¶44-45, 47.

19.     There was a shell entity named Health Management Group, LLC ("HMG") created in parallel to the Clinic for the purpose of providing management services to the Clinic and potentially other clinics.  HMG had very limited assets, if any, and no real operations.  David purported to provide management services to the Clinic via HMG although there were no contracts between HMG and the Clinic and David did not have an employment contract.  The HMG operating agreement was a mirror image of the Clinic except that David was the other managing member besides Victor.  Because of David and James gross misconduct, Victor exercised his final decision authority under the HMG operating agreement to remove David as managing member and to declare David and James' interests in HMG forfeit.  Victor took this action on behalf of HMG at the same time as he took his action on behalf of the Clinic.  Torosyan Aff. ¶¶61-66.

20.     Notwithstanding Victor's action on behalf of HMG, David continued to pursue improper activities on behalf of HMG such as attempting to purchase dozens of cell phones and

saddle the Clinic with the bill.  To protect the Clinic, Victor cancelled HMG's registration with

the Massachusetts Secretary of State on February 9, 2016.  Torosyan Aff. ¶¶67-69.

21.     After January 7, 2016, Victor ceased being a silent investor and took over day-to-

day management responsibility at the Clinic.  Since that date, he has devoted all of his efforts to

ensuring that the Clinic achieves a profitable operating position.  Victor brought in a consulting

firm to assist with the credentialing for MassHealth, by far the most important insurance provider

for the Clinic's patient population.  The Clinic received its MassHealth billing number in the

middle of January 2016.  After Victor stepped in, he advanced approximately $200,000 in

additional funds to enable the Clinic to keep its doors open.  Torosyan Aff. ¶¶50-52.

22.     Because of Victor's efforts, the Clinic has been able to continue serving its patient

community and is presently, or soon will be, operating financially at break even.  Torosyan Aff.

¶¶53.

## ARGUMENT

23.     Factors to be considered in evaluating a request for preliminary injunction include

the moving party's claim of injury, and the likelihood of success on the merits.  *See Packaging*

*Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980).  An injunction is appropriate only

if a substantial risk of irreparable harm to the movant, viewed in light of the movant's chances of

success on its claims, outweighs the risk of harm to the non-movant.  *See John T. Callahan &*

*Sons, Inc. v. City of Malden*, 430 Mass. 124, 131 (1999).  If a remedy at law, such as money

damages, is available to the movant, injunctive relief will not be available.  *Caffyn v. Caffyn*, 70

Mass. App. Ct. 37, 42 (2007) (claim of potential monetary loss insufficient to establish

irreparable harm).

I.      **The Plaintiffs do not have a substantial likelihood of success on the merits.**

24.     The Clinic operating agreement granted Victor the final authority to decide any dispute among the members of the Clinic and provided that there could be no distributions on account of the membership interests in the Clinic until Victor was repaid his investment. *Supra* ¶2. The Clinic operating agreement further provided that any manager could be removed and any member's interests in the Clinic could be forfeited for violation of the duty of good faith and loyalty to the Clinic. *Supra* ¶6. Therefore, Victor had express and final contractual authority to decide that David and James' many, serious violations of the duty of good faith and loyalty to the Clinic required James' removal as manager of the Clinic and the forfeiture of James and David's interests in the Clinic.

25.     This is therefore not an ordinary case about a freeze-out in a close corporation. This is a case concerning whether a very clear contractual provision was properly exercised. The plaintiffs' reliance on case law involving relations between shareholders of close corporations is misplaced.

26.     David and James' attempts to cast doubt on Victor's contractual right to finally determine all disputes among the members of the Clinic are without merit. First of all, Victor was granted this final decision making authority in the initial letter agreement between David and Victor that induced Victor to invest in the Clinic project. *Supra* ¶3. The membership of the Clinic, including David and James, ratified the letter agreement as the current operating agreement of the Clinic, with the provision granting Victor final decision making authority, at the first organizational meeting of the Clinic. *Supra* ¶4. David's argument that the final operating agreement was not the one he agreed to, and James's argument that he was fraudulently induced to sign the final operating agreement are not believable. David and James

were advised in the negotiation of the final operating agreement by highly competent counsel,

Jeremy Sternberg, a partner at Holland & Knight, LLP.  Torosyan Aff. ¶16; *see also Affidavit of*

*David Tkhilaishvili Submitted in Support of Plaintiffs' Motion for Preliminary Injunction* ¶27 (".

. . I reviewed with my personal attorney").

27.     Victor was fully justified in exercising his express contractual authority in the

face of David and James' flagrant violations of the duty of good faith and loyalty to the Clinic.

David and James converted funds of the Clinic for personal expenses. *Supra* ¶8.  David and

James threatened to kill Victor and his family and burn down the Clinic unless Victor

surrendered his interests in the Clinic as well as his contractual rights to finally decide all

disputes and be repaid his investment before anyone else. *Supra* ¶¶11-13.  If these threats are not

a violation of the duty of good faith and loyalty to the Clinic, then nothing is.

28.     David and James threats made to Victor must be taken seriously.  Victor reported

these potential crimes to the Federal Bureau of Investigation. *Supra* ¶15.  He has been identified

as a victim of a crime. *Supra* ¶16.  He has testified before a federal grand jury about them.

*Supra* ¶17.  In addition, David has a history of threatening conduct.  In 2008, David admitted to

sufficient facts to support a conviction for assault with a dangerous weapon and threats to

commit a crime. For each of the criminal counts, the court continued the matter without a finding

for 18 months and ordered David to stay away from and have no contact with the victims.

Torosyan Aff. ¶¶56-57.

29.     In addition, David allegedly issued threats while providing management services

to the Suboxone clinic that operated at 21 School Street, Quincy more than a year before the

Clinic opened.  In the complaint brought by that clinic against David, it is alleged that David

threatened the physician-owner of that clinic saying that David would ensure that the physician-

owner would never be able to practice medicine in America again. In that complaint, it is also alleged, just as Victor asserts here, that David converted the funds of the clinic. Torosyan Aff. ¶¶58-59.

30.     David also attacked his girlfriend at the time at the prior clinic. Torosyan Aff. ¶60; Kenton Aff. ¶5.

31.     On this record, the Court cannot possibly conclude that David and James have a likelihood of success on the merits justifying issuance of a preliminary injunction.

**II.     There will be no irreparable harm if the request for an injunction is denied.**

31.     As an initial matter, there can be no irreparable harm here because the plaintiffs have a legal remedy available to them—money damages for the value of their interests in the Clinic—should the Court determine (and it should not) to restore David and James' interests in the Clinic to them. Where money damages are a sufficient remedy, injunctive relief cannot be granted. *Caffyn*, 70 Mass. App. Ct. at 42. Plaintiffs have made no showing that there will be irreparable harm to them if the requested injunction is not granted. David and James had no employment agreements with the Clinic. Even if there were such agreements, David and James misconduct would be more than sufficient grounds for dismissal. Even here, money damages would be an adequate remedy.

32.     In addition, there can be no irreparable harm if an injunction is not granted because Victor advanced over $500,000 to get the Clinic established and an additional $400,000 since the Clinic opened to offset its continuing losses during its start-up phase. All of these funds must be repaid to Victor before there can be any distribution on David and James' interests. Consequently, David and James' interests presently have little or no value.

33.     Victor, an experienced and successful businessman, is now working daily at the Clinic and highly motivated to ensure the Clinic becomes profitable in order to save his investment.  As a result of Victor's efforts, David and James' interests can only increase in value, should the Court decide (and it should not) to restore those interests to David and James.

34.     Plaintiffs have improperly tried to manufacture an appearance of potential harm in David and James' affidavits by making false allegations about Victor's conduct at the Clinic since he has stepped in.  The Court should disregard these allegations because they are hearsay and have no place in affidavits.  The false allegations regarding Victor involving himself in medical decisions concerning patients, altering a prescription or recording conversations or the false allegation suggesting that Dr. Johnson and medical assistant Abreu resigned on account of Victor's conduct are all based on what an unnamed person allegedly told David or what David told James that this unnamed person said (double hearsay).  Moreover, these allegations have been debunked in the Kenton and Abreu Affidavits.  *See* Kenton Aff. ¶¶ 10-13; Abreu Aff. ¶¶4-6; *see also* Torosyan Aff. ¶¶72-75.  Furthermore, Victor has never threatened anyone with a handgun.  David and James' allegations in this regard are utterly false and a cynical attempt to turn the tables on Victor by alleging that Victor, unbelievably, was the aggressor at their meetings in the fall of 2015.  *See* Torosyan Aff. ¶71; Levon Aff. ¶4-5.

35.     The Court cannot conclude on this record that the plaintiffs will suffer irreparable harm if the Court does not grant the requested injunction.

### III.     There will be irreparable harm to Victor and the Clinic if the injunction is granted.

35.     On the other hand, granting the injunction would cause irreparable harm.  It would place Victor in potential mortal danger, requiring him to work in close quarters again with individuals who have threatened to kill him.  The reintroduction into Clinic operations of David

and James, incompetents accused of and under investigation for serious crimes, would spell the end of the Clinic. After what has transpired, David, James and Victor could not possibly work together. The resulting fear and distrust would poison the operations of the Clinic, causing it ultimately to fail. The ever-growing patient population that has come to rely on the services of the Clinic would lose a much needed resource.

36.    The harm to Victor and the Clinic if the requested injunction is granted clearly outweighs the negligible harm to David and James if the injunction is not granted.


WHEREFORE, Defendants Vahagn Victor Torosyan and Allied Health Clinic, LLC respectfully request that this Court (i) deny Plaintiffs' Motion for a Preliminary Injunction and (ii) grant such other and further relief as is just and appropriate under the circumstances.


Dated:  May 5, 2015                          Respectfully submitted,

                                             VAHAGN VICTOR TOROSYAN,
                                             ALLIED HEALTH CLINIC, LLC

                                             By their attorneys,


                                             _____
                                             Paul Shaw   BBO No. 455500
                                             John C. Elstad   BBO No. 654469
                                             VERRILL DANA, LLP
                                             One Boston Place, Suite 1600
                                             Boston, MA 02108-4407
                                             Tel: (617) 309-2600
                                             pshaw@verrilldana.com
                                             jelstad@verrilldana.com

CERTIFICATE OF SERVICE

I, John C. Elstad, hereby certify that on May 5, 2016, I caused a true and accurate copy of

this Opposition to Plaintiffs' Motion for a Preliminary Injunction and attachments to be served

on the following:

By Electronic Mail
Ryan C. Siden, Esq.
Siden & Associates, P.C.
20 Park Plaza, Suite 505
Boston, MA   02116
rsiden@sidenlaw.com

*Counsel for David Tkhilaishvili and*
*James Tkhilaishvili*

<div align="center">

**COMMONWEALTH OF MASSACHUSETTS**

</div>

SUFFOLK, SS.                                                        SUPERIOR COURT

|                                          |     |                              |
|------------------------------------------|-----|------------------------------|
| DAVID TKHILAISHVILI                      | )   |                              |
| JAMBULAT TKHILAISHVILI aka               | )   |                              |
| JAMES TKHILAISHVILI                      | )   |                              |
|                                          | )   |                              |
| Plaintiffs,                              | )   | CIVIL ACTION NO. 16-1268-BLS1 |
| v.                                       | )   |                              |
|                                          | )   |                              |
| VAHAGN VICTOR TOROSYAN                    | )   |                              |
|                                          | )   |                              |
| and                                      | )   |                              |
|                                          | )   |                              |
| ALLIED HEALTH CLINIC, LLC                | )   |                              |
|                                          | )   |                              |
| Defendants.                              | )   |                              |
|                                          | )   |                              |

<div align="center">

**AFFIDAVIT OF VAHAGN VICTOR TOROSYAN**

</div>

I, Vahagn Victor Torosyan, one of the Defendants in the above captioned action, on oath

depose and state as follows:

1.      I am a naturalized citizen of Armenian origin.

2.      I live in Watertown, Massachusetts.

3.      I own and operate an auto repair shop in Belmont, Massachusetts and have other

investments and business interests.

4.      I have been acquainted with David Tkhilaishvili ("David") for approximately six

years.  I mistakenly trusted him and considered him a friend.  For a period of time, David ran a

transportation company.  His cars were serviced at my auto repair shop and I instructed his

drivers on the proper operation and care of the vehicles.  David hoped to involve me in a home

<div align="center">

1

</div>

health care company concept that he had. To my knowledge, nothing came of this idea. On several occasions, David asked me to help him by providing small loans to which I agreed. In the early years of our relationship, David won my confidence by repaying these small loans.

5.     David and Jambulat Tkhilaishvili ("James") and I communicate in Russian. I speak English, Armenian and Russian. David is from the country of Georgia in the former Soviet Union. David speaks English very poorly and he otherwise communicates in Georgian or Russian. James is David's brother and is also from Georgia. James cannot speak English. He communicates in Georgian or Russian.

### *Clinic Background*

6.     In the latter part of 2014, David approached me about investing in a new Suboxone clinic to be established at 21 School Street Suite #1, Quincy, Massachusetts (subsequently organized in Massachusetts as the Allied Health Clinic, LLC, herein the "Clinic").

7.     David claimed he would be ruined unless I invested in the new Clinic and begged me to invest. David asserted that he and his brother had many years of experience in running medical clinics including Suboxone clinics. I was to be a silent partner, not involved in the day-to-day development of the Clinic or its subsequent day-to-day operations.

8.     Believing that the Clinic would be a good investment and placing mistaken trust in David, I agreed to invest in the new Clinic.

### *Contractual measures protect Victor's investment*

9.     To convince me to invest in the Clinic, David promised to repay me for 50% of my investment in the Clinic if the Clinic closed and I did not recover my investment in it. David pledged his interest in a pizza business to secure this guarantee. *See* paragraph 3 of the letter agreement dated December 11, 2014 between David and myself attached hereto as <u>Exhibit A</u>

2

(the "Letter Agreement").

10.    Pursuant to the letter agreement, all decisions required the unanimous approval of the "Class A Members" who were James and myself. *See* Letter Agreement term sheet at 2. However, owing to the size of the anticipated investment in the Clinic, I insisted upon significant protections. Most importantly, the Letter Agreement gave me the power to decide any disputed issue:

> [U]ntil Victor recovers his entire investments in [the Clinic] and [the associated management entity], in the event of a deadlock on any matter voted on by Victor and [James], Victor will have the authority to decide the matter; provided, however, that Victor's decision on such matter must be made in his reasonable judgment regarding what is in the best interest of [the Clinic].

Letter Agreement term sheet at 3.

11.    My power to make final determinations was repeated in the "Miscellaneous" section of the Letter Agreement:

> Notwithstanding anything to the contrary herein, Victor has the authority to make a final determination with respect to any decision of the members or Class A Members or any other decision concerning [the Clinic] until Victor recovers his entire investments in [the Clinic].

Letter Agreement term sheet at 4.

12.    David and I signed the Letter Agreement and initialed every page of the term sheet attached to it.

13.    The members of the Clinic met for its first organizational meeting on May 3, 2015. I was elected chairperson of the meeting and Kenton Fabrick was elected secretary. James and David were both at the meeting. At the meeting, the members agreed the Letter Agreement was the operating agreement of the Clinic. The minutes of the meeting confirm the members' agreement that the Letter Agreement was the operating agreement of the Clinic. James and David signed the minutes of the meeting. A copy of the minutes of the May 3, 2015

3

meeting are attached hereto as Exhibit B.

### *The Letter Agreement and first meeting minutes are incorporated into an operating agreement in proper form*

14.    The Clinic was represented by Krokidas & Bluestein LLP ("Krokidas") in its efforts to obtain a license from the Department of Health ("DPH") to operate a Suboxone clinic.

15.    Krokidas advised that the Clinic required an operating agreement in proper form to support its DPH application. Krokidas, representing the Clinic, drafted the *Amended and Restated Operating Agreement of Allied Health Clinic, P.C.* as of September 11, 2015 (the "Clinic Operating Agreement" attached hereto as Exhibit C).

16.    I was represented in the negotiation of the Clinic Operating Agreement by Verrill Dana LLP. David and James were represented by Jeremy Sternberg, a partner at Holland & Knight LLP.

17.    David and James signed the Clinic Operating Agreement along with two other anticipated employees of the Clinic who hold minimal membership interests. The Clinic Operating Agreement amended, restated and ratified (to the extent consistent) the Letter Agreement between David and me that had been adopted as the operating agreement of the Clinic at the first organizational meeting of the members of the Clinic on May 3, 2015.

18.    Pursuant to the Clinic Operating Agreement, all significant transactions of the Clinic require the "Consent of the Class A Members" (a defined term, hereinafter called the "Special Consent Authority"). Pursuant to the Special Consent Authority, all significant transactions require:

> until such time as the Torosyan Capital has been returned in full through distribution or otherwise and the Torosyan Loans have been repaid in full, the consent or approval of both Class A Members [Victor and James], provided, however, that in the event that both Class A Members are not in agreement on the matter at issue, *the matter shall be decided by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC.* (emphasis added)

4

Clinic Operating Agreement at 29-30.

19.     In addition, with respect to the management of the Clinic, the Clinic Operating
Agreement provides that "Notwithstanding anything to the contrary herein, any dispute between
the Managers that occurs prior to the return of the Torosyan Capital and repayment of the
Torosyan Loans will be decided by Vahagn Victor Torosyan in his sole discretion." Clinic
Operating Agreement at 11. James and I are the managers of the Clinic under the Clinic
Operating Agreement.

20.     The Clinic Operating Agreement provides that "The Managers shall have a
fiduciary duty of good faith and loyalty to the [Clinic], and any violation of such duty will be
grounds for immediate removal as a Manager by the Consent of the Class A Members." Clinic
Operating Agreement at 3.

21.     The Clinic Operating Agreement further provides that "The Members shall have a
fiduciary duty of good faith and loyalty to the Company, and any violation of such duty by a
Member will be grounds for forfeiture of such Member's entire Interest upon the Consent of the
Class A Members." Clinic Operating Agreement at 4-5.

22.     In addition, the Clinic Operating Agreement provides that, to the extent that funds
of the Clinic are available for distribution, such funds shall be distributed first in repayment of
Member loans and second in repayment of Member capital contributions (the "Priority
Distribution"). Clinic Operating Agreement at 5-6. My capital contribution was $200,043.45;
the capital contributions of the other members were minimal. Clinic Operating Agreement at
Schedule I. I have advanced over $700,000 in additional funds to support the Clinic start-up.

### David and James' Mismanagement of the Clinic

23.     I began to have misgivings about the capabilities and trustworthiness of David

5

and James in connection with the renovations for the new Clinic. The construction work was to commence in December 2014. I insisted that the construction work could not begin without a building permit from the City of Quincy. David commenced the construction work without a permit over my objection. The City of Quincy quickly shut the project down resulting in a three month delay. The Clinic incurred approximately $10,000 in legal fees and approximately $30,000 in other expenses because of this mistake.

24.     David continued to use the credit card of a prior management company he operated, Davis Clinic Management, Inc., and paid the resulting credit card statements from the new Clinic's operating account at Bank of America. I would transfer funds to the Clinic operating account from my own personal funds when needed upon David's request. David told me that the charges were associated with the build-out of the Clinic. I later learned that many of them were not. I have learned that the charges included payment of a staff person's personal car insurance in March 2015. The charges included payment for 5 personal cell phone accounts, including personal cell phone accounts for David and James. The Clinic does not provide for personal cell phones for members or staff. I do not have a personal cell phone paid by the Clinic. The Clinic supervisor, Kenton Fabrick, does not have a personal cell phone paid by the Clinic.

25.     I have also learned that David misrepresented his brother James' capabilities and experience. In fact, James has no relevant prior experience with medical clinics. James has not been involved in any meaningful capacity in the business of the Clinic. Over the approximately one year that it took to get the Clinic up and running, I have seen James at the Clinic on only three occasions and on two of those occasions his only role was to assist David in threatening me—the other occasion was a party.

6

*David and James become more aggressive*

26.      The Clinic received a certificate of occupancy from the City of Quincy on or

about August 16, 2015.  Once we received the certificate of occupancy, we were confident that

we would obtain a license to operate as a Suboxone clinic from the Department of Public Health

(the "DPH").  The Clinic received its license from the DPH on October 8, 2015.

27.      Contemporaneously with the receipt of the certificate of occupancy, I noticed a

change in the attitude of David and James towards me.  They began to behave aggressively

towards me.

28.      As the silent investor, I periodically reviewed the transactions on the Clinic

operating account.  I discovered that on August 21, 2015, David wrote himself a check for

$5,000 on the Clinic bank account at Bank of America.  (Attached hereto as <u>Exhibit D</u>).  On

August 22, 2015, David wrote himself a check for $6,000 on the Clinic bank account at Bank of

America.  (Attached hereto as <u>Exhibit E</u>).  He cashed both checks and took the cash with him

overseas on a trip to Georgia.  David told me that he was going home to see his wife.  I had

agreed to pay for David's plane fare to see his wife provided he paid me back.  I had no prior

knowledge of David's theft of the $11,000 from the Clinic unrelated to plane fare, and I did not

approve it.

29.      When I asked David and James why their attitude towards me seemed to have

changed, David said words to the effect that "We don't need you telling us what to do anymore."

*David and James begin to threaten Victor*

30.      Before the annual meeting of the Clinic membership at the Clinic on August 22,

2015, David, James and I met privately.  David and James requested that I release the security

interest in the pizza business owned by David that secured David's personal guarantee of 50% of

my investment in the Clinic.   They said that they needed the release so they could sell this

business and work full time at the Clinic.  I agreed, thinking this would be good for the Clinic.

31.     Once I signed the release, however, David and James began to threaten me.  They

demanded that I give up my ultimate authority over the Clinic – the Special Consent Authority.

They threatened to harm me and my family unless I abandoned the Special Consent Authority.

David said that there were nine people who had a problem with him in the past and he had made

all of them with their families disappear.  In addition, David and James threatened to burn down

the Clinic if I did not abandon the Special Consent Authority.  To back up their threats, David

and James said that "they don't give a fuck about any contract and, God forbid, if someone wants

to go against them, they will fuck that person up until he is gone."  If they have to, they said,

"they will put a bullet in that person's head."  They said that they were going to get "ten Russian

Mafia members" involved.  In order to buy time, I said I would think about it.

32.     On a phone call on August 23, 2015, David said that his brother James had shot a

neighbor in the head back in their home country of Georgia.  David said that he had arranged for

nine people to disappear and he could make me disappear too.  David said that he and his brother

lived the "outlaw" life and paid no heed to the law or contracts.

33.     On September 12, 2015, James came to my auto repair shop in Belmont to sign

the Clinic Operating Agreement.  James fully understood that he was signing the Clinic

Operating Agreement.  During that visit to me, James demanded that I surrender 10% of my

interests in the Clinic.  James said that he wanted to bring his friends into the business of the

Clinic and that he intended to give 5% of my interests to one friend named Saba and sell the

other 5% interest to another friend.  James threatened to burn down the Clinic, unless I agreed to

surrender 10% of my interests.  To buy time and to avoid a scene in front of customers and

8

employees at my business, I said I would think about it.

34.      On November 4, 2015, David also demanded that I surrender some of my interests in the Clinic. David demanded that I surrender 5% of my interests in the Clinic so that the friend, Saba, who had not worked in 10 to 15 years, could be brought into the business of the Clinic. I protested that only professionals with experience in medical clinics should be brought in.

35.      On Sunday November 8, 2015, David called me and asked me to meet at the Clinic the next day. I agreed.

36.      At the Clinic the next day, November 9, 2015, David and James requested that I talk with them in private in an exam room. David and James closed and locked the door to the exam room and then unleashed a barrage of threats. David and James demanded that I surrender 5% of my interests in the Clinic to a friend of David's immediately. They repeated their demand that I give up an additional 5% of my interests in the Clinic, but at a later date. They demanded that I give up my Special Consent Authority. They demanded that I give up my Priority Distribution right and that instead 40% of any Clinic funds available for distribution should go to David. David screamed and pounded the table. He made to strike me with his fists but James restrained him. Then, David left the exam room.

37.      When James and I were alone in the exam room, James said that I had to agree to their demands or otherwise he would burn the Clinic down and make me disappear. I believe that James is even more dangerous than his brother David. In the parking lot afterwards, I observed James remove a large switch blade from the glove compartment of David's car.

38.      I spoke again with David on November 11, 2015. In that conversation, David said that he can't control his brother James.

9

*Victor seeks help*

39.     By this time, I was very upset.  I realized that I had placed mistaken trust in David.  I was afraid for my family.  It appeared that my investment in the Clinic, at that time over $550,000, might be lost.  I believed that I had been a fool.  On November 11, 2015, I sought the advice of counsel at Verrill Dana LLP who had previously represented me in documenting the Clinic Operating Agreement.

40.     I have sought help from the authorities.  On November 24, 2015, I met at counsel's office with agents from the Federal Bureau of Investigation (the "FBI").  I have cooperated with the FBI in their investigation.

41.     On December 15, 2015, I met with FBI agents and the United States Attorney at the United States Attorneys' Office.

42.     On or about December 24, 2015, I received a letter from the FBI informing me that I had been identified as a possible victim of a crime.  A copy of the victim notification letter is attached hereto as Exhibit F.

43.     On February 17, 2016, I testified before a federal grand jury about my knowledge of the potential criminal activities of David and James.  A copy of the Subpoena to Testify before a Grand Jury is attached hereto as Exhibit G.

*Victor takes action to preserve his investment*

44.     On January 6, 2016, I took action to end the intolerable situation at the Clinic.  I determined that James' use of Clinic funds for personal cell phones and his attempts to extort concessions from me by threatening to burn down the Clinic and harm myself and my family were grounds for his removal as manager of the Clinic as a breach of the fiduciary duty of good faith and loyalty to the Clinic. I also took into consideration the misrepresentation of James'

capabilities and experience in running a medical clinic. I further determined that the disputes with James had gone on for months and that any further discussion was futile and dangerous. I determined that the removal of James as manager was in the best interests of the Clinic and employed my Special Consent Authority to remove James as manager.

45.     I also determined that David and James' use of Clinic funds for personal expenses and their attempts to extort concessions from me by threatening to burn down the Clinic and harm myself and my family were grounds for the forfeiture of their interests in the Clinic as a breach of the fiduciary duty of good faith and loyalty to the Clinic. I also took into consideration the many misrepresentations that David and James had made to me. I further determined that the disputes with David and James had gone on for months and that any further discussion was futile and dangerous. I determined that the forfeiture of David and James' interests in the Clinic was in the best interests of the Clinic and employed my Special Consent Authority to declare their interests forfeit.

46.     Because the Clinic is in a very difficult financial position and is obligated to repay the substantial loans I have made to it as well as my capital contribution before there can be any distribution on the interests of the Clinic, the interests of the Clinic presently have no value.

47.     I took the foregoing steps in the "Action by Written Consent of the Class A Members in Lieu of Special Meeting" attached hereto as Exhibit H. David and James were provided notice of my actions by letter from my counsel on January 7, 2016.

48.     After January 7, 2016, I ceased being a silent investor and took over day-to-day management responsibility at the Clinic. Since that date, I have been devoting all my efforts to ensuring that the Clinic achieves a profitable operating position.

*The Clinic is in a difficult financial position*

11

49.     The Clinic began treating patients on November 16, 2015. The Clinic employees also commenced work full time on November 16, 2015. The Clinic, however, had not completed the credentialing process to obtain insurance billing numbers. Because of David and James' incompetence, the Clinic opened fully staffed with few patients, without being properly credentialed with insurance providers, no insurance billing numbers and, consequently, no revenue.

50.     I brought in a consulting firm to assist with the credentialing for MassHealth, by far the most important insurance provider for the Clinic's patient population. The Clinic received its MassHealth billing number in the middle of January 2016, two months later. The Clinic received its first insurance provider payment on January 22, 2016 in the amount of $204.61. To date the Clinic has received only approximately $133,000 in revenue.

51.     Weekly average Clinic expenses are $$20,000. As a result, I have had to advance still more funds to the Clinic to keep the doors open.

52.     From late 2014 through October 8, 2015, the date the Clinic received its DPH license, my outlay for the Clinic, capital contribution and loans, amounted to approximately $511,000. Neither James nor David nor any other person contributed any funds to support the Clinic during this time. Since October 8, 2015 through January 11, 2016, before I became involved in day-to-day Clinic operations, I have been forced to loan the Clinic approximately $200,000 more to maintain operations. As of January 11, 2016, my total outlay had increased to approximately $721,000. Since January 11, 2016, I have advanced approximately another $200,000 and my total outlay has increased to $916,000.

53.     The Clinic is presently billing at a rate that would cover its expenses and, taking into account the lag time between billing and insurance provider payment, I anticipate the Clinic

12

will soon be operating at break even.

54.     I have not taken any distribution from the Clinic. I stopped drawing a salary from the Clinic in early November, 2015, before the Clinic opened.

### David's Prior Threatening Conduct

55.     I have learned that David has a prior history of threatening conduct and appears to have caused similar problems at the clinic previously at the 21 School Street, Quincy location.

56.     On or about July 12, 2008, David was charged in one criminal complaint with three counts of assault with a dangerous weapon (a pistol) and one count of improper storage of a firearm. (A copy of the record in the West Roxbury District Court is attached hereto as Exhibit I). In a second criminal complaint, David was charged with three counts of witness intimidation and three counts of threats to commit a crime.  According to the police report, David left a phone message with the victim threatening to "Put a fucking bullet in his head" and, if the police were contacted, David and a confederate would "Screw all of their families up." (A copy of the record is attached hereto as Exhibit J).

57.     David admitted to sufficient facts to support a conviction for each of the three assault with a dangerous weapon charges, the improper firearm storage charge and the three threats to commit a crime charges. For each of these criminal counts, the Court continued the matter without a finding for 18 months or until August 25, 2010 and ordered David to stay away from and have no contact with the victims.

58.     In addition, Davis Health, P.C., the operator of a Suboxone clinic at the 21 School Street, Quincy location during parts of 2013 and 2014, filed a complaint against David and his entity, Davis Clinic Management, Inc. on May 1, 2014 in Norfolk Superior Court. A copy of the amended complaint is attached hereto as Exhibit K. In the amended complaint, it is alleged that

13

David and a confederate threatened Dr. Kurt Fabrick, the medical director, and other employees of that clinic. The amended complaint specifically alleges that "[David] and another individual, not an employee of Davis Health, entered an area where patient records were in view and directed Dr. Fabrick's subordinates not to follow his orders. They said they would make sure that Dr. Fabrick would never be able to practice medicine anywhere in America. . . . David and his friend told the employees that Dr. Fabrick was 'going down' and anyone associated with Dr. Fabrick was 'going down with him.'" Amended Complaint ¶¶ 35-36.

59.     It is also alleged in the Davis Health complaint that David fraudulently represented that he had the expertise to develop and manage a medical practice for Davis Health when in fact he had no such experience or any degree or credential that qualified him to manage a medical clinic. Amended Complaint ¶¶ 8-10, 17.   It is also alleged in the Amended Complaint that David took over the finances of Davis Health and converted its funds.  Amended Complaint ¶¶ 13-16, 30.

60.     I have also learned that David attacked his girlfriend at the prior clinic at 21 School Street, Quincy approximately two years ago.  When I inquired about this incident, David confirmed to me that he had done so.  I have also learned that in July of 2015, David became very violent at the Clinic, screaming, pounding the table and threatening one of the employees. When I asked David about this incident, David confirmed to me that he had done this also, saying "They have to learn the hard way."

### Victor's decision to cancel Health Management Group, LLC

61.     There was another entity established in parallel to the Clinic called Health Management Group, LLC ("HMG").  Its intended purpose was to provide management services to the Clinic and other clinics to be established  once the Clinic became a success.

62.     The operating agreement for HMG was identical to the Clinic Operating

Agreement in most significant respects.  A copy of the HMG operating agreement is attached

hereto as Exhibit L.  David and I were the managers and the Class A Members under the HMG

operating agreement.

63.     HMG had very limited assets and no operations.  HMG had no contracts with the

Clinic.  David does not have an employment contract with the Clinic and does not have one with

HMG. On behalf of HMG, David purported to provide management services to the Clinic.  In

fact, his direction of the Clinic was incompetent and he used his involvement with the Clinic to

steal its funds.

64.     Accordingly, on January 6, 2016, at the same time that I took action to end David

and James involvement with the Clinic, I took action to end their involvement with HMG.  I

determined that David's use of Clinic funds for personal expenses and his attempts to extort

concessions from me by threatening to burn down the Clinic and harm myself and my family

were grounds for his removal as manager of the HMG as a breach of the fiduciary duty of good

faith and loyalty. I further determined that the disputes with David had gone on for months and

that any further discussion was futile and dangerous.  I determined that the removal of David as

manager was in the best interests of HMG and employed my Special Consent Authority to

remove David as manager.

65.     I also determined that David and James' use of Clinic funds for personal expenses

and their attempts to extort concessions from me by threatening to burn down the Clinic and

harm myself and my family were grounds for the forfeiture of their interests in HMG as a breach

of the fiduciary duty of good faith and loyalty. I further determined that the disputes with David

and James had gone on for months and that any further discussion was futile and dangerous.  I

determined that the forfeiture of David and James' interests in the Clinic was in the best interests of HMG and employed my Special Consent Authority to declare their interests forfeit.

66. I took the foregoing steps in the "Action by Written Consent of the Class A Members in Lieu of Special Meeting" attached hereto as Exhibit M. David and James were provided notice of my actions by letter from my counsel on January 7, 2016.

67. Notwithstanding my Action by Written Consent, David continued to hold himself out as representing HMG. On several occasions, David sought to purchase dozens of cell phones from telecommunications carriers on behalf of HMG and gave the Clinic's address and phone number as his place of work in his applications. When the telecommunications carriers would call the Clinic to confirm the request, I instructed Clinic staff to deny the request.

68. I cannot conceive of any legitimate purpose for the request for dozens of cell phones on behalf of HMG. I feared that the cell phones would be sold on the black market for improper purposes and that the Clinic would be stuck with the bill to the telecommunications carriers.

69. Because HMG had no assets and no operations and was still being used by David for improper purposes, putting the Clinic at risk, I instructed Krokidas, on or about February 9, 2016, to file a certificate of cancellation for HMG with the Massachusetts Secretary of State.

***False allegations in David and James' affidavits***

70. I have read David and James' affidavits in support of their motion for a preliminary injunction. I believe that I must contradict certain of the false allegations made in these affidavits to the extent I have not already contradicted them in what I have written above.

71. I have a license to carry a handgun. David knows this because he was once a friend and we have been to a shooting range together. I have never threatened anyone with my

handgun.

72.    I do not make and have never made medical decisions for patients at the Clinic. I did not change a pharmacy prescription for a patient.

73.    Dr. Susan Johnson did resign her position at the Clinic but not for the reasons alleged in David and James' affidavits, but instead for personal reasons  Since her resignation, Dr. Johnson has indicated a desire to start working at the Clinic again.

74.    Richard Abreu, medical assistant, resigned his position at the Clinic to take a better, higher-paying job.

75.    I do not and have never recorded patient and staff conversations at the Clinic without their consent.

Signed under the pains and penalties of perjury this ⁵ day of May, 2016.

Vahagn Victor Torosyan

# EXHIBIT A

## To Affidavit of Vahagn Victor Torosyan

December 11, 2014

David Tkhilaishvili
7 Seaport Drive, Apt. 608
Quincy, MA 02171

Re:     Terms for Allied Health Clinic, LLC and Health Management Group, LLC

Dear David:

This letter agreement and Exhibit A hereto ("Agreement") set forth our agreement in principle concerning the formation, structure, and operations of Allied Health Clinic, LLC ("AHC") and Health Management Group, LLC ("HMG").

1.      As we have discussed, AHC will be an operating company that provides some combination of primary care and substance abuse services to its patients.  HMG will be a management company that provides operations and administrative functions for AHC pursuant to a Management Services Agreement to be executed between AHC and HMG.

2.      Our collective vision for AHC and HMG will be documented in, among other agreements and legal documents, Operating Agreements for each of AHC and HMG and a Management Services Agreement between AHC and HMG, each of which will be consistent with Exhibit A.

3.      As described on Exhibit A, you and I will execute a separate Letter Agreement and other documents as necessary pursuant to which I will lend you approximately twenty thousand dollars ($20,000) (subject to the execution of Operating Agreements for AHC and HMG and with terms to be negotiated) and you will agree to be fully responsible for fifty percent (50%) of my investment in AHC and HMG in the event that I do not recover my full investment in AHC and HMG.  By way of your signature below, you hereby agree to be fully responsible, and hereby pledge your interest in your pizza business operating as Classic Pizza I Incorporated (of which you are the sole owner) as security for, fifty percent (50%) of any funds I contribute to AHC and HMG.  You will not change your interest in Classic Pizza I Incorporated (by sale, transfer, or otherwise) or the operations of Classic Pizza I Incorporated without my prior written approval.  At the time of their execution, such Letter Agreement and other documents will supersede this paragraph.

4.      This Agreement is binding upon both of us except as we may otherwise mutually agree in the future.  We agree to cooperate and negotiate in good faith with respect to the execution of the legal documents necessary to form and operate AHC and HMG and the

David Tkhilaishvili
December 11, 2014
Page 2

Letter Agreement and related documents described in Paragraph 3 in an expeditious manner.

5.     This Agreement will continue in force and effect unless and until we mutually agree to terminate it.  This Agreement may not be amended except in a written agreement signed by both of us.

6.     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without regard to the conflict of laws principles thereof.

7.     None of the provisions of this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

If you are in agreement with the terms of this Agreement (including Exhibit A), please sign below and return it to me at your earliest convenience.  This Agreement may be executed in two counterparts, each of which will be deemed to be an original and both of which taken together shall constitute one and the same instrument.

Very truly yours,

Vahag Victor Torosyan

Accepted and agreed:

David Tkhilaishvili
Date: 12-12-2014

5751346

FINAL DRAFT

### Exhibit A

### Operating Agreement of Allied Health Clinic, LLC ("AHC")

Members and Membership Interests

| Name | Membership Interest |
|---|---|
| **Class A Members** | |
| Jambulat Tkhilaishvili | 45% |
| Vahag Victor Torosyan | 41% |
| **Class B Members** | |
| Kenton Fabrick | 5% |
| David Tkhilaishvili | 4% |
| Nato Rusia | 5% |

- Each member in AHC will be 100% vested as of the effective date of AHC's Operating Agreement (subject to exceptions for Kenton and Nato that will be agreed upon by Victor and Jambulat).

- Five years after the effective date of the AHC Operating Agreement, Jambulat will transfer 5% of his membership interest to Olga Dorofyeyeva pursuant to a separate agreement between Jambulat and Olga.

- Jambulat cannot sell his shares in AHC without first providing Victor a right of first refusal to purchase those shares.  Victor cannot sell his shares in AHC without first providing Jambulat a right of first refusal to purchase those shares.

- If a member transfers his/her membership interests to another member (by sale or otherwise) or if a member's interests are redeemed, the parties will retain a certified public accountant to determine the adjusted book value of the membership interests.

- Health and dental insurance will be provided (directly or through a stipend) by AHC or HMG (as defined below) for all members of AHC when AHC's clinic becomes operational subject to the approval of the Class A Members.

- AHC will make distributions, at least annually, to its members to cover their tax liability. The Class A Members will determine the timing and amounts of all other distributions. Distributions will be made consistent with a member's interest in AHC.

 V. T

1

FINAL DRAFT

- All decisions to be made by the members of AHC will be made by the unanimous approval of both Class A Members. For purposes of clarity, the following major decisions require the unanimous written approval of both Class A Members:

    a) Approval of strategic plans for AHC;

    b) Approval of the annual capital and operating budgets of AHC;

    c) Any amendment, or modification of AHC's Operating Agreement;

    d) The scoping out of new management opportunities, including the recruiting of investors to establish new outpatient treatment facilities which AHC would manage;

    e) The acquisition by AHC in any manner of any such interest in any entity;

    f) Approval of borrowing or lending of funds for the LLC in excess of $1,000, including borrowing of funds necessary to finance the cost of compliance with operational or physical plant standards required by applicable law;

    g) Approval of expenditures not authorized by, or included within, the annual budget;

    h) Approval of the acquisition, sale, lease, pledge, mortgage or other encumbrance or disposition of any assets of AHC;

    i) A merger, consolidation or reorganization of the corporate structure or the dissolution of AHC;

    j) The engagement of legal counsel for AHC;

    k) Authorization of contracts by AHC which are in excess of $1,000;

    l) Ratification of settlements of claims and litigation when such claims or settlements exceed applicable insurance coverage; and

    m) Approval of any loan by AHC.

- Other major decisions by Class A Members will also require the unanimous written approval of both Class A Members.

- If there is a deadlock and they cannot agree, Jambulat and Victor will work with their respective attorneys to negotiate in good faith for 30 days. If after 30 days there is a still a deadlock, Jambulat and Victor will use mediation to resolve the conflict.

D T                      2                   V. T

* Notwithstanding the foregoing, until Victor recovers his entire investments in AHC and HMG, in the event of deadlock on any matter voted on by Victor and Jambulat, Victor will have the authority to decide the matter; provided, however, that Victor's decision on such matter must be made in his reasonable judgment regarding what is in the best interests of AHC. Neither one can take out any loans under the business name or take out any money.
* Once Victor recovers his entire investments in AHC and HMG, Jambulat and Victor will have equal voting authority as Class A Members and in the event of deadlock, the provisions set forth above will control.
* The Class A Members have the right of first refusal to purchase any member's interest before it is transferred to a third party.

Capital Contributions

* Victor will receive 100% of his investment of $300,000 back from AHC as described below, and once he receives that $300,000 from AHC, that $300,000 will be kept by Victor for the purposes of investing into clinic satellites in the future if such investments are determined by Victor to be appropriate. (If any extra funds are needed over $300,000 for satellites, Class A Members will decide where to obtain such funds.) If Victor contributes additional amounts over $300,000 up to $500,000, he will be repaid those amounts in full and such amounts will be subject to no restrictions on future use. These amounts are not subject to any interest.

    o Funds invested by Victor up to $300,000 shall be paid back to Victor monthly in payments of sixty percent (60%) of AHC's Net Profits (as defined below) until the full amount (up to $300,000) is paid back to Victor. "Net Profits" shall mean 100% of revenue collected by AHC for the outpatient treatment facility's services less expenses, including only utilities, rent, supplies, equipment leases, salaries, payments to the management company for services, marketing, leasehold improvements, and other standard operating expenses.

    o Regardless of AHC's Net Profits or circumstances, funds invested by Victor over $300,000 (up to $500,000) will be paid back to Victor in equal monthly installments beginning the month that AHC becomes operational such that Victor receives his entire investment over $300,000 (up to $500,000) within one year of the date upon which AHC becomes operational. For example purposes only, in the event that Victor invests an additional $100,000 over $300,000 in AHC, Victor will be repaid such $100,000 in monthly installments of $8,333.33 starting the month that AHC becomes operational.



3



* Victor's initial capital contributions will be used for build-out of leased space at 21 School Street, Quincy, Massachusetts (including Suite #1 and if obtained, Suite #2 at such location) as well as for initial operating costs of AHC.

## Management and Salaries

* Management services will be provided through a contract between AHC and HMG.

## Miscellaneous

* Notwithstanding anything to the contrary herein, Victor has the authority to make a final determination with respect to any decision of the members or Class A Members or any other decision concerning AHC until Victor recovers his entire investments in AHC and HMG. Once Victor recovers his entire investments in AHC and HMG, Victor will have no such final determination authority and all decisions will be made by the Class A Members.

* The AHC Certificate of Organization will be amended upon execution of the Operating Agreement.

* Notwithstanding M.G.L. ch. 156C, § 7, no members can encumber AHC in any way (including by loan, credit agreement, or otherwise), borrow any funds from AHC, or transact any business with AHC without the prior written approval of both Class A Members. No members can use company funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the company's assets as collateral for a loan) without the prior written approval of both Class A Members. No members can in any way transfer to AHC any personal debt or the debt of any business in which the member is currently, or has in the past been, involved. For purposes of clarity, the approval of either, but not both, Class A Members, will not be sufficient to authorize the foregoing actions. Notwithstanding anything to the contrary, Victor cannot overrule Jambulat with regards to the matters set forth in this bullet regardless of whether Victor has been repaid his entire investment.

* No member in AHC will have any personal liability for the debts of AHC in accordance with M.G.L. ch. 156C, § 22.

* No members can open any separate medical business, satellite, or other business in any way related to the clinic operated by AHC (including an outpatient opioid addiction clinic or other facility that provides services/treatments to opioid addicted patients) at any time during such Member's involvement in AHC or thereafter for as long as AHC is in operation without prior written approval of both Class A Members.

DT

4

V.

- In the event that a new investor agrees to invest in AHC or any new entity formed by all or some of the members in AHC, Victor will receive 40% of the profits/distributions from that investment unless Victor bring that investment into the Company, in which case Victor will receive 60% of the profits/distributions from that investment. No members of AHC other than Victor, Jambulat, and David will receive any profits/distributions from that investment. The parties acknowledge and agree that this bullet will not be included in the AHC Operating Agreement.

- In the event that AHC ceases operations or dissolves, after making required payments to third parties, AHC's funds will be distributed to Victor until Victor's entire initial investments in AHC and HMG are repaid. Only thereafter will AHC's funds be distributed to the members of AHC (including Victor) in accordance with their membership interests.

## Operating Agreement of Health Management Group, LLC ("HMG")

Members and Membership Interests

| Name | Membership Interest |
|------|---------------------|
| **Class A Members** | |
| Vahag Victor Torosyan | 41% |
| David Tkhilaishvili | 40% |
| **Class B Members** | |
| Kenton Fabrick | 5% |
| Jambulat Tkhilaishvili | 5% |
| Olga Dorofyeyeva | 5% |
| Nato Rusia | 4% |

- Each member in HMG will be 100% vested as of the effective date of HMG's Operating Agreement.

- David cannot sell his shares in HMG without first providing Victor a right of first refusal to purchase those shares. David cannot sell his shares in HMG without first providing Victor a right of first refusal to purchase those shares.

- If a member transfers his/her membership interests to another member (by sale or otherwise) or if a member's interests are redeemed, the parties will retain a certified public accountant to determine the adjusted book value of the membership interests.



5



**FINAL DRAFT**

- Health and dental insurance will be provided (directly or through a stipend) by AHC or HMG for all members of AHC when AHC's clinic becomes operational subject to the approval of the Class A Members.

- HMG will make distributions, at least annually, to its members to cover their tax liability. The Class A Members will determine the timing and amounts of all other distributions. Distributions will be made consistent with a member's interest in HMG.

- All decisions to be made by the members of HMG will be made by the unanimous approval of both Class A Members. For purposes of clarity, the following major decisions require the unanimous written approval of both Class A Members:

  a) Approval of strategic plans for HMG;

  b) Approval of the annual capital and operating budgets of HMG;

  c) Any amendment, or modification of HMG's Operating Agreement;

  d) The scoping out of new management opportunities, including the recruiting of investors to establish new outpatient treatment facilities which the HMG would manage;

  e) The acquisition by HMG in any manner of any such interest in any entity;

  f) Approval of borrowing or lending of funds for the LLC in excess of $1,000, including borrowing of funds necessary to finance the cost of compliance with operational or physical plant standards required by applicable law;

  g) Approval of expenditures not authorized by, or included within, the annual budget;

  h) Approval the acquisition, sale, lease, pledge, mortgage or other encumbrance or disposition of any assets of HMG;

  i) A merger, consolidation or reorganization of the corporate structure or the dissolution of HMG;

  j) The engagement of legal counsel for HMG;

  k) Authorization of contracts by HMG which are in excess of $1,000;

  l) Ratification of settlements of claims and litigation when such claims or settlements exceed applicable insurance coverage; and



6

FINAL DRAFT

   m) Approval of any loan by HMG.

- Other major decisions by Class A Members will also require the unanimous written approval of both Class A Members.

- If there is a deadlock and they cannot agree, David and Victor will work with their respective attorneys to negotiate in good faith for 30 days. If after 30 days there is a still a deadlock, David and Victor will use mediation to resolve the conflict.

- Notwithstanding the foregoing, until Victor recovers his entire investments in AHC and HMG, in the event of deadlock on any matter voted on by Victor and David, Victor will have the authority to decide the matter; provided, however, that Victor's decision on such matter must be made in his reasonable judgment regarding what is in the best interests of HMG. Neither one can take out any loans under the business name or take out any money.

- Once Victor recovers his entire investments in AHC and HMG, David and Victor will have equal voting authority as Class A Members and in the event of deadlock provisions set forth above will control.

- The Class A Members have the right of first refusal to purchase any member's interest before it is transferred to a third party.

Management and Salaries

- Kenton

  o Kenton will serve as the "Administrator" of AHC.

  o Kenton will manage the day-to-day operations of AHC, except that Victor and Jambulat can overrule Kenton in the event of disagreement on management of the day-to-day operations of AHC.

  o Kenton will receive a salary for the services he provides to AHC.

- Victor

  o Victor will serve as the Advisor of AHC.

  o Once the AHC Operating Agreement is executed, Victor will be paid $2,000 per month for his role overseeing the operations of the clinic.

- David

7

FINAL DRAFT

- David will manage the day-to-day operations of HMG, except that Victor can overrule David in the event of disagreement in the management of the day-to-day operations of HMG.

  - Notwithstanding the foregoing, once Victor recovers his entire investment in AHC and HMG, Victor and David will have equal authority to decide the day-to-day operations of HMG. In the event of a dispute between Victor and David, Victor and David to will refer the dispute to a mutually acceptable third party mediator.

- David will be paid $3,000 per month for his work at HMG until AHC is operational.

- Once AHC is operational, David will be paid $52,000 per year for his work at HMG. This $52,000 annual salary will remain fixed until the AHC is making profit.

- Once AHC's clinic is stable, David will be entitled to two weeks paid vacation per year and may take additional reasonable vacation without pay.


Miscellaneous

- Notwithstanding anything to the contrary herein, Victor has the authority to make a final determination with respect to any decision of the members or Class A Members or any other decision concerning HMG until Victor recovers his entire investments in AHC and HMG. Once Victor recovers his entire investments in AHC and HMG, Victor will have no such final determination authority and all decisions will be made by the Class A Members.

- The HMG Certificate of Organization will be amended upon execution of the Operating Agreement.

- Notwithstanding M.G.L. ch. 156C, § 7, no Members can encumber HMG in any way (including by loan, credit agreement, or otherwise), borrow any funds from HMG, or transact any business with HMG without the prior written approval of both Class A Members. No Members can use company funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the company's assets as collateral for a loan) without the prior written approval of both Class A Members. No Members can in any way transfer to HMG any personal debt or the debt of any business in which the Member is currently, or has in the past been, involved. For purposes of



8



clarity, the approval of either, but not both, Class A Members, will not be sufficient to authorize the foregoing actions. Notwithstanding anything to the contrary, Victor cannot overrule David with regards to the matters set forth in this bullet regardless of whether Victor has been repaid his entire investment.

- No member in HMG will have any personal liability for the debts of HMG in accordance with M.G.L. ch. 156C, § 22.

- No Members can open any separate medical business, satellite, or other business in any way related to the clinic operated by AHC (including an outpatient opioid addiction clinic or other facility that provides services/treatments to opioid addicted patients) at any time during such Member's involvement in HMG or thereafter for as long as AHC or HMG is in operation without prior written approval of both Class A Members.

- In the event that HMG ceases operations or dissolves, after making required payments to third parties, HMG's funds will be distributed to Victor until Victor's entire initial investments in AHC and HMG are repaid. Only thereafter will HMG's funds be distributed to the members of HMG (including Victor) in accordance with their membership interests.

## Separate Letter Agreement between Victor and David

- Victor will loan $20,000 to David.

  o Loaned funds may be used by David only to pay off David's current debts.

  o Once the clinic operated by AHC becomes operational, David will begin repaying the loaned funds to Victor by paying Victor 25% of David's monthly income at HMG.

  o Loaned funds will be repaid without interest.

- In the event that Victor does not recover his investment in AHC and HMG, David is responsible for repaying Victor for 50% of Victor's investment in AHC and HMG (in aggregate) plus 5% interest per year within 5 years of AHC's cessation of operations. David will repay Victor in payments of $2,100 per month until the full amount is paid. David will pledge his pizza business as collateral for the foregoing debts.



9



# EXHIBIT B

## To Affidavit of Vahagn Victor Torosyan



ALLIED HEALTH CLINIC, LLC
31 SCHOOL STREET, SUITE #1 QUINCY, MA 02169
617 302 3343 (O)  617 481 4010 (F)

## ORGANIZATIONAL MEETING OF FIRST LLC MEMBERS OF ALLIED HEALTH CLINIC, LLC

### MINUTES OF FIRST MEETING

The first organizational meeting of the limited liability company was held on May 1, 2015 at 6:00 PM at the location of 7 Seaport Drive, Suite #608, Quincy, MA 02169.

The following members were present at this first meeting:

Victor Tororyan                    Chairperson
Kenton R. P. Fabrick               Secretary
Landsiar Tckhladishvili
David Tckhladishvili
Olga Dorofeyeva

The following other people were present at this first organizational meeting:

1.  Victor Tororyan was elected as the chairperson of the meeting

2.  Kenton Fabrick was elected as the secretary of the meeting, and was the person memorializing these minutes

3.  The chairperson announced that the meeting was called by the members of the limited liability company and determined that a quorum was present.

4.  The complete LLC book was made available to inspect the articles of organization and any amendments, the operating agreement, the member's interest, the capital contributions, and a current print out from the Massachusetts Secretary of State Division of Corporations, showing what the records currently look like on the agency's database.  *CAMBULAT REQUESTED ANNUAL DISCUSSION*

5.  The Secretary presented an overview of the operating agreement, and all members present acknowledged that this was in fact the operating agreement of the LLC.

6.  The Chairman reviewed the membership shares of the LLC.

7.  The following people and/or entities were named as the managers of the LLC.

8.  Upon motion made and carried by the members, the manager's salaries were fixed at the following until another meeting:

9.  The Secretary review operating budget. (Add in comments of members.) The operating budget was accepted as presented with the following amendments...  *VICTOR CONCERNED ABOUT PRE JULY (IE EXPENSES)*

10. The Secretary reviewed the plans for operation of clinic, as they presently stand. (Add in comments of members.) The plans for the operation of the clinic was accepted as presented with the following amendments and/or changes.

11. The Secretary reviewed all contracts and current obligations of the LLC. (Add in significant comments)

Benchmark
Quality Systems & Compliance
H & M Brothers
Pending: Dr. Miryousefi, Beckman, Orchard, Kenton R. P. Fabrick, Olga Dorofeyeva

ALLHEALTH CLINIC

ALLHEALTH CLINIC, LLC
21 SCHOOL STREET, SUITE #1 QUINCY, MA 02169
617 302 3543 (P)     617 481 4555 (F)

12. The Chairperson reported on the progress to date of the project. (add in significant comments)

13. Upon motion made and carried, the members decided that the next meeting shall be held on ~2015~ *June 2d, 2015* *thing*

14. There being no further business to discuss, upon motion by the Chairperson and carried, the meeting was adjourned

| Member Name | Member Signature |
|---|---|
| Vetri Tarosyan | |
| Kenson R. P. Fabrici | *Kenton Ronald Petrishield* |
| Jambalai Tkhtaibhvili | *Jha* |
| David Tkhtaibhvili | *David* |
| Olga Doronyeyeva | *Olga Vhooofogen* |

Signature of the Secretary of this meeting that documents this form:

*Kenton Ronald Petrishield*

Kenson R. P. Fabrici

Date: May 3, 2015

# EXHIBIT C

## To Affidavit of Vahagn Victor Torosyan

*Execution Copy*

ALLIED HEALTH CLINIC, LLC

AMENDED AND RESTATED
OPERATING AGREEMENT

Dated:  As of September 11, 2015

---

---

THE INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT
BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR
UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH INTERESTS MAY
NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY
TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR
EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER
SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

## TABLE OF CONTENTS

ARTICLE I    Organization and Powers ...................................................................................2
    1.01    Organization ...........................................................................................................2
    1.02    Powers. ....................................................................................................................2
    1.03    Designation of Managers ......................................................................................3
    1.04    Principal Place of Business ...................................................................................3
ARTICLE II    Membership ...................................................................................................3
    2.01    Representations and Warranties ............................................................................3
    2.02    Capital Accounts ....................................................................................................3
    2.03    Capital Contributions ............................................................................................4
    2.04    No Withdrawal of or Interest on Capital .............................................................4
    2.05    The Manager as Member .......................................................................................4
    2.06    Liability of Members .............................................................................................4
    2.07    Indemnification ......................................................................................................4
ARTICLE III    Additional Capital .......................................................................................5
    3.01    Funding Capital Requirements .............................................................................5
    3.02    Third Party Liabilities ...........................................................................................5
ARTICLE IV    Distributions; Profits and Losses .................................................................5
    4.01    Distributions ..........................................................................................................5
    4.02    Distribution Upon Dissolution .............................................................................6
    4.03    Distribution of Assets in Kind ..............................................................................6
    4.04    Allocation of Profits and Losses ..........................................................................6
    4.05    Required Regulatory Allocations ..........................................................................7
    4.06    Curative Allocations ..............................................................................................9
    4.07    Tax Allocations and Book Allocations ...............................................................10
    4.08    General Allocation and Distribution Rules .........................................................10
    4.09    Tax Withholding ..................................................................................................11
    4.10    Special Distributions ...........................................................................................11
ARTICLE V    Management ..................................................................................................11
    5.01    Management of the LLC .......................................................................................11
    5.02    Member Consent Requirements ..........................................................................12
    5.03    Binding the LLC ..................................................................................................14
    5.04    Compensation of the Manager ............................................................................14
    5.05    Indemnification ....................................................................................................14
    5.06    Contracts with Members ......................................................................................15
    5.07    Other Activities ....................................................................................................15
ARTICLE VI    Fiscal Matters .............................................................................................15
    6.01    Books and Records ...............................................................................................15
    6.02    Bank Accounts .....................................................................................................16
    6.03    Fiscal Year ...........................................................................................................16
    6.04    Tax Matters Partner .............................................................................................16
ARTICLE VII    Transfers of Interests; LLC Purchase of Interests .....................................16
    7.01    Restrictions on Transfer ......................................................................................16
    7.02    Conditions to Transfer .........................................................................................16
    7.03    Conditions to Admission as Member ...................................................................17

7.04    Right of First Refusal......................................................................18
7.05    Option to Purchase .........................................................................19
7.06    Triggering Events ...........................................................................19
7.07    Agreement Price .............................................................................20
7.08    Agreement Terms ...........................................................................20
ARTICLE VIII    Dissolution and Termination.................................................20
8.01    Events Causing Dissolution ...........................................................20
8.02    Procedures on Dissolution .............................................................21
ARTICLE IX    General Provisions...............................................................21
9.01    Notices ...........................................................................................21
9.02    Word Meanings ..............................................................................21
9.03    Binding Provisions .........................................................................21
9.04    Applicable Law ..............................................................................21
9.05    Counterparts....................................................................................21
9.06    Separability of Provisions ..............................................................21
9.07    Section Titles .................................................................................22
9.08    Entire Agreement............................................................................22
9.09    Survival of Certain Provisions .......................................................22
9.10    Amendments....................................................................................22
9.11    Waiver .............................................................................................22
9.12    Investment Representation .............................................................23
9.09    Survival of Certain Provisions .......................................................23
ARTICLE X    Mediation..........................................................................23
10.1 Dispute Resolution and Matters Which May Be Mediated.............23
10.2 Selection of Mediator ......................................................................23
10.3    Decision; Procedure.........................................................................24
10.4 Fees and Expenses............................................................................24
10.5 Confidential and Inadmissible for Purposes of Arbitration.............24
ARTICLE XI    Binding Arbitration............................................................24
11.1 Matters Which May Be Arbitrated ..................................................24
11.2 Selection of Arbitrators ....................................................................25
11.3 Decision; Procedure..........................................................................25
11.4 Fees and Expenses............................................................................25
ARTICLE XII    Definitions.......................................................................26

ii

# ALLIED HEALTH CLINIC, LLC
# AMENDED AND RESTATED OPERATING AGREEMENT

AGREEMENT dated as of the eleventh day of September, 2015 between Jambulat Tkhilaishvili and Vahagn Victor Torosyan (collectively, the "Class A Members" and each individually, a "Class A Member"); Olga Dorofyeyeva, Kenton Fabrick, David Tkhilaishvili, Jambulat Tkhilaishvili and Vahagn Victor Torosyan (collectively, the "Class B Members" and each, individually, a "Class B Member") (the Class A Members and the Class B Members collectively are referred to herein as the "Members" and each a "Member"). Jambulat Tkhilaishvili and Vahagn Victor Torosyan also join this Agreement as the "Managers" of the LLC.

WHEREAS, the parties have formed Allied Health Clinic, LLC (the "LLC") as a limited liability company under the laws of the Commonwealth of Massachusetts pursuant to the Act by the filing a Certificate of Organization in the office of the Secretary of State of the Commonwealth of Massachusetts on July 29, 2014;

WHEREAS, on December 12, 2014, David Tkhilaishvili and Vahagn Victor Torosyan executed a Letter Agreement ("Letter Agreement") which stated, among other terms, that (i) the Class A Members of the LLC shall be Jambulat Tkhilaishvili and Vahagn Victor Torosyan, (ii) the Operating Agreement of the LLC can be amended only with the approval of both Class A Members, and (iii) notwithstanding clause (ii), until Vahagn Victor Torosyan recovers his entire investment in the LLC and Health Management Group, LLC, in the event of a dispute between Jambulat Tkhilaishvili and Vahagn Victor Torosyan, Vahagn Victor Torosyan will have the authority to decide the matter based on his reasonable judgment regarding what is in the best interests of the LLC ("Vahagn Authority");

WHEREAS, at the first organizational meeting ("Meeting") of the LLC on May 3, 2015 at 6:00 pm at the location of 7 Seaport Drive, Suite #608, Quincy, MA 02169, the Letter Agreement was presented to all Members and all Members (including Jambulat Tkhilaishvili) acknowledged and agreed that the Letter Agreement was the Operating Agreement of the LLC and documented such acknowledgement and agreement by executing a copy of the minutes of the Meeting;

WHEREAS, as of the date hereof, Vahagn Victor Torosyan has not yet recovered his entire investment in the LLC and Health Management Group, LLC, and Vahagn Victor Torosyan has determined in his reasonable judgment, with advice of legal counsel, that executing this Agreement is in the best interests of the LLC;

WHEREAS, based on the Vahagn Authority, as confirmed and ratified by the Members at the Meeting, in the event of a dispute between Jambulat Tkhilaishvili and Vahagn Victor Torosyan concerning the amendment of the Operating Agreement of the LLC, Vahagn Victor Torosyan is authorized to amend the Operating Agreement of the LLC, and thereby adopt this Agreement, without the signature of Jambulat Tkhilaishvili; and

WHEREAS, the Managers and the Members wish to set out fully their respective rights, obligations and duties with respect to the LLC and its assets;

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

## ARTICLE I
## Organization and Powers

1.01   Organization. The Managers shall file such certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the LLC shall conduct business and shall continue to file such certificates and documents for as long as the LLC conducts business therein. The LLC may establish places of business within and without the Commonwealth of Massachusetts, as and when required by its business and in furtherance of its purposes set forth in Section 1.02 hereof, and may appoint agents for service of process in all jurisdictions in which the LLC shall conduct business. The LLC may from time to time change its name, its resident agent for service of process, the location of its registered office and/or any other matter described in the Certificate. The Managers shall have no obligation to deliver or mail a copy of the Certificate or any amendment thereto to the Members.

1.02   Powers. The general character of the business of the LLC, as set forth in the Certificate of Organization, is to provide primary care services for patients with behavioral health issues, and to engage in any other activities allowed by a limited liability company organized under the Act and to carry on any related or unrelated lawful business, trade, purpose or activity, including without limitation:

(a)   To enter into, execute, modify, amend, supplement, acknowledge, deliver, perform and carry out contracts of any kind, including operating agreements of limited liability companies, whether as a member or manager, contracts with Affiliated Persons, guarantees and joint ventures, limited and general partnership agreements and contracts establishing business arrangements or organizations, necessary to, in connection with, or incidental to the accomplishment of the purposes of the LLC, and to secure the same by mortgages, pledges or other liens.

(b)   To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the LLC, and to secure the same by mortgages, pledges, or other liens.

(c)   To the extent that funds of the LLC are available, to pay all expenses, debts and obligations of the LLC.

(d)   To enter into or engage in any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of the LLC, so long as said

2

activities may be lawfully carried on or performed by a limited liability company under the laws of the Commonwealth of Massachusetts.

(e)     To take any other action not prohibited under the Act or other applicable law.

1.03    Designation of Managers. Vahagn Victor Torosyan and Jambulat Tkhilaishvili are hereby designated as the Managers of the LLC. The Managers may be removed by only by Consent of the Class A Members. A Manager shall serve until his death, incapacity (as determined by the Manager's personal physician), retirement, resignation or removal as a Manager. In the event of a vacancy in the office of one of the Managers, a new Manager to fill such vacancy will be designated and appointed by the Consent of the Class A Members, and the power and authority of such person or entity to participate in the management of the LLC (other than as Member, if applicable) shall be terminated.

1.04    Fiduciary Duty of Managers. The Managers shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty will be grounds for immediate removal as a Manager by the Consent of the Class A Members. No Manager may encumber the LLC in any way (including, but not limited to, by loan, credit agreement, or otherwise) for personal reasons, borrow any funds from the LLC, transact any business with the LLC, use LLC funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the LLC's assets as collateral for a loan), or in any way transfer to the LLC any personal debt or the debt of any business in which such Manager is involved, in each case, without the approval of both Class A Members.

1.05    Principal Place of Business. The principal place of business of the LLC, unless otherwise designated by the Managers, shall be 21 School Street, Suite #1, Quincy, MA 02169.

## ARTICLE II
## Membership

2.01    Representations and Warranties. Each Member hereby represents and warrants to the LLC and to each other Member that (i) the Member has full power and authority to execute and agree to this Agreement and to perform his or her obligations hereunder; (ii) the Member has duly executed and delivered this Agreement; and (iii) the Member's authorization, execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which the Member is a party or by which that Member is bound.

2.02    Capital Accounts. A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the LLC.

3

2.03   Capital Contributions.

(a)   Each Member has made a Capital Contribution to the LLC as set forth opposite his or her name in Schedule I.

(b)   Except as set forth in Article III, neither the Members nor Managers shall be entitled, obligated or required to make any Capital Contribution in addition to their Capital Contribution made under Section 2.03(a), or any loan, to the LLC, even if the failure to do so would result in a default of any of the LLC's obligations or the loss or termination of all or any part of the LLC's assets or business. No loan made to the LLC by any Member or Manager shall constitute a Capital Contribution to the LLC for any purpose.

2.04   No Withdrawal of or Interest on Capital. No Member shall have the right to resign and receive any distribution from the LLC as a result of such resignation, and no Member shall have the right to receive the return of all or any part of his or her Capital Contribution or Capital Account, or any other distribution, except as provided in Sections 4.01, 4.02 and 8.02. No Member shall have any right to demand and receive property of the LLC in exchange for all or any portion of his or her Capital Contribution or Capital Account, except as provided in Sections 4.02 and 8.02 upon dissolution and liquidation of the LLC. No interest or prior or preferred return shall accrue or be paid on any Capital Contribution or Capital Account or any loan from a Member or Manager to the LLC, except pursuant to Sections 3.01, 4.01, 4.02 and 8.02.

2.05   Manager as Member. A Manager may hold an interest in the LLC as Member, and such party's rights and interest as a Manager shall be distinct and separate from such party's rights and interest as a Member.

2.06   Liability of Members. No Member, in his or her capacity as a Member, shall have any liability to restore any negative balance in his or her Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the LLC, or to restore any amounts distributed from the LLC, except as may be required under the Act or other applicable law. In no event shall any Member, in his or her capacity as a Member, be personally liable for any liabilities or obligations of the LLC.

2.07   Indemnification. Each Member shall be entitled to indemnity from the LLC for any liability incurred and/or for any act performed by him or her within the scope of the authority conferred on him, her or it, by this Agreement, and/or for any act omitted to be performed except for his or her gross negligence or willful misconduct, which indemnification shall include all reasonable expenses incurred, including reasonable legal and other professional fees and expenses.

2.08   Duty of Loyalty. The Members shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty by a Member will be grounds for forfeiture of such

4

Member's entire Interest upon the Consent of the Class A Members. No Member may encumber the LLC in any way (including, but not limited to, by loan, credit agreement, or otherwise) for personal reasons, borrow any funds from the LLC, transact any business with the LLC, use LLC funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the LLC's assets as collateral for a loan), or in any way transfer to the LLC any personal debt or the debt of any business in which such Member is involved, in each case, without the approval of both Class A Members.

### ARTICLE III
### Additional Capital

3.01   Funding Capital Requirements.

(a)   In the event that the LLC requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the LLC may borrow funds from such lender(s), including the Managers and Members, on such terms and conditions as are determined by the Managers.

(b)   No Member or Manager shall have any obligation to give notice of an existing or potential default of any obligation of the LLC to any of the Members or the Managers.

3.02   Third Party Liabilities.  The provisions of this Article III are not intended to be for the benefit of any creditor or other Person (other than a Member in his or her capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the LLC or any of the Members.  Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article III, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the LLC or any Member.

### ARTICLE IV
### Distributions; Profits and Losses

4.01   Distributions.  Except as provided in Section 4.02, Section 4.09 and Section 4.10, all LLC funds, which are determined by the Consent of the Class A Members to be available for distribution, shall be distributed to the Interest Holders as follows:

(i)   First, to repay any loans from the Members (including, but not limited to, the Torosyan Loans) or their Affiliated Persons;

(ii)   Second, to the Interest Holders, if any, with positive balances in their respective Capital Accounts, to eliminate and in proportion to such positive balances, after reflecting in such Capital Accounts all adjustments thereto necessitated by all other LLC transactions

(distributions and allocations of Profits and Losses and items of income, gain, deduction and loss);

    (iii)    Third, the balance to the Interest Holders, in proportion to their Percentage Interests.

4.02    Distribution Upon Dissolution.

(a)  Proceeds from a Liquidating Capital Transaction and amounts available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the LLC, and liquidation of any remaining assets of the LLC, shall be distributed and applied in the following priority:

    (i)    First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by the Managers, provided that, upon the expiration of such period of time as the Managers shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section 4.02(a);

    (ii)    Second, to the Interest Holders, if any, with positive balances in their respective Capital Accounts, to eliminate and in proportion to such positive balances, after reflecting in such Capital Accounts all adjustments thereto necessitated by all other LLC transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss), and such Liquidating Capital Transaction; and

    (iii)    Third, any remaining assets shall be distributed to the Interest Holders in proportion to their respective Percentage Interests as set forth in Section 4.01(iii).

4.03    Distribution of Assets in Kind. No Interest Holder shall have the right to require any distribution of any assets of the LLC in kind. If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Managers. Any Interest Holder entitled to any interest in such assets shall, unless otherwise determined by the Managers, receive separate assets of the LLC and not an interest as tenant-in-common, with other Interest Holders so entitled, in each asset being distributed.

4.04    Allocation of Profits and Losses.

(a)    After giving effect to the allocations set forth in Sections 4.05 and 4.06, Profits shall be allocated in the following order and priority:

6

      (i)     First, to the extent Losses have previously been allocated pursuant to clauses (ii) or (iii) of Section 4.04(b) for any prior period, Profits shall be allocated to the Interest Holders first to offset any Losses allocated pursuant to said clause (iii) of Section 4.04(b), and then to offset any Losses allocated pursuant to said clause (ii) of Section 4.04(b), (in each case pro rata among the Interest Holders in proportion to their shares of the Losses to be offset under such clause), and to the extent any allocations of Losses are offset pursuant to this clause First, such allocations of Losses shall be disregarded for purposes of computing subsequent allocations pursuant to this clause First; and

      (ii)    Second, any remaining Profits shall be allocated among the Interest Holders in proportion to their respective Percentage Interests as specified in Section 4.01(iii) of this Agreement.

    (b)     After giving effect to the allocations set forth in Sections 4.05 and 4.06, Losses shall be allocated in the following order and priority:

      (i)     First, to the extent Profits have previously been allocated pursuant to clause (ii) of Section 4.04(a) for any prior period, Losses shall be allocated to the Interest Holders first to offset any Profits allocated pursuant to said clause (ii) of Section 4.04(a), (in each case pro rata among the Interest Holders in proportion to their shares of the Profits to be offset under such clause), and to the extent any allocations of Profits are offset pursuant to this clause such allocations of Profits shall be disregarded for purposes of computing subsequent allocations pursuant to this clause First;

      (ii)    Second, Losses shall be allocated among the Interest Holders in proportion to the respective amounts of their Capital Accounts until the cumulative Losses allocated pursuant to this clause (ii) of Section 4.04(b) are equal to the aggregate amount of all such Capital Accounts; and

      (iii)   Third, any remaining Losses shall be allocated among the Interest Holders in proportion to their respective Percentage Interests as set forth in Section 4.01(iii) of this Agreement.

4.05   Required Regulatory Allocations.

    (a)     Limitation on and Reallocation of Losses. At no time shall any allocations of Losses, or any item of loss or deduction, be made to an Interest Holder if and to the extent such allocation would cause such Interest Holder to have, or would increase the

deficit in, any Adjusted Capital Account Deficit of such Interest Holder at the end of any fiscal year. To the extent any Losses or items of loss or deduction are not allocated to one or more Interest Holders pursuant to the preceding sentence, such Losses or items of loss or deduction shall be allocated to the Interest Holders to which such Losses or items of loss or deduction may be allocated without violation of this Section 4.05(a).

(b)    Minimum Gain. If there is a net decrease in the Minimum Gain of the LLC during any fiscal year, then items of income or gain of the LLC for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Interest Holder in an amount equal to such Interest Holder's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d). An Interest Holder's share of the net decrease in the Minimum Gain of the LLC shall be determined in accordance with Regulations Section 1.704-2(g). The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-(2)(j)(2)(i).

(c)    Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year or other period (not including any Partner Nonrecourse Deductions allocated pursuant to Section 4.05(d)) shall be allocated among the Interest Holders in proportion to their respective Percentage Interests. Solely for purposes of determining each Interest Holder's proportionate share of the "excess nonrecourse liabilities" of the LLC, within the meaning of Regulations Section 1.752-3(a)(3), each Interest Holder's interest in Profits shall be equal to his or her Percentage Interest. The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Interest Holder who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4) to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e)    Partner Minimum Gain Chargeback. Notwithstanding any contrary provisions of this Article IV, other than Section 4.05(b) above, if there is a net decrease in Partner Minimum Gain attributable to Partner Nonrecourse Debt during any fiscal year, then each Interest Holder who has a share of such Partner Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the LLC, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Interest Holder's share of the net decrease in such Partner Minimum Gain, determined in accordance with Regulations Section 1.704-(2)(i)(3) and 2(i)(5).

8

(f)     Qualified Income Offset. If any Interest Holder unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Interest Holder in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Interest Holder, provided that an allocation pursuant to this Section 4.05(f) shall be made if and only to the extent that such Interest Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.05(f) were not in the Agreement.

(g)     Basis Adjustment. To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to either of Code Sections 734 or 743 is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(h)     Gross Income Allocation. In the event any Interest Holder has a Capital Account deficit at the end of any LLC fiscal year, which is in excess of the sum of the items to be credited to an Interest Holder's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Interest Holder shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 4.05(h) shall be made if and only to the extent that such Interest Holder would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.05(h) were not in this Agreement. As among Interest Holders having such excess if there are not sufficient items of income and gain to eliminate all such excesses, such allocations shall be made in proportion to the amount of any such excess.

### 4.06     Curative Allocations.

The allocations set forth in Section 4.05 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Interest Holders intend to divide LLC distributions and to make Profit and Loss allocations. Accordingly, as determined by the Managers, other allocations of Profits, Losses and items thereof shall be divided among the Interest Holders so as to prevent the allocations in Section 4.05 from distorting the manner in which LLC distributions will be divided among the Interest Holders pursuant to Sections 4.01 and 4.02 hereof. In general, the Interest Holders anticipate that this will be accomplished by specially allocating other Profits, Losses and items of income, gain, loss and deduction among the Interest Holders so that the net amount of allocations under Section 4.05 and allocations

9

under this Section 4.06 to each such Interest Holder is zero. However, the Managers shall have discretion to accomplish this result in any reasonable manner.

4.07    Tax Allocations and Book Allocations.

Except as otherwise provided in this Section 4.07, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Interest Holders in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article IV.

In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its Book Value, such allocation to be made by the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

In the event the Book Value of any property of the LLC is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such assets for federal income tax purposes and its Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

Allocations pursuant to this Section 4.07 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Interest Holder's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

4.08    General Allocation and Distribution Rules.

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managers using any permissible method under Code Section 706 and the Regulations thereunder. Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocable among the Interest Holders in the same proportions as the Profits and Losses for the fiscal year in which such item is included is allocated.

(b)    Upon the admission of a new Interest Holder or the Transfer of all or part of an Interest, the new and old Interest Holders or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or Transferred

10

Interest was held by the new and old Interest Holders, or the transferor and transferee, respectively. For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the LLC shall close its books on an interim basis on the last day of the previous calendar month.

4.09   Tax Withholding. If the LLC incurs a withholding tax obligation with respect to the share of income allocated to any Interest Holder, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Interest Holder and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Interest Holder, and (b) any amount which is so paid over by the LLC, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Interest Holder, shall be treated as an interest-free advance to such Interest Holder. Amounts treated as advanced to any Interest Holder pursuant to this Section 4.09 shall be repaid by such Interest Holder to the LLC within 30 days after the Managers, acting by Consent of the Class A Members, give notice to such Interest Holder making demand therefor. Any amounts so advanced and not timely repaid shall bear interest, commencing on the expiration of said 30 day period, compounded monthly on unpaid balances, at an annual rate equal to the Applicable Federal Rate as of such expiration date. The LLC shall collect any unpaid amounts from any LLC distributions that would otherwise be made to such Interest Holder.

4.10   Special Distributions. Notwithstanding anything to the contrary herein, until the Capital Contributions made by the Members have been returned in full, all cash and/or revenue collected by the Company shall be paid to the Members in accordance with their Capital Contributions in twenty-four (24) equal monthly installments based upon the balance of such Capital Contributions as of the date hereof. For example purposes only, if Vahagn Victor Torosyan has a Capital Contribution balance of $200,000 and the other Members have no Capital Contribution balances, then each month cash in the amount of $8,333 shall be a priority distribution to Vahagn Victor Torosyan until he has received an amount equal to $200,000.

## ARTICLE V
## Management

5.01   Management of the LLC. Subject to the provisions of this Agreement, including, without limitation, Section 5.02, the overall management and control of the business and affairs of the LLC shall be vested in the Managers who may each act individually on behalf of the LLC. The Managers shall devote such time to the affairs of the LLC as may be reasonably necessary for performance by the Managers of their duties. Notwithstanding anything to the contrary herein, any dispute between the Managers that occurs prior to return of the Torosyan Capital and repayment of the Torosyan Loans will be decided by Vahagn Victor Torosyan in his sole discretion.

11

All management and other responsibilities not specifically reserved to the Class A Members in this Agreement shall be vested in the Managers, and the Members shall have no voting rights except as specifically provided in this Agreement. Specifically, but not by way of limitation, and subject to all other provisions of this Agreement (including without limitation, Sections 1.03 and 5.02), the Managers shall be authorized in the name of and on behalf of the LLC, to do all things necessary or appropriate to carry on the business and purposes of the LLC, including, without limitation, the following:

(i)     to determine the appropriate accounting method or methods to be used by the LLC;

(ii)    to cause the LLC to make or revoke any of the elections referred to in I.R.C. §§ 108, 704, 709, 754 and 1017 and any similar provisions enacted in lieu thereof, and in any other section of the Code;

(iii)   to establish and maintain reserves for such purposes and in such amounts as the Managers deems appropriate from time to time;

(iv)    to engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of the purposes of the LLC;

(v)     to exercise all powers and authority granted by the Act to managers, except as otherwise provided in this Agreement;

(vi)    to cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed on any of the assets of the LLC unless the same are contested by the Managers; and

(vii)   to perform any other act the Managers may deem necessary, convenient or desirable for the LLC or the conduct of the LLC's business.

5.02    Class A Member Consent Requirements. Notwithstanding the provisions of Section 5.01, Consent of the Class A Members shall be required to cause the LLC to take the following actions, except as otherwise provided in this Agreement:

(i)     engage in any activity that is not consistent with the purposes of the LLC as set forth herein, including entering a new line of business;

(ii)    approve strategic plans for the LLC;

(iii)   approve annual capital and operating budgets for the LLC, and authorize any expenditure not included in the annual budget;

(iv)    except as provided in Section 9.10, approve any amendment, modification, revision, supplement, or rescission this Agreement;

(v)     identify new management opportunities, including the recruitment of investors to establish new outpatient treatment facilities to be managed by the LLC;

12

(vi)    acquire, by purchase or otherwise, any equity interests in another entity;

(vii)   cause or permit the LLC to extend credit or make any loans to, or to become a surety, guarantor, endorser, or accommodation endorser for, any Person, in an amount exceeding $1,000;

(viii)  obtain, increase, modify, consolidate, or extend any loan, whether secured or unsecured, affecting the LLC;

(ix)    incur Indebtedness in excess of $1,000;

(x)     accept a loan from a Member on behalf of the LLC (excluding the Torosyan Loans);

(xi)    sell, lease, transfer, pledge, mortgage, or otherwise dispose of, or refinance any asset of the LLC valued in excess of $1,000;

(xii)   merge or consolidate with, or acquire all or substantially all of the assets or equity securities of, another Person;

(xiii)  liquidate, reorganize or dissolve the LLC;

(xiv)   engagement of legal counsel for the LLC;

(xv)    expenditures in excess of $1,000 individually;

(xvi)   confess a judgment or settle a claim against the LLC in an amount in excess of applicable insurance coverage;

(xvii)  initiate litigation or arbitration of any of the LLC's disputes or controversies with third parties;

(xviii) release, compromise, assign, or transfer any claims, rights, or benefits of the LLC;

(xix)   obtain, increase, modify, consolidate, or extend any loan, whether secured or unsecured, affecting the LLC;

(xx)    employ, engage or retain persons to act as employees or agents;

(xxi)   determine salary or bonuses for employees;

(xxii)  determine health and dental insurance and other benefits for employees;

(xxiii) determine compensation of the Managers;

(xxiv)  appoint or remove a Manager as provided in Section 1.03;

(xxv)   do any act in contravention of this Agreement;

(xxvi)  perform any act that would subject any Member to personal liability in any jurisdiction;

(xxvii) acquire, by purchase, lease, or otherwise, any real property or construct any new capital improvements or replace an existing capital improvement following completion of construction thereof;

13

(xxviii) give or grant any options, rights of first refusal, deeds of trust, mortgages, pledges, ground leases, security interests, easements or similar rights or interests;

(xxix) change principal place of business and appoint agent for service of process;

(xxx) take any action that results in Bankruptcy;

(xxxi) request additional capital contributions;

(xxxii) indemnify against or guarantee any act, debt, default or misconduct of any person or entity;

(xxxiii) grant permission to any Manager, Member, officer or employee to pursue an independent or competitive business opportunity;

(xxxiv) issue new membership interests or repurchase or redeem membership interest on behalf of the LLC; or

(xxxv) acquire and enter into any contract of insurance for the protection of the LLC, any Member or Manager.

Notwithstanding the foregoing and the definition of "Consent of the Class A Members", the following actions shall require the approval of both Vahagn Victor Torosyan and Jambulat Tkhilaishvili in each instance (regardless of whether the Torosyan Capital and Torosyan Loans have been returned or repaid, as applicable):

(1) the decisions listed in Section 5.02 (x) and (xxxiii) above;

(2) transactions or contracts with Members or Affiliates of Members of the LLC;

(3) the use of the assets, resources, employees, or funds of the LLC for personal reasons by the Members; or

(4) the transfer of personal debts of any of the Members or their Affiliates to the LLC.

5.03    Binding the LLC.  Any action taken by any Manager acting as a Manager of the LLC shall bind the LLC and shall be deemed to be the action of the LLC, and no third party need look to any other evidence or require joinder or consent of any other party.

5.04    Compensation of the Manager.  A Manager shall be entitled to reimbursement from the LLC for all expenses incurred by such Manager in managing and conducting the business and affairs of the LLC and may receive compensation from the LLC for services rendered to the LLC as an employee, consultant or otherwise.  The Managers, acting by approval by both Managers, shall determine which expenses, if any, are allocable to the LLC in a manner which is fair and reasonable to the Managers and the LLC, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

5.05    Indemnification.  The Managers shall be entitled to indemnity from the LLC for any liability incurred and/or for any act performed by him or her within the scope of the

14

authority conferred on him or her, by this Agreement, and/or for any act omitted to be performed except for his or her gross negligence or willful misconduct, which indemnification shall include all reasonable expenses incurred, including reasonable legal and other professional fees and expenses. The doing of any act or failure to do any act by the Manager, the effect of which may cause or result in loss or damage to the LLC, shall not subject the Manager to any liability to the Members.

5.06    Contracts with Members.  With the Consent of the Class A Members in each case, the LLC may engage in business with, or enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the LLC of goods, services or space with any Interest Holder, and may pay compensation in connection with such business, goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those that would be payable to unaffiliated persons under similar agreements.

5.07    Other Activities.  For so long as they are Members of the LLC, each Member shall devote his full time and best efforts to the business of the LLC.  Each Member shall be entitled to the vacations, sick leave, personal leave, health, disability and dental insurance and other such benefits and leave as determined by the Consent of the Class A Members from time to time.  The Members, the Managers and their Affiliates may not engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of the LLC, where such business ventures or investment opportunities are in competition with the business of the LLC (including without limitation, medical businesses, satellite clinics or clinics providing outpatient opioid addiction services or treatments), without the approval of Victor Torosyan and Jambulat Tkhilaishvili.

ARTICLE VI
Fiscal Matters

6.01    Books and Records.  The Managers shall keep or cause to be kept complete and accurate books and records of the LLC, using the same methods of accounting which are used in preparing the federal income tax returns of the LLC to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied.  Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the LLC for examination and copying by any Member or the Manager, or his or her duly authorized representative, at his or her reasonable request and at his or her expense during ordinary business hours.  A current list of the full name and last known address of each Member and Manager, a copy of this Agreement, any amendments thereto and the Certificate, including all certificates of amendment thereto, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, the Certificate or any certificate of amendment has been executed, copies of the LLC's federal, state and local income tax returns and reports, if any, for the three most recent years, shall be maintained at the registered office of the LLC required by Section 5 of the Act.

Any Member may, at any time, at his or her own expense, cause an audit or review of the LLC books to be made by a certified public accountant of his or her own selection.

6.02   Bank Accounts.  Bank accounts and/or other accounts of the LLC shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Managers and withdrawals shall be made and other activity conducted on such signature or signatures as determined by the Managers.

6.03   Fiscal Year.  The fiscal year of the LLC shall end on December 31st of each year.

6.04   Tax Matters Partner.  Jambulat Tkhilaishvili is hereby designated as the "tax matters partner." The "tax matters partner" is hereby authorized to and shall perform all duties of a "tax matters partner" under the Code and shall serve as "tax matters partner" until his resignation or until the designation of his successor by the Managers, whichever occurs sooner.

<div align="center">

ARTICLE VII
Transfers of Interests; Option to Purchase

</div>

7.01   Restrictions on Transfer.  Each Interest Holder agrees that he or she will not encumber or permit to be encumbered and that he or she will not Transfer or permit to be Transferred, all or any portion of his Interest in the LLC, except as provided herein. Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any interest in the LLC, and shall not bind, or be recognized by, or on the books of, the LLC, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member or an Interest Holder for any purpose. In the event any Interest Holder shall at any time Transfer an Interest in the LLC in contravention of any of the provisions of this Agreement, then each Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Interest Holder shall not plead in defense thereto that there would be an adequate remedy at law, it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach of threatened breach of the provisions concerning such transactions set forth in the Agreement.

7.02   Conditions to Transfer.  A Transfer that is otherwise permitted by this Article VII shall not bind or be recognized by, or on the books of the LLC and the transferee or assignee in such transaction shall not be, or be treated as, or deemed to be, an Interest Holder or a Member for any purpose until the following conditions are satisfied:

(a)   No Transfer of any Interest in the LLC may be made if such Transfer would cause or result in a breach of any agreement binding upon the LLC or of then applicable rules and regulations of any governmental authority having jurisdiction over such Transfer. The Managers may require as a condition of any Transfer that the transferor furnish an opinion of counsel, satisfactory to the LLC (both as to counsel and as to the substance of the opinion), that the proposed Transfer is exempt from applicable registration requirements, complies with applicable law,

<div align="center">16</div>

including federal and state securities laws, and does not cause the LLC to be an investment company as such term is defined in the Investment Company Act of 1940, as amended.

(b)     The transferor and transferee shall execute and deliver to the LLC such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the LLC to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement. The LLC shall be reimbursed by the transferor and/or the transferee for all costs and expenses that the LLC reasonably occurs in connection with the Transfer.

(c)     If required by the Managers, the transferor shall furnish the LLC an opinion of counsel, which counsel and opinion shall be satisfactory to the LLC, that the Transfer shall not cause the LLC to terminate for federal income tax purposes.

(d)     The transferor and transferee shall furnish the LLC with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the interest that has been Transferred, and any other information reasonably necessary to permit the LLC to file all required federal and state income tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the LLC shall not be required to make any distribution otherwise provided for in this Agreement with respect to an Interest that has been Transferred until it has received such information.

(e)     Unless the Managers have specifically approved otherwise in writing, a transferor of an Interest shall not be relieved of liability under this Agreement with respect to the Transferred interest arising or accruing on or after the effective date of the Transfer, except to the extent of the payments made in the transferor's place by any transferee of the Interest; and the LLC may proceed to collect any amount due from the transferor as and when due, together with interest thereon from the date for payment stated herein at the rate of 18 percent per annum, compounded monthly (but not exceeding the maximum rate permitted by law) and all costs and expenses of collection incurred by the LLC (including reasonable fees and disbursements of counsel).

(f)     Any person who acquires in any manner whatsoever an Interest, whether or not such person has assumed in writing the terms and provisions of this Agreement shall be deemed, by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such Interest.

7.03    Conditions to Admission as Member.

(a)     A transferee of an Interest in the LLC, or any portion thereof, shall become an additional or substituted Member entitled to all of the rights of a Member, if the Transfer is in accordance with this Agreement and if and only if:

(i)     the transferor gives the transferee such right;

17

(ii)     the addition or substitution is approved by Consent of the Class A Members;

(iii)     the transferee pays to the LLC all costs and expenses incurred in connection with such addition or substitution, including, specifically, without limitation, cost incurred in the review and processing of the assignment and in amending the Agreement, and the Certificate if required;

(iv)     the transferee executes and delivers an amendment to this Agreement (and to the Certificate, if required), which amendment shall be executed by the Managers and such transferee, and such other instruments, in form and substance satisfactory to the Managers, as may be necessary, appropriate or desirable to effect such substitution or addition, and to confirm the agreement of the transferee to be bound by the terms and provisions of this Agreement.

(c)     The Managers may require, as a condition to the admission to the LLC as a Member of any transferee who is not a Member, that such transferee demonstrate to the reasonable satisfaction of the Managers that he, she or it is either a financially responsible person or has one or more financially responsible persons who have affirmatively assumed the financial obligations of the transferee under this Agreement, if any, on his, her or its behalf.

(d)     Unless a transferee becomes a substituted or additional Member in accordance with the provisions of this Section 7.03, the transferee shall not be entitled to any of the rights granted to a Member hereunder, other than the right as an Interest Holder to receive all or part of the share of the Profits and Losses (and items hereof), and distributions o to which the transferor would otherwise be entitled in respect of the Interest Transferred, pursuant to Sections 4.01 and 4.02.

7.04     Right of First Refusal.

(a)     The Class A Members shall have a right of first refusal if a Member (including, but not limited to, a Class A Member) desires to Transfer all or any part of such Member's Interests, unless the Member receives the written consent of each Class A Member waiving such right.

(b)     Before Transferring any Interest, the Member must first provide to the Class A Members prior written notice of such Member's intention to make a disposition of such Member's Interest or any part thereof (the "Disposition Notice"). In the Disposition Notice, the Member shall specify the price at which the Interest is proposed to be transferred, the Interest (or any part thereof) to be transferred, the identity of the proposed purchaser or transferee, and the terms and conditions of the proposed transaction.

(c)     Any or all of the Class A Members may elect, by giving written notice to the other Class A Members and to the Member seeking to sell his Interest within thirty (30) days after receiving the Disposition Notice, to purchase the Interest proposed to be transferred by the Member at the proposed price as contained in the Disposition Notice. If more than one Class A Member so elects to purchase the Interest, then each electing Class A Member shall purchase a portion of the Interest offered for sale in proportion to their Interest and each shall pay the proportionate share of

18

the cost of such purchase. If only one Class A Member so elects to purchase such Interest within the time frame specified herein, the electing party shall have the right to purchase the entire Interest and shall pay the entire cost of such purchase. The terms and conditions of the transfer shall be the terms and conditions of the proposed transaction, as set forth in the Disposition Notice. If, after the expiration of the thirty-day period, no Class A Member has elected to purchase all of the Interest, the LLC may elect, in its sole discretion by giving written notice to the Member within seventy-five (75) days after receiving the Disposition Notice, to purchase any remaining Interest not otherwise purchased by the Class A Members pursuant to this paragraph. The terms and conditions of the transfer shall be the terms and conditions of the proposed transaction, as set forth in the Disposition Notice.

(d)     If the LLC shall not have purchased all of the Interest (or portion thereof) covered by the Disposition Notice as provided in the foregoing, within one hundred twenty (120) days of sending the Disposition Notice, the Member may transfer to persons other than the LLC, provided that any transfer must be made on the terms and conditions and to the party specified in the Disposition Notice and must be consummated within the one hundred fifty (150) days of LLC receiving the Disposition Notice.

7.05     Option to Purchase.  In the event of the occurrence of any one or more Triggering Events (as defined in Section 7.06) with respect to a person or entity holding an interest in the LLC, such person or entity (the "Offering Interest Holder") shall promptly send notice of the Triggering Event to the LLC and to the Class A Member(s) or the other Class A Member(s), if the Offering Interest Holder is a Class A Member (the "Other Class A Members") and offer or, if notice is not sent, be deemed to have offered, to sell some or all of the Offering Interest Holder's interest in the LLC (the "Offered Interest") to the LLC and the Other Class A Members at the Agreement Price and on the Agreement Terms, as further described below:

(a) The LLC shall have thirty (30) days from the date it becomes aware of the Triggering Event in which to elect to buy all or any of the Offered Interest by notice to the Offering Interest Holder. In the event that the LLC declines to elect to purchase all of the Offered Interest during the thirty (30) day period, the LLC shall so notify the Other Class A Members, and upon receipt of such notice or in the event that the LLC does not in fact purchase within thirty (30) days of its election to purchase, the Other Class A Member may accept such offer or deemed offer and may buy all of the Offered Interest at the Agreement Price and on the Agreement Terms. If more than one Other Class A Member accepts such offer, then the Other Class A Members electing to purchase the Offered Interest may purchase the Offered Interest in proportion to their Interest.

7.06     Triggering Events.  Each of the events described below (collectively, the "Triggering Events" and each a "Triggering Event") shall trigger an offer or deemed offer pursuant to Section 7.05 of this Agreement:

(i)     the Involuntary Transfer of an Interest or any portion thereof;

(ii)     the termination of a Member's employment with the LLC for any reason;

19

    (iii)    the disability of a Member, as determined by the Member's personal physician; or

    (iv)    the Transfer of some or all of an Interest in the LLC to a Person in violation of this Agreement.

7.07    <u>Agreement Price</u>. With respect to an offer or deemed offer described in Section 7.05, the Agreement Price means the Book Value of the interest in the LLC or portion thereof purchased by the LLC.

7.08    <u>Agreement Terms</u>. The purchase of the Offered Interest pursuant to this Agreement shall take place at a closing held at 1:00 p.m. on the thirtieth (30th) day after notice to the Offering Interest Holder of the acceptance of his or her offer or deemed offer, as the case may be, at the LLC's primary place of business, or at any other place at which the parties agree. At the closing, the buyer or buyers will pay for the Offered Interests in cash and the Offering Interest Holder will deliver such documentation as the LLC shall require to effect a transfer of the Offered Interests, free and clear of all liens, claims and encumbrances, and the LLC shall adjust its books and records to reflect the transfer of the Offered Interest. Each Interest Holder appoints the Managers and any person or entity that becomes substitute or additional Managers of the LLC, as such Interest Holder's agent and attorney in fact for the purpose of executing the documentation referred to in this Section 7.08, in the event that such documentation is not delivered to the LLC within thirty (30) days of the notice of acceptance of the Offering Interest Holder's offer or deemed offer.

<div align="center">

ARTICLE VIII
Dissolution and Termination

</div>

8.01    <u>Events Causing Dissolution</u>. The LLC shall be dissolved and its affairs wound up upon:

    (a)    The election to dissolve the LLC made in writing with the Consent of the Class A Members;

    (b)    Any consolidation or merger of the LLC with or into any entity in which the LLC is not the resulting or surviving entity; or

    (c)    Upon the occurrence of any other event specified under the laws of the Commonwealth of Massachusetts as one effecting dissolution, except when there is a written Consent of the Class A Members that the LLC immediately be reconstituted and reformed on all the applicable, terms, conditions, and provisions of this Agreement.

The LLC shall not be dissolved due to the occurrence of the death, insanity, retirement, resignation, expulsion, Bankruptcy or dissolution of a Member or any other event which terminates the membership of the Member.

<div align="center">

20

</div>

8.02   Procedures on Dissolution. Dissolution of the LLC shall be effective on the day on which the event occurs giving rise to the dissolution, but the LLC shall not terminate until the Certificate shall be canceled. Notwithstanding the dissolution of the LLC, prior to the termination of the LLC, as aforesaid, the business and the affairs of the LLC shall be conducted so as to maintain the continuous operation of the LLC pursuant to the terms of the this Agreement. Upon dissolution of the LLC, the Managers or, if none, a liquidator elected by the Consent of the Class A Members shall distribute the assets of the LLC pursuant to Section 4.02 of this Agreement, and cause the cancellation of the Certificate.

<div align="center">

ARTICLE IX
General Provisions

</div>

9.01   Notices. Any and all notices under this Agreement shall be effective (a) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the LLC at its registered office under the Act, if to a Member at the last address of record on the LLC books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

9.02   Word Meanings. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

9.03   Binding Provisions. Subject to the restrictions on Transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

9.04   Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, including the Act, as interpreted by the courts of the Commonwealth of Massachusetts, notwithstanding any rules regarding choice of law to the contrary,

9.05   Counterparts. This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

9.06   Separability of Provisions. Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to violate any existing or future law, such that they would affect those which are valid, and if for any reason

<div align="center">

21

</div>

any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the LLC, such provision or provisions shall be deemed void and of no effect.

9.07   Section Titles.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

9.08   Entire Agreement.  This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

9.09   Survival of Certain Provisions.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the LLC, including, but without limitation, the provisions of Sections 2.06, 2.07 and 5.05.  The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the LLC so as to effectuate the intended purposes and agreements of the Members shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the LLC or the execution of any document terminating this Agreement, unless such termination document specifically provides for nonsurvival by reference to this Section 9.09.

9.10   Amendments.

Except as provided in this Section 9.10, this Agreement may not be amended without the written Consent of the Class A Members.  Notwithstanding the foregoing, this Agreement may be amended by the Managers without the Consent of the Class A Members:

      (i)    To cure any ambiguity, to correct or supplement any provision hereof which may be inconsistent with any other provision hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; and

      (ii)    To change any provision of this Agreement required to be so changed by the staff of the Securities and Exchange Commission or other federal agency or by a state "Blue Sky" commissioner or similar official.

9.11   Waiver.  No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by such other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation of such Member hereunder.  Failure on the part of any Member to complain of any act or failure

22

to act of any other Member or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of such Member of its rights hereunder.

9.12    Investment Representation. Each of the Members represents that he or she is acquiring his or her Interest for his or her own account as an investment and not with a view to the distribution or resale thereof.

9.13    Conflict with Letter Agreement. In the event of a conflict between the terms of this Agreement and the terms of the Letter Agreement between Vahagn Victor Torosyan and David Tkhilaishvili dated December 11, 2014, the terms of this Agreement will control; provided, however, that the Letter Agreement is hereby ratified and confirmed by the Members with respect to its terms which do not conflict with this Agreement, including, but not limited to, terms concerning new investors in the LLC or any new entity formed by all or some of the Members.

## ARTICLE X
### Mediation

10.1    Dispute Resolution and Matters Which May Be Mediated. In the event of claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof between the Members and/or the Managers, the disputing parties agree to negotiate in good faith (with their respective attorneys, if required) for a period of thirty (30) days.

All claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof (i) that arise prior to return of the Torosyan Capital and repayment of the Torosyan Loans and (ii) that the Members and/or the Managers are unable to resolve after such thirty-day period, shall be resolved by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC.

All claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof (i) that arise after return of the Torosyan Capital and repayment of the Torosyan Loans and (ii) that the Members and/or the Managers are unable to resolve after such thirty-day period, shall first be mediated in Boston, Massachusetts by a mediator recognized in his or her field. The mediation shall be conducted in the manner specified in this section.

10.2    Selection of Mediator. The party(ies) desiring mediation shall submit a written notice of an intention to mediate to the American Arbitration Association (the "AAA") with a copy to all of the other Members and the Manager. The notice shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and containing a request that the AAA provide a list of at least three disinterested persons of recognized competence in the field involved from whom a mediator may be appointed by agreement of the parties to the mediation. If for any reason the appointment cannot be made from such list, the AAA shall have the power to make the appointment from among the other members of its panel without the submission of additional lists. The mediator

23

shall as promptly as possible mediate such matter. All parties shall each be entitled to present evidence and argument to the mediator.

10.3   Decision; Procedure. The determination of the mediator shall not be conclusive upon the parties unless agreed to by the parties. The parties agree to mediate in good faith. Mediation shall be conducted under the American Arbitration Association Commercial Mediation Rules in effect on the date hereof, as modified by this Agreement. Once an agreement has been reached, any enforcement of the agreement may be submitted to Superior Court in Suffolk County, Massachusetts and judgment upon the same may be entered. If any issue cannot be resolved through mediation, the disputed issue or issues may be submitted to binding arbitration, which is described in Article XI of this Agreement.

10.4   Fees and Expenses. The provisions of this mediation procedure may be enforced by any competent Court in Suffolk County, Massachusetts, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable attorneys' fees, to be paid by the party against whom enforcement is ordered. Each party shall pay for his or its own expenses and his or its attorney's fees and expenses. If the mediation results in the acceptance of a position held by one or more of the parties, the other party(ies) shall pay the costs of the mediation. If the mediation does not result in the acceptance of the position held by one or more parties, all of the parties participating in the mediation shall pay an equal amount of the fees and expenses of the mediator; provided, however, that if more than one party is taking the same position they will share in 50% of the costs of the mediation unless otherwise agreed to in mediation.

10.5   Confidential and Inadmissible for Purposes of Arbitration. All information, offers, promises, conduct and statements whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys and by the mediator are confidential, privileged and inadmissible for any purpose, including any impeachment, and in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible as a result of mediation. Either party may initiate arbitration, with respect to the matters submitted to mediation at any time following the initial mediation session or 45 days after the date of filing the written request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as the arbitrator in the case.

<div align="center">

ARTICLE XI
Binding Arbitration

</div>

11.1   Matters Which May Be Arbitrated. After mediation (as provided in Article X hereof), all claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof may be decided by binding arbitration in Boston Massachusetts, as permitted above, conducted in the manner specified in this section.

11.2    Selection of Arbitrators. The party(ies) desiring arbitration shall submit a written notice of an intention to arbitrate to the American Arbitration Association (the "AAA") with a copy to all of the other Members and the Manager. The notice shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and containing a request that the AAA provide a list of at least three disinterested persons of recognized competence in the field involved from whom an arbitrator may be appointed in accordance with the AAA Commercial Arbitration Rules then in effect, as modified by this Agreement. If, for any reason, the appointment cannot be made from such list, the AAA shall have the power to make the appointment from among the other members of its panel without the submission of additional lists. The arbitrator shall as promptly as possible arbitrate such matter. All parties shall each be entitled to present evidence and argument to the arbitrator.

11.3    Decision; Procedure. The determination of the arbitrator shall be conclusive upon the parties and judgment upon the same may be entered in Superior Court of Suffolk County of the Commonwealth of Massachusetts. The arbitrator shall give written notice to the parties stating her or his determination, and shall furnish to each party a signed copy of such determination. Arbitration proceedings shall be conducted under the American Arbitration Association Commercial Rules with Expedited Procedures in effect on the date hereof as modified by this Agreement. There shall be no discovery or dispositive motion practice except the arbitrator(s) shall authorize such discovery as may be shown to be necessary to ensure a fair hearing, and no such discovery shall extend the time limits contained herein. The arbitrator(s) shall not be bound by the rules of evidence or of civil procedure, but may consider such information as reasonable businesspeople would use in the conduct of their day-to-day affairs and may require the parties to submit some or all of their case by written declaration or such other manner of presentation as the arbitrator(s) may determine to be appropriate. The parties intend to limit live testimony and cross-examination to the extent necessary to ensure a fair hearing on material issues. Any resolution may be submitted to Superior Court of Suffolk County of the Commonwealth of Massachusetts for enforcement.

11.4    Fees and Expenses. The parties covenant that they will participate in such arbitration in good faith. Each party hereby agrees to pay for his or its expenses and his or its own attorney's fees and expenses and to share equally in the other costs of said arbitration, except that (a) in the discretion of the arbitrator, any award may include the cost of a party's counsel, and (b) any award shall include the costs of a party's counsel if the arbitrator expressly determines that the party against whom the award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a frivolous or dilatory action. The provisions of this section may be enforced by the Superior Court of Suffolk County of the Commonwealth of Massachusetts. If this is necessary, the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

25

ARTICLE XII
Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" means the G.L. c. 156C, Massachusetts Limited Liability Company Act, in effect at the time of the initial filing of the Certificate with the office of the Secretary of the Commonwealth of Massachusetts, and as thereafter amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

      (a)    credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (b)    debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliated Person" or "Affiliate" means, with reference to a specified Person, any (i) Person who owns directly or indirectly 10% or more of the beneficial ownership in such Person; (ii) one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clause (i); (iii) entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (i) and (ii) owns directly or indirectly 10% or more of the beneficial ownership.

"Agreement" means this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" means the Applicable Federal Rate as that term is defined in Code Section 7872, whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury based on average market yields for relevant recent periods.

"Bankruptcy" means any of the following:

      (i)    If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under

26

the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her Interest (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree); or

(ii)    If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her Interest shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty days (whether or not consecutive); or

(iii)    If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Book Value" means, with respect to any asset of the LLC, such asset's adjusted basis for federal income tax purposes, except that:

(i)    the initial Book Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset (not reduced for any liabilities to which it is subject or which the LLC assumes), as such value is determined and for which credit is given to the contributing Member under this Agreement;

27

(ii)    the Book Values of all assets of the LLC shall be adjusted to equal their respective gross fair market values, as determined by the Managers, at and as of the following times:

    (a)    . the acquisition of an additional or new Interest, or any part thereof, by a new or existing Member in exchange for other than a de minimis capital contribution by such Member, if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

    (b)    the distribution by the LLC to a Member of more than a de minimis amount of any asset of the LLC (including cash or cash equivalents) as consideration for all or any portion of an Interest, if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

    (c)    the liquidation of the LLC within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and

(iii)    the Book Value of the assets of the LLC shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (iii) to the extent that the Managers determine that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (iii).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (i), (ii) or (iii), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses, and the amount of the adjustment shall thereafter be taken into account as gain or loss from the distribution of such asset for purposes of computing Profits and Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Sections 704(b) and (c) of the Code. The Capital Account of each Interest Holder shall be:

(i)    credited with all payments made to the LLC by such Interest Holder on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Interest Holder, the agreed (as

28

between the Interest Holders) fair market value of such property, net of liabilities secured by such property and assumed by the LLC or subject to which such contributed property is taken) and by such Interest Holder's allocable share of Profits and items in the nature of income and gain of the LLC;

(ii) charged with the amount of any distributions to such Interest Holder (and as to any distributions of property other than cash or a promissory note of an Interest Holder or the LLC, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Interest Holder or subject to which such distributed property is taken), and by such Interest Holder's allocable share of Losses and items in the nature of losses and deductions of the LLC;

(iii) adjusted simultaneously with the making of any adjustment to the Book Value of the LLC's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the LLC recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

(iv) otherwise appropriately adjusted to reflect transactions of the LLC and the Interest Holders.

"Capital Contribution" means the amount of cash and the value of any other property contributed to the LLC by an Interest Holder as set forth in Schedule I hereto.

"Certificate" means the Certificate of Organization creating the LLC, as it may, from time to time, be amended in accordance with the Act.

"Class A Member" shall refer severally to the Interest Holders named as Class A Members in this Agreement and any Person who becomes an additional, substitute or replacement Class A Member as permitted by this Agreement, in each such Person's capacity as a Class A Member of the LLC.

"Class B Member" shall refer severally to the Interest Holders named as Class B Members in this Agreement and any Person who becomes an additional, substitute or replacement Class B Member as permitted by this Agreement, in each such Person's capacity as a Class B Member of the LLC.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any subsequent federal law of similar import.

"Consent of the Class A Members" means, until such time as the Torosyan Capital has been returned in full through distribution or otherwise and the Torosyan Loans have been repaid in full,

29

the consent or approval of both Class A Members, provided, however, that in the event that both Class A Members are not in agreement on the matter at issue, the matter shall be decided by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC. Once the Torosyan Capital has been returned in full and the Torosyan Loans have been repaid in full, "Consent of the Class A Members" shall mean the consent of both Class A Members (with disputes decided in accordance with Articles X and XI). Consent may be given verbally, in writing, or by email, unless otherwise specified herein.

"Depreciation" means, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by the Manager, but not less than depreciation allowable for tax purposes for such year.

"Indebtedness" means (i) any indebtedness for borrowed money or the deferred purchase price of property, as evidenced by a note, bond, or other instrument; (ii) obligations as lessee under any capital lease; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien, or charge of any kind existing on any asset owned or held by the LLC, whether or not the LLC has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and (v) obligations under direct or indirect guarantees of (including obligations, contingent or otherwise, to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), and (iv) of this sentence.

"Interest" means an equity interest in the LLC and all rights and liabilities associated therewith.

"Interest Holder" shall mean the holder of an Interest.

"Involuntary Transfer" means any sale, assignment, transfer, exchange or other disposition made on account of a court order or otherwise by operation of law, including but not limited to any sale, assignment, transfer, exchange or other disposition as a result of a Bankruptcy or divorce but excluding transfers as a result of death, whether or not it is a probate or nonprobate, testate or intestate transfer.

"LLC" means the limited liability company formed pursuant to the Certificate and this Agreement, as it may from time to time be constituted and amended.

"Legal Representative" means, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative or other legal representative appointed as a result of the death or incompetency of such individual.

"Liquidating Capital Transaction" means any event which causes the liquidation of the LLC.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Managers" shall refer to Jambulat Tkhilaishvili and Vahagn Victor Torosyan in their capacity as Managers of the LLC and any person who becomes an additional substitute or replacement Manager as permitted by this Agreement.

"Member" shall refer severally to the Interest Holders named as Members in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the LLC. "Members" shall refer collectively to the Persons named as Members in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the LLC.

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Partner Minimum Gain" shall mean "Partner nonrecourse debt minimum gain" as set forth in Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Debt" shall have the meaning given in Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(i)(2).

"Percentage Interest" shall be the percentage interest of an Interest Holder set forth in Article IV.

"Person" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation or other entity.

"Profits" and "Losses" means, for each year or other period, an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

31

(i)     Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

(ii)    Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or loss;

(iii)   Gain or loss from a disposition of property of the LLC with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

(iv)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

(v)     Any items which are separately allocated pursuant to Sections 4.05 and/or 4.06 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the LLC's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the LLC's Profits for such year; and if negative, such amount shall be the LLC's Losses for such year.

"Regulations" means the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Torosyan Capital" means the total Capital Contribution of two hundred thousand dollars ($200,000) made by Vahagn Victor Torosyan to the LLC as of or following the date of this Agreement.

"Torosyan Loans" mean one or more loan(s) from Vahagn Victor Torosyan to the LLC and/or to Health Management Group, LLC entered into as of the date of this Agreement.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to

any Interest, whether voluntary or involuntary, by operation of law, or judicial sale, or otherwise. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

**[Signature Page Follows]**

33

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

MANAGERS:

_____
Jambula Tkhilaishvili

_____
Vahagn Victor Torosyan

CLASS A MEMBERS:

_____
Jambula Tkhilaishvili

_____
Vahagn Victor Torosyan

CLASS B MEMBERS:

_____
Olga Dorofyeyeva

_____
Kenton Fabrick

_____
David Tkhilaishvili

34

## SCHEDULE I

## Membership Interest

Date of Schedule: September 11, 2015

| CLASS A MEMBERS | | | |
|---|---|---|---|
| Name | Address | Percentage Interest | Capital Contribution |
| Jambulat Tkhilaishvili | | 42.25% | $42.25 |
| Vahagn Victor Torosyan | | 43.45% | $200,043.45 |
| CLASS B MEMBERS | | | |
| Name | Address | Percentage Interest | Capital Contribution |
| Olga Dorofyeyeva | | 4.9% | $4.90 |
| Kenton Fabrick | | 4.9% | $4.90 |
| David Tkhilaishvili | 7 Seaport Drive, Apartment 608 Quincy, MA 02171 | 4.5% | $4.50 |
| TOTAL | | 100% | $200,100.00 |

3019\0002\383123.3

# EXHIBIT D

## To Affidavit of Vahagn Victor Torosyan



ALLIED HEALTH CLINIC, LLC
21 SCHOOL ST STE 1
QUINCY MA 02169-6640

1190

53-13/110 MA
26359

Bank of America

DATE 8.21.15.

PAY TO THE ORDER OF David Tkhilaishvili

five thousand Dollars 00/00

$ 5000.00 DOLLARS

IV check 1159.

# EXHIBIT E

## To Affidavit of Vahagn Victor Torosyan

ALLIED HEALTH CLINIC, LLC
21 SCHOOL ST STE 1
QUINCY MA 02169-8640

1191

53-13 110 MA
26959

DATE 8.22.15

PAY TO THE ORDER OF _Allied Health David Mkhadashvili_    $ 6000.00

Six thousand dollars    00/100    DOLLARS

Bank of America

ACH R/T 011000138

FOR _____

DT DT PT

USP

⑈010001.38⑈ 011000138⑈ 004643392804⑈

# EXHIBIT F

## To Affidavit of Vahagn Victor Torosyan



**U.S. Department of Justice**
Federal Bureau of Investigation
Boston Division
Suite 600
One Center Plaza
Boston, MA 02108
Phone: (617) 223-6440

December 24, 2015

Victor Torosyan
11 DEXTER AVE
Watertown, MA 02472

RE: Case Number: 281H-BS-6772193

Dear Victor Torosyan:

As a Victim Specialist with the Boston Division, I'm contacting you because we have identified you as a possible victim of a crime.

This case is currently under investigation by the FBI. A criminal investigation can be a lengthy undertaking, and, for several reasons, we cannot tell you about its progress at this time. A victim of a federal crime is entitled to receive certain services. The enclosed brochure introduces you to the FBI's Victim Assistance Program and the types of assistance that may be available to you.

Current information regarding the status of your case can be found on the Internet at https://www.notify.usdoj.gov or by calling the Victim Notification System (VNS) Call Center at 1-866-DOJ-4YOU (1-866-365-4968). You will need to enter your Victim Identification Number (VIN) **'4873405'** and your Personal Identification Number (PIN) **'6590'** anytime you contact the Call Center and the first time you log into VNS on the Internet. If you are receiving notifications with multiple victim ID/PIN codes please contact the VNS Call Center. In addition, the first time you access the VNS Internet site, you will be prompted to enter your last name (or business name) as currently contained in VNS. The name you should enter is Torosyan.

You can also use the Call Center and the Internet to correct/update your contact information and/or change your decision regarding participation in the notification system. Your participation in this notification system is totally voluntary. You can choose not to participate or reactivate your access at any time. In order to continue to receive notifications, it is your responsibility to keep your contact information current.

For many VNS registrants email will provide the most timely notification. VNS does not currently have an email address for you. You can provide VNS an email address by accessing the VNS Internet Web page using the login information provided above. By entering your email as part of the VNS registration process future notifications will be delivered by email, except in rare circumstances when you might also receive a letter from VNS.

If you have additional questions related to this matter, please contact me at (617) 223-6440. When you call, please provide the file number located at the top of this letter.

Sincerely,

Lisa Solecki
Victim Specialist

# EXHIBIT G

## To Affidavit of Vahagn Victor Torosyan

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
for the

District of Massachusetts

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Victor Torosyan
22 Dexter Ave.
Watertown MA

   **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Grand Jury Room, 10th Floor<br>John Joseph Moakley Federal Courthouse<br>1 Courthouse Way<br>Boston, MA  02210 | Date and Time:<br><br>02/17/2016 10:00 am |
|---|---|

   You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

WITNESS TRAVEL & REIMBURSEMENT INSTRUCTIONS ARE ATTACHED.  CALL WITNESS COORDINATOR BENITA CAREY AT (617) 748-3134 FOR TRAVEL AND REIMBURSEMENT ONLY.  IF YOU HAVE ANY QUESTIONS REGARDING SCHEDULING ISSUES, CALL THE ATTORNEY LISTED BELOW.  FOR AFTER BUSINESS HOUR EMERGENCIES CALL (617) 748-3100.

Date:   02/04/2016

*CLERK OF COURT*

*Robert M. Farrell*
*Signature of Clerk or Deputy Clerk*

---

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena are:
AUSA Laura J. Kaplan
John Joseph Moakley U.S. Courthouse
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA  02210
Telephone: 617-748-3100

MRT-0010

AO 110 (Rev. 06/09)  Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* _____

was received by me on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

☒   For personal appearances only:
Fact witness travel and reimbursement instructions are attached.
If you have travel or reimbursement questions call witness travel coordinator
Benita Carey at 617-748-3134.

For after business hour emergencies, call 617-748-3100.

## Advice of Rights

- The grand jury is conducting an investigation of possible violations of Federal criminal laws.

- You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

- Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.

- If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you so desire.



U.S. Department of Justice

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way, Suite 9200*
*Boston, Massachusetts 02210*

## TRAVEL & REIMBURSEMENT INSTRUCTIONS
## FOR FACT WITNESSES
## APPEARING IN BOSTON, MASSACHUSETTS

- The U.S. Attorney's Office and the federal grand jury are located in the Moakley Federal Courthouse at the corner of Northern Ave. and Sleeper St. in the Seaport District.
- Report to the U.S. Attorney's Office reception desk on the 9th Floor, Suite 9200.
- Bring your subpoena. Also bring two forms of ID, one ID must have your photo on it.
- Leave electronic devices at the court security desk at the main entrance to the courthouse.

### GROUND TRANSPORTATION AND PARKING
- Travel must be by public transportation, coach class or the least expensive means.
- Original receipts are required for reimbursement of ALL PARKING, and for other transportation expenses, regardless of the amount.
- Obtain receipts showing travel date, fare amount, and payment method.
- Closest subway stop is Courthouse on the Silver Line, South Station on the Red Line.
- Reimbursement for use of a privately-owned vehicle is at the government mileage rate.
- Gasoline expenses are not reimbursed in addition to mileage.
- Parking lots near the courthouse charge flat rates, rates start at approx. $18.00 a day.
- Reimbursement for parking in Boston is limited to the rates charged in the area of the Moakley Federal Courthouse.
- Car rentals, illegal parking tickets and taxicab rides* will not be reimbursed.
- *Only taxicab rides between Logan Airport and certain Boston hotels will be reimbursed.
- Taxi receipts are required regardless of the amount. Taxicab and shuttle van service tips are limited to up to 15% of the fare. Tell the taxi driver to use the Ted Williams Tunnel when traveling between Logan Airport and the federal courthouse/Seaport District hotels.
- Water shuttle service from Logan Airport to the federal courthouse is available during summer months.
- Obtain an original receipt showing date, fare amount & form of payment. Boarding passes or on-line reservation confirmation sheets are NOT sufficient for reimbursement.
- Reimbursement for driving, rather than flying from most out-of-state locations, require prior written approval by the U.S. Attorney's Office. If you will drive from out-of-state, call the witness coordinator prior to making any arrangements.
- All unusual expenses (any non-standard government travel expense or arrangement) requires prior written approval from the U.S. Attorney's Office.

1

## ADVANCE ON TRAVEL FUNDS  - FOR OUT-OF-STATE WITNESSES

- If you do not have a credit card or cash for ground transportation or hotel security deposit tell the witness coordinator before arrangements are made for you.
- An advance on reimbursement may be obtained from the U.S. Marshals Office in the state where the witness resides, but only after arrangements are made by the U.S. Attorney's Office.
- Witnesses seeking an advance on their travel reimbursement must appear in person at the U.S. Marshals Office in their home state. The amount of the advance is determined by regulations and it will be deducted from the final reimbursement amount. The witness will be issued a U.S. Treasury check, not cash. Witnesses must present their photo ID and subpoena the to the U.S. Marshals Office.
- INDIGENT OUT-OF-STATE WITNESSES should discuss reimbursement arrangements with the witness coordinator prior to arrival. In very limited circumstances, it may be possible to obtain reimbursement on the day the indigent witness departs the courthouse.

## AIRLINE TICKETS

- **DO NOT PURCHASE YOUR OWN AIRLINE TICKET.  FLIGHTS WILL BE PRE-PAID BY THE U.S. ATTORNEY'S OFFICE.**
- Call the U.S. Attorney's Office witness travel coordinator prior to the scheduled court date or grand jury date listed on the subpoena to confirm your <u>actual</u> appearance date, and to obtain a pre-paid government fare airline ticket.
- Out-of-state witnesses are not authorized to arrive in Boston earlier than the day prior to the actual appearance/testimony date.
- Witnesses are required to depart Boston on the day their grand jury or trial testimony is completed.
- Do not contact the airline directly to alter flight reservations made by the U.S. Attorney's Office, contact the U.S. Attorney's Office witness travel coordinator.
- Photo identification is required to obtain the airline ticket at the airport.
- No reimbursement will be made for the use of personal or corporate frequent flyer miles, or for travel by first-class or business-class.

## HOTEL INFORMATION

- **Do NOT make your own hotel reservation. Call the U.S. Attorney's Office witness travel coordinator prior to making lodging arrangements for which you will seek reimbursement.**
- Hotel information is applicable ONLY to out-of-state witnesses traveling more than 50 miles one-way who are required for two or more consecutive days of testimony.
- A U.S. Attorney's Office witness coordinator will make a pre-paid hotel reservation. Only the room rate will be pre-paid.  All hotel rooms are non-smoking.
- Witnesses must present the hotel with a personal credit card or cash as a security deposit for incidental expenses. If the witness does not have a credit card or cash for the security deposit, tell the witness coordinator before the lodging arrangement is made.
- Witnesses will <u>not</u> be reimbursed for incidental expenses, including but not limited to valet parking, room service, food, beverages, phone calls, movies, service bar, business services, including Internet and laundry services.
- Witnesses must checkout of the hotel on the day their testimony is completed. Checkout

2

of the hotel room before going to the courthouse.  Adhere to the hotel's standard checkout time, utilize hotel baggage storage if needed. No reimbursement will be made for expenses incurred due to late check.

- If you choose to make your own hotel reservation, speak with the witness coordinator first to obtain information about limitations on reimbursement, and possible court schedule changes or cancellations. You may be reimbursed up to the established government lodging rate. However, should your appearance date or time change or be cancelled <u>no</u> reimbursement will be made. Witnesses will not be reimbursed for "no show" room charges, late checkout fees, or any other penalty or fee.
- An itemized hotel bill showing dates, room rate, and form of payment is required for reimbursement.
- Credit card statements and on-line reservation confirmation sheets will not be accepted.
- Confirm your actual appearance date with the designated witness coordinator. Not every witness must appear on the date a trial is scheduled to begin. Scheduling adjustments occur daily once a trial is underway.

## MEALS & INCIDENTAL EXPENSES

- Only witnesses required to stay overnight in Boston for two or more consecutive days are entitled to reimbursement for meals & incidental expenses (M&IE).
- Reimbursement for M&IE is a flat rate set by the government, it varies based on geographical location.
- Do not submit food and beverage receipts.
- Reimbursement for M&IE for Boston, is $35.50 for arrival and departure days and $71.00 for each day in between.

## REIMBURSEMENT PROCEDURE

- Witnesses subpoenaed to testify are entitled to a $40.00 a day witness fee.
- **Obtain a fact witness reimbursement form (form OBD-3) from the designated witness coordinator and return that form to the witness coordinator once you have signed it.**
- Submit your ground transportation receipts by mail after you leave the courthouse. One reimbursement check will be issued per witness, so reimbursement will not be processed until all <u>original</u> receipts are received.
- Federal and military employees do not use the OBD-3 form and do not receive a witness fee.
- Witnesses will receive a reimbursement check by mail from the U.S. Marshals Service.
- Allow a minimum of 45 business days from the date the completed form and all <u>original</u> receipts are received in the U.S. Attorney's Office. Keep a copy of what you submit.
- Within 5 business days of your appearance, mail (do not email or fax) <u>original</u> receipts, with your name, address, phone number and name of the Assistant U.S. Attorney printed on the back of reach receipt, to:

>U.S. Attorney's Office
>1 Courthouse Way, Suite 9200
>Boston, MA  02210
>Attention: Witness Coordinator _____

3

## FEDERAL GOVERNMENT & MILITARY EMPLOYEES &
## INTERNATIONAL TRAVELERS & NON- U.S. CITIZENS

Travel and reimbursement are not handled in the manner described in this document. Upon notification of your scheduled testimony date call the U.S. Attorney's Office witness travel coordinator for information. Do not make travel arrangements.

## WITNESS TRAVEL COORDINATORS

If you call the U.S. Attorney's Office main number, 617-748-3100, provide the name of the Assistant U.S. Attorney listed on the bottom left side of the subpoena. Ask to speak with the witness travel coordinator for that Assistant U.S. Attorney's unit. If you are unsure whom to contact, call Valerie Gauthier in the Victim Witness Unit at 617-748-3334.

| UNIT | STAFF | PHONE |
|---|---|---|
| Economic Crimes (1st) | Amy Jones-Jackson | 617-748-3153 |
| Economic Crimes (2nd) | Nancy Rojas | 617-748-3288 |
| Health Care Fraud | Connor Herdic | 617-748-3646 |
| Anti-Terrorism Unit (1st) | Connie O'Brien | 617-748-3127 |
| Anti-Terrorism Unit (2nd) | Patricia Carlozzi | 617-748-3259 |
| CyberCrimes Unit (1st) | Jodi-Gird Rodriguez | 617-748-3166 |
| CyberCrimes Unit (2nd) | Amy Jones | 617-748-3153 |
| Major Crimes(1st) | Sylvia Cooper | 617-748-3178 |
| Major Crimes(2nd) | Sandy Cheung | 617-748-3115 |
| Strike Force | Benita Carey | 617-748-3134 |
| Public Corruption | Jennifer Cullinane | 617-748-3368 |
| Civil Division(1st) | Ellen Souris | 617-748-3285 |
| Civil Division (2nd) | Jessica Pooler | 617-748-3299 |
| OC/Drug Task Force | Nancy Luciano | 617-748-3367 |
| OC/Drug Task Force | Karin Matthews | 617-748-3257 |
| OC/Drug Task Force | Jessica Hogg | 617-748-3173 |
| Springfield Office | Laureen Cote | 413-785-0124 |
| Worcester Office | Helen Bower | 508-368-0102 |

## FOR EMERGENCIES AFTER BUSINESS HOURS
## CALL THE VICTIM WITNESS UNIT STAFF

Kathleen Griffin, Victim Witness Specialist: (Cell) 617-470-9482
Jessica Pooler, Victim Witness Specialist: (Cell) 617-504-0680
Valerie Gauthier, Victim Witness Assistant: (Cell) 617-304-2973

Tab F - Revised 9/10/14

4

# EXHIBIT H

## To Affidavit of Vahagn Victor Torosyan



Attorneys at Law

PAUL W. SHAW
pshaw@verrilldana.com
Direct: (617) 274-2860

ONE BOSTON PLACE
SUITE 1600
BOSTON, MASSACHUSETTS 02108-4407
617-309-2600 • FAX 617-309-2601
www.verrilldana.com

January 7, 2016

**VIA OVERNIGHT DELIVERY
AND ELECTRONIC MAIL**

David Tkhilaishvili
7 Seaport Drive-Apt 608
Quincy, MA 02171

Jambulat Tkhilaishvili
4 Carol Avenue Apt. 2,
Brighton, MA 02135

> Re:    Allied Health Clinic, LLC
>        Health Management Group LLC

Dear David and Jambulat:

Verrill Dana is counsel to Victor Torosyan.  Pursuant to the Operating Agreements governing Allied Health Clinic, LLC (the "Clinic") and Health Management Group, LLC ("Health Management"), attached are copies of (1) the Action by Written Consent by Class A Members in Lieu of Special Meeting taken by Mr. Torosyan on behalf of the Clinic and (2) the Action by Written Consent by Class A Members in Lieu of Special Meeting taken by Mr. Torosyan on behalf of Health Management.  By reason of these Actions by Written Consent, Jambulat Tkhilaishvili has been removed as Manager of the Clinic and David Tkhilaishvili has been removed as Manager of Health Management.  In addition, Mr. Torosyan has determined on behalf of the Clinic and Health Management that David Tkhilaishvili and Jambulat Tkhilaishvili have forfeited their interests in the Clinic and in Health Management through their misconduct. The reasons for these actions are stated in the Written Consents.

January 7, 2016
Page 2

      As a result of the actions, you (David Tkhilaishvili and Jambulat Tkhilaishvili) are hereby notified that:

(i)      you are prohibited from conducting any business in the name, or on behalf, of either the Clinic or Health Management;

(ii)     you are prohibited from coming onto the premises of the Clinic at 21 School Street Suite #1, Quincy, Massachusetts; and

(iii)    you are prohibited from having any contact with any employees or other personnel of the Clinic.

      I suggest you consult an attorney, and have that attorney contact me if he/she has any questions.

Very truly yours,

VERRILL DANA LLP

By: _____

Paul W. Shaw

8914581_1

ALLIED HEALTH CLINIC, LLC

ACTION BY WRITTEN CONSENT BY CLASS A MEMBERS
IN LIEU OF SPECIAL MEETING

As of January 6, 2016

The undersigned, Vahagn Victor Torosyan ("Victor"), being one of the two Class A Members of Allied Health Clinic, LLC (the "Company"), and having sole and absolute discretion under that certain *Amended and Restated Operating Agreement* of the Company dated as of September 11, 2015 (the "Operating Agreement"), hereby consents to the adoption of the following resolutions without a meeting and to the taking of any and all actions contemplated therein or thereby:

WHEREAS:     Jambulat Tkhilaishvili ("Jambulat T") is a Manager of the Company and holds a 42.45% membership interest.

WHEREAS:     Pursuant to the Operating Agreement, "[t]he Managers shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty will be grounds for immediate removal as a Manager by the Consent of the Class A Members."

WHEREAS:     The Operating Agreement further provides, "The Members shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty by a Member will be grounds for forfeiture of such Member's entire Interest upon the Consent of the Class A Members."

WHEREAS:     Pursuant to the Operating Agreement, "'Consent of the Class A Members' means, until such time as the Torosyan Capital has been returned in full through distribution or otherwise and the Torosyan Loans have been repaid in full,  the consent or approval of both Class A Members, provided, however, that in the event that both Class A Members are not in agreement on the matter at issue, the matter shall be decided by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC."

WHEREAS:     The Operating Agreement provides, "Notwithstanding anything to the contrary herein, any dispute between the Managers that occurs prior to the return of the Torosyan Capital and repayment of the Torosyan Loans will be decided by Vahagn Victor Torosyan in his sole discretion."

WHEREAS:     The Torosyan Capital has not been returned in full and the Torosyan Loans have not been repaid in full.

WHEREAS:     Jambulat T has breached the fiduciary duty of good faith and loyalty to the Company by (i) misappropriating funds of the Company for his personal benefit including payments for his personal cell phone, (ii) conspiring with his brother David Tkhilaishvili ("David T") to misappropriate funds of the

1 of 2

Company, including, without limitation, $11,000 in two checks made out to David T which he cashed to pay for a vacation and (iii) threatening to burn the Clinic down and harm Victor unless Victor agreed to Jambulat T and David T's demands that Victor surrender his rights in the Company under the Operating Agreement and his interests in the Company.

WHEREAS:    David T is a member of the Company holding a 4.5% membership interest.

WHEREAS:    David T has breached the fiduciary duty of good faith and loyalty to the Company by (i) misappropriating funds of the Company, including, without limitation, $11,000 in two checks made out to David T which he cashed to pay for a vacation and (ii) threatening to burn the Clinic down and harm Victor unless Victor agreed to Jambulat T and David T's demands that Victor surrender his rights in the Company under the Operating Agreement and his interests in the Company.

WHEREAS:    Victor has determined in his reasonable judgment that, in the best interests of the Company, Jambulat T should be removed as Manager of the Company and that his interests in the Company should be forfeited.

WHEREAS:    Victor has determined in his reasonable judgment that, in the best interests of the Company, David T's interests in the Company should be forfeited.

VOTED:      That Jambulat T be and is hereby removed as a Manager of the Company and that his power to participate in the management of the Company be and is hereby terminated.

VOTED:      That Jambulat T's interests in the Company be and are hereby forfeited.

VOTED:      That David T's interests in the Company be and are hereby forfeited.

VOTED:      That this Action By Written Consent of the Class A Members In Lieu Of Special Meeting shall be filed in the Minute Book of the Company and that a copy of this Action be delivered in accordance with applicable provisions of the Operating Agreement to David T and Jambulat T.


IN WITNESS WHEREOF, the undersigned, being the Class A Member with sole and absolute discretion over the matters herein contained, has executed this instrument as of the date first set forth above.


Vahagn Victor Torosyan

8906953_1

# EXHIBIT I

## To Affidavit of Vahagn Victor Torosyan

# CRIMINAL DOCKET

**District Court Department**

| DEFENDANT: NAME AND ADDRESS | DOB | GENDER | COURT NAME AND ADDRESS |
|---|---|---|---|
| DAVID TKHILAISHVILI<br>95 GROVE ST #8<br>W ROXBURY, MA 02132 | 09/21/1980 | MALE | WEST ROXBURY DISTRICT COURT<br>445 ARBORWAY<br>JAMAICA PLAIN, MA 02130-3688 |
| | DATE COMPLAINT ISSUED<br>07/14/2008 | | (617)971-1200 |
| | PRECOMPLAINT ARREST DATE<br>07/12/2008 | | INTERPRETER REQUIRED<br>*Russian* |

## FIRST FIVE OFFENSE COUNTS

| COUNT | CODE | OFFENSE DESCRIPTION | OFFENSE DATE |
|---|---|---|---|
| 1 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 2 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 3 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 4 | 140/131L/A | FIREARM, STORE IMPROP c140 §131L(a)&(b) | 07/12/2008 |

DEFENSE ATTORNEY

OFFENSE CITY/TOWN: W ROXBURY

POLICE DEPARTMENT: BOSTON P.D. -AREA E-

| DATE & JUDGE | DOCKET ENTRY | DATE & JUDGE | FEES IMPOSED |
|---|---|---|---|
| 7-14-08 Driscoll | ☐ Attorney appointed (SJC R. 3:10)<br>☑ Atty denied & Deft. Advised per 211 D §2A<br>☐ Waiver of Counsel found after colloquy | Driscoll | Legal Counsel Fee (211D § 2A¶2) $ 150/S ☐ WAIVED |
| 7-14-08 Driscoll | Terms of release set: ☐ PR ☐ Bail 1000 at station<br>☑ See Docket for special conditions<br>☐ Held (276 §58A) | | Legal Counsel Contribution (211D § 2) $ ☐ WAIVED<br>Default Warrant Assessment Fee (276 § 30 ¶2) $ ☐ WAIVED |
| 7-14-08 Driscoll | Arraigned and advised: ☑ Potential of bail revocation (276 §58)<br>☐ Right to bail to review (276 §58)<br>☐ Right to drug exam (111E § 10) | 2-25-09 Giandaca | Default Warrant Removal Fee (276 § 30 ¶1) $ ☐ WAIVED<br>Probation Supervision Fee (276 § 37A) $ ☐ WAIVED |
| 2-25-09 Giandaca | Advised of right to jury trial ☐ Waiver of jury found after colloquy ☐ Does not waive | | Bail Order Forfeited |
| | Advised of trial rights as pro se (Dist. Ct. Supp.R.4) | | |
| | Advised of right of appeal to Appeals Ct. (M.R. Crim P.R. 28) | | |

## SCHEDULING HISTORY

| NO. | SCHEDULED DATE | EVENT | RESULT | JUDGE | TAPE START/STOP |
|---|---|---|---|---|---|
| 1 | 07/14/2008 | ARR | ☐ Held ☐ Cont'd No contact / S.A. ALL victims | | |
| 2 | 7-21-08 | PTI | ☐ Held ☐ Cont'd Russian Interp | | |
| 3 | 9-17-08 | PTH | ☐ Held ☐ Cont'd Russian Interp | | |
| 4 | 8-5-08 | Not present allowed fp | ☐ Held ☐ Cont'd | | |
| 5 | 10-20-08 | PTH | ☐ Held ☐ Cont'd | | |
| 6 | 12-4-08 | Motion | ☐ Held ☐ Cont'd Russian Interp | | |
| 7 | 2-25-09 | " | ☐ Held ☐ Cont'd | | |
| 8 | 8-25-10 | CWOF | ☐ Held ☐ Cont'd | | |
| 9 | | | ☐ Held ☐ Cont'd | | |
| 10 | | | ☐ Held ☐ Cont'd | | |

APPROVED ABBREVIATIONS

ARR = Arraignment PT= Pretrial hearing CE = Discovery compliance & jury selection T= Bench trial JT = Jury trial PC = Probable cause hearing M = Motion hearing SR= Status review SRP = Status review of payments FA= First appearance in jury session S = Sentencing CW = Continuance-without-finding scheduled to terminate P = Probation scheduled to terminate DFTA = Defendant failed to appear & was defaulted WAR = Warrant Issued WARD = Default warrant issued WR = Warrant or default warrant recalled PV = probation violation hearing

| A TRUE COPY ATTEST: | CLERK-MAGISTRATE / ASST CLERK X | TOTAL NO. OF PAGES | ON (DATE) |
|---|---|---|---|

| DATE | DOCKET ENTRIES |
|---|---|
| 7-14-08 | $1,000.00 cash bail rec'd from Clerk-Magistrate Walsh (JP) |
| | Russian Interpreter requested for AH on 7-21-08. gl |
| 9-17-08 | A's mtn. to suppress physical evidence & statements filed mms |
| 12-04-08 | Georgian Int. requested for JT on 02-28-09 gl |
| 2-25-09 | deportation warning given Fiendaca mms |
| | 2/25/09 |
| | DATE: $ 1000   BAIL RETURNED TO SURETY CK# 0192 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

APPROVED ABBERVIATIONS

ARR = Arraignment   PT= Pretrial hearing   CE = Discovery compliance & jury selection   T = Bench trial   JT = Jury trial   PC = Probable cause hearing M = Motion hearing   SR= Status review
SRP = Status review of payments   FA = First appearance in jury session   S = Sentencing   CW = Continuance-without-finding scheduled to terminate   P = Probation scheduled to terminate
DFTA = Defendant failed to appear & was defaulted   WAR = Warrant issued   WARD = Default warrant issued   WR = Warrant or default warrant recalled   PR = probation revocation hearing

| CRIMINAL DOCKET - OFFENSES | DEFENDANT NAME<br>DAVID TKHILAISHVILI | DOCKET NUMBER<br>0806CR002062 |
|---|---|---|

| COUNT / OFFENSE | | |
|---|---|---|
| 1 | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | DISPOSITION DATE AND JUDGE 8-25-09 Fiandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☑ WAIVED | OTHER |
|---|---|---|---|---|---|---|---|---|

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth  ☐ Request of Victim
  - ☐ Request of Defendant  ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

1) stay away from victims / no contact
2) assmnt

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☑ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | Hon. Faison | 8-30-2010 |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE | | |
|---|---|---|
| 2 | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | DISPOSITION DATE AND JUDGE 8-25-09 Fiandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☐ WAIVED | OTHER |
|---|---|---|---|---|---|---|---|---|

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth  ☐ Request of Victim
  - ☐ Request of Defendant  ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☑ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | Hon. Faison | 8-30-2010 |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE | | |
|---|---|---|
| 3 | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | DISPOSITION DATE AND JUDGE 8-25-09 Fiandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☐ WAIVED | OTHER |
|---|---|---|---|---|---|---|---|---|

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth  ☐ Request of Victim
  - ☐ Request of Defendant  ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☑ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | Hon. Faison | 8-30-2010 |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE | DISPOSITION DATE AND JUDGE |
|---|---|
| 4    FIREARM, STORE IMPROP c140 §131L(a)&(b) | 8-25-09 Mandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ WAIVED | |

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth   ☐ Request of Victim
  - ☐ Request of Defendant   ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-09
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

| FINDING | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|
| ☐ Guilty   ☐ Not Guilty | ☑ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible   ☐ Not Responsible | ☐ Probation terminated: defendant discharged | Hon. Frison | 8-30-2010 |
| ☐ Probable Cause   ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE | DISPOSITION DATE AND JUDGE |
|---|---|
| | |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ WAIVED | |

**DISPOSITION METHOD**
- ☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth   ☐ Request of Victim
  - ☐ Request of Defendant   ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☐ Sufficient facts found but continued without a finding until:
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

| FINDING | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|
| ☐ Guilty   ☐ Not Guilty | ☐ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible   ☐ Not Responsible | ☐ Probation terminated: defendant discharged | | |
| ☐ Probable Cause   ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE | DISPOSITION DATE AND JUDGE |
|---|---|
| | |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ WAIVED | |

**DISPOSITION METHOD**
- ☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth   ☐ Request of Victim
  - ☐ Request of Defendant   ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☐ Sufficient facts found but continued without a finding until:
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

| FINDING | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|
| ☐ Guilty   ☐ Not Guilty | ☐ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible   ☐ Not Responsible | ☐ Probation terminated: defendant discharged | | |
| ☐ Probable Cause   ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

APPLICATION FOR
CRIMINAL COMPLAINT

APPLICATION NO. (COURT USE ONLY)     PAGE ___ of ___

Trial Court of Massachusetts
District Court Department

I, the undersigned complainant, request that a criminal complaint issue against the accused charging the offense(s) listed below. If the accused **HAS NOT BEEN ARRESTED** and the charges involve:

☐ ONLY MISDEMEANOR(S), I request a hearing ☐ **WITHOUT NOTICE** because of an imminent threat of ☐ **BODILY INJURY** ☐ **COMMISSION OF A CRIME** ☐ **FLIGHT** ☐ **WITH NOTICE** to accused.
☐ ONE OR MORE FELONIES, I request a hearing ☐ **WITHOUT NOTICE** ☐ **WITH NOTICE** to accused.

☐ **WARRANT** is requested because prosecutor represents that accused may not appear unless arrested.

Boston Municipal Court
West Roxbury Division
445 Arborway
Jamaica Plain, MA 02130

ARREST STATUS OF ACCUSED
☒ HAS     ☐ HAS NOT been arrested

## INFORMATION ABOUT ACCUSED

NAME (FIRST MI LAST) AND ADDRESS
David Tkhilaishvili
95 Grove St #8
West Roxb. MA 02132

BIRTH DATE
9.21.80

SOCIAL SECURITY NUMBER
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

PCF NO.

MARITAL STATUS
Single

DRIVERS LICENSE NO.
S16837062

STATE

GENDER
Male

HEIGHT
6-

WEIGHT
180

EYES
Bro

HAIR
Bro

RACE
Wh

COMPLEXION
light

SCARS/MARKS/TATTOOS

BIRTH STATE OR COUNTRY
Batumi, Rus

DAY PHONE

EMPLOYER/SCHOOL
NI Transport

MOTHER'S MAIDEN NAME (FIRST MI LAST)
Dodo Kachibaia

FATHER'S NAME (FIRST MI LAST)
Venuri Tkhaishvili

## CASE INFORMATION

COMPLAINANT NAME (FIRST MI LAST)
Det Wendell C. Josey Et Al

ADDRESS
Boston Police Dept Dest E-5
1708 Centre St
West Roxb MA 02132

COMPLAINANT TYPE.
☒ POLICE ☐ CITIZEN ☐ OTHER

PD
BPD

PLACE OF OFFENSE
Grove St @ Washington, W. Roxb

INCIDENT REPORT NO.
080401088

OBTN

CITATION NO(S).

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| 265 15B | Assault/DW (Gun) | 7-12-08 |

VARIABLES (e.g. victim name, controlled substance, type and value of property, other variable information; see Complaint Language Manual)
David Dzidzikashvilie 66 Walnut St #6, Somerville MA

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| 265-15B | Assault DW (Gun) | 7-12-08 |

VARIABLES
Archvz Ucha 96 Bussey St. Dedham MA

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| 265 15B | Assault. DW (Gun) | 7-12-08 |

VARIABLES
Tashvili Ruso Khube 96 Bussey St. Dedham MA

REMARKS

COMPLAINANT'S SIGNATURE
X Wendell Josey

DATE FILED
7-14-08

COURT USE ONLY | A HEARING UPON THIS COMPLAINT APPLICATION WILL BE HELD AT THE ABOVE COURT ADDRESS ON | DATE OF HEARING | TIME OF HEARING | COURT USE ONLY
| | | AT | ←

## PROCESSING OF NON-ARREST APPLICATION (COURT USE ONLY)

| DATE | | CLERK/JUDGE |
|---|---|---|
| | NOTICE SENT OF CLERK'S HEARING SCHEDULED ON: | |
| | NOTICE SENT OF JUDGE'S HEARING SCHEDULED ON: | |
| | HEARING CONTINUED TO: | |
| | APPLICATION DECIDED WITHOUT NOTICE TO ACCUSED BECAUSE: | |
| | ☐ IMMINENT THREAT OF ☐ BODILY INJURY ☐ CRIME ☐ FLIGHT BY ACCUSED | |
| | ☐ FELONY CHARGED AND POLICE DO NOT REQUEST NOTICE | |
| | ☐ FELONY CHARGED BY CIVILIAN; NO NOTICE AT CLERK'S DISCRETION | |

| DATE | COMPLAINT TO ISSUE | COMPLAINT DENIED | CLERK/JUDGE |
|---|---|---|---|
| 7/14/08 | ☒ PROBABLE CAUSE FOUND FOR ABOVE OFFENSE(S) NO(S). #1, #2, #3. BASED ON ☒ FACTS SET FORTH IN ATTACHED STATEMENT(S) ☐ TESTIMONY RECORDED: TAPE NO._____ START NO._____ END NO._____ ☐ WARRANT ☐ SUMMONS TO ISSUE ARRAIGNMENT DATE: | ☐ NO PROBABLE CAUSE FOUND ☐ REQUEST OF COMPLAINANT ☐ FAILURE TO PROSECUTE ☐ AGREEMENT OF BOTH PARTIES ☐ OTHER: COMMENT | R.LW |

# APPLICATION FOR CRIMINAL COMPLAINT

| APPLICATION NO. (COURT USE ONLY) | PAGE | Trial Court of Massachusetts |
|---|---|---|
| 08 000 | 2 of 0 | District Court Department |

the undersigned complainant, request that a criminal complaint issue against the accused charging the offense(s) listed below. If the accused **HAS NOT BEEN ARRESTED** and the charges involve:

☐ ONLY MISDEMEANOR(S), I request a hearing ☐ WITHOUT NOTICE because of an imminent threat of
  ☐ BODILY INJURY ☐ COMMISSION OF A CRIME ☐ FLIGHT ☐ WITH NOTICE to accused.
☐ ONE OR MORE FELONIES, I request a hearing ☐ WITHOUT NOTICE ☐ WITH NOTICE to accused.

☐ WARRANT is requested because prosecutor represents that accused may not appear unless arrested.

Boston Municipal Court
West Roxbury Division
445 Arborway
Jamaica Plain, MA 02130

**ARREST STATUS OF ACCUSED**
☒ HAS ☐ HAS NOT been arrested

## INFORMATION ABOUT ACCUSED

NAME (FIRST MI LAST) AND ADDRESS

David Tkhilaishvili
93 Grove St #0
West Roxbury MA 02132

| BIRTH DATE | SOCIAL SECURITY NUMBER |
|---|---|
| 9-21-80 | 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 |

| PCF NO. | MARITAL STATUS |
|---|---|
| | Single |

| DRIVERS LICENSE NO. | STATE |
|---|---|
| S16837062 | |

| GENDER | HEIGHT | WEIGHT | EYES |
|---|---|---|---|
| MALE | 6- | 180 | Brn |

| HAIR | RACE | COMPLEXION | SCARS/MARKS/TATTOOS | BIRTH STATE OR COUNTRY | DAY PHONE |
|---|---|---|---|---|---|
| BRN | WN | light | | Batumi, Rus. | |

| EMPLOYER/SCHOOL | MOTHER'S MAIDEN NAME (FIRST MI LAST) | FATHER'S NAME (FIRST MI LAST) |
|---|---|---|
| NJ Transport | Dodo Kachibain | Temur Tkhaishvili |

## CASE INFORMATION

| COMPLAINANT NAME (FIRST MI LAST) | COMPLAINANT TYPE | |
|---|---|---|
| DET. Windell C. Josey | ☒ POLICE ☐ CITIZEN ☐ OTHER | BPA |

ADDRESS

Boston Police Dept Dist E-5
1708 Centre St
West Roxbury MA
02132

| PLACE OF OFFENSE |
|---|
| Grove St @ Wash. W.Rox |

| INCIDENT REPORT NO. | OBTN |
|---|---|
| 080401088 | |

CITATION NO(S).

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| 140-131½ | improper securing F.A. * | 2-12-08 |

VARIABLES (e.g. victim name, controlled substance, type and value of property, other variable information; see Complaint Language Manual)
Comm of MASS

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| | | |

VARIABLES

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| | | |

VARIABLES

| REMARKS | COMPLAINANT'S SIGNATURE | DATE FILED |
|---|---|---|
| | X _Windell Josey_ | 7-14-08 |

| COURT USE ONLY | A HEARING UPON THIS COMPLAINT APPLICATION WILL BE HELD AT THE ABOVE COURT ADDRESS ON | DATE OF HEARING | TIME OF HEARING | COURT USE ONLY |
|---|---|---|---|---|
| | | AT | | |

## PROCESSING OF NON-ARREST APPLICATION (COURT USE ONLY)

| DATE | | CLERK/JUDGE |
|---|---|---|
| | NOTICE SENT OF CLERK'S HEARING SCHEDULED ON: | |
| | NOTICE SENT OF JUDGE'S HEARING SCHEDULED ON: | |
| | HEARING CONTINUED TO: | |
| | APPLICATION DECIDED WITHOUT NOTICE TO ACCUSED BECAUSE: | |
| | ☐ IMMINENT THREAT OF ☐ BODILY INJURY ☐ CRIME ☐ FLIGHT BY ACCUSED | |
| | ☐ FELONY CHARGED AND POLICE DO NOT REQUEST NOTICE | |
| | ☐ FELONY CHARGED BY CIVILIAN; NO NOTICE AT CLERK'S DISCRETION | |

| DATE | COMPLAINT TO ISSUE | COMPLAINT DENIED | CLERK/JUDGE |
|---|---|---|---|
| 7/14/08 | ☒ PROBABLE CAUSE FOUND FOR ABOVE OFFENSE(S) NO(S). ☒ 1. ☐ 2. ☐ 3. BASED ON ☒ FACTS SET FORTH IN ATTACHED STATEMENT(S) ☐ TESTIMONY RECORDED: TAPE NO._____ START NO._____ END NO._____ ☐ WARRANT ☒ SUMMONS TO ISSUE ARRAIGNMENT DATE: | ☐ NO PROBABLE CAUSE FOUND ☐ REQUEST OF COMPLAINANT ☐ FAILURE TO PROSECUTE ☐ AGREEMENT OF BOTH PARTIES ☐ OTHER: COMMENT | RIW |



Edward F Davis, Police Commissioner

## INCIDENT REPORT

ORIGINAL                                                                 STATUS: UNAPPROVED

| KEY SITUATIONS | COMPLAINT NO. | RPT DIST. | CAD RA | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|
| Gun | 080401088 | E5 | 713 | 713 | |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | STATUS | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|
| | | | 07/12/2008 | 07/12/2008 |

| LOCATION OF INCIDENT | ABT | DISPATCH TIME | TIME OCCURRED FROM | TIME OCCURRED TO |
|---|---|---|---|---|
| 00 GROVE ST/ WASHINGTON ST | | 03:34 PM | 03:34 PM | 03:34 PM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| WEST ROXBURY | ROADWAY | | SUNNY - DAY | OUTSIDE - DAY |

| TYPE OF WEAPON/TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | SUSPECT RELATIONS[HIP] TO VICTIM |
|---|---|---|---|
| HANDGUN | CAR | DRIVING | KOWN |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR
POINTED A HAND GUN AT DRIVER

**1** TYPE VICTIM

| NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|
| DZIDZIKASHVILLE, DAVID | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 66 WALNUT ST 6, SOMERVILLE MA 00000-0000 | MALE | WHITE NON-HISPANIC | 06/28/1980 | 28 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-09 | 190 | N/A | DARK BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | Unknown | (617)-759-7777 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

**2** TYPE VICTIM

| NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|
| UCHA, ARCHVI | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 96 BUSSEY ST , DEDHAM MA 00000-0000 | N/A | WHITE NON-HISPANIC | 08/15/1978 | 29 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-11 | 178 | N/A | BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (408)-627-9561 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

**3** TYPE VICTIM

| NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|
| KHUBE, JASHVILI, RUSO | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 96 BUSSEY ST , DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 02/21/1984 | 24 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-10 | 170 | N/A | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-777-7700 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

**4** TYPE OFFENDER

| NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|
| UNKOWN | 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 | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 95 GROVE ST 8, WEST ROXBURY MA | MALE | WHITE HISPANIC | | 35 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| | | STOCKY | PART GREY | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)
POINTED A HAND GUN AT VITICMS.

Page 2 of 2

| STATUS | | REG. STATE | REG. NO. | PLATE TYPE | | YEAR (EXP) | MODEL |
|---|---|---|---|---|---|---|---|
| | | MA | 87D76H | OTHER | | 0 | ODYSSEY |
| VEHICLE MAKE YEAR | | V.I.N. | | STYLE | | COLOR (TOP-BOTTOM) | |
| HONDA - 0 | | | | MINIVAN | | GREY - GREY | |
| OPERATOR'S NAME | | LICENSE NO. | | STATE | OPERATOR'S ADDRESS | | |
| | | | | | | | |
| OWNER'S NAME | | | | OWNER ADDRESS | | | |
| N N J TRANSPORTATION | | | | 95 GROVE ST WEST ROXBURY MA | | | |

NARRATIVE AND ADDITIONAL INFORMATION:

On 7/12/2008 about 3:15 PM the E626D PTL Hawkins was approached by the diver of a GREY Honda Accord Mass plate 47EZ86. David zidzlkashvile stated a few minutes earlier at Grove and Washington streets West Roxbury, a white Male mid 30"s with grey and brown hair round face pointed a black hand gun at him and the passengers in his car. Suspect car 2001 to 2003 Honda Grey Odyssey van, Mass plates LV 87D76H with DNJ Transportation on the windows. The passenger in the mini van was a White male thin face slim build he did not show any weapons. One of the victims Ucha Archvz recognized the suspect from Pizza delivery's. Area E units Made a check at 95 Grove street apt. no one was home.

| UNIT ASSIGNED | SHIFT | | REPORTING OFFICER'S NAME | | | REPORTING OFFICER'S ID | PARTNER'S ID |
|---|---|---|---|---|---|---|---|
| E626D | 2 | | JAMES D HAWKINS | | | 8010 | 0 |
| SPECIAL UNITS NOTIFIED/REPORTING | | | | | | | |
| Area E-5 | | | | | | | |
| DATE OF REPORT | TIME COMPLETED | | APPROVING SUPERVISOR NAME | | | APPROVING SUPERVISOR ID | |
| 07/12/2008 | 05:24 PM | | N/A | | | 0 | |



**Edward F Davis, Police Commissioner**

## INCIDENT REPORT

SUPPLEMENT NO. 1 OF

STATUS: APPROVED

| KEY SITUATIONS | COMPLAINT NO. | RPT DIST. | CAD RA | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|
| Gun | 080401088 | E5 | 713 | 0 | |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | STATUS | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|
| ASSAULT D/W - GUN | ASSAULT D/W - GUN | | 07/12/2008 | 07/12/2008 |

| LOCATION OF INCIDENT | AFT | DISPATCH TIME | TIME OCCURRED FROM | TIME OCCURRED TO |
|---|---|---|---|---|
| 095 GROVE ST | 08 | | 08:30 PM | 08:30 PM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| WEST ROXBURY | N/A | | SUNNY - DAY | OUTSIDE - DAY |

| TYPE OF WEAPON-TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | SUBJECT RELATIONSHIP TO VICTIM |
|---|---|---|---|
| HANDGUN | CAR | | ACQUAINTANCE |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATORS

SEE NARRATIVE

| 1 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | DZIDZIKASHVILLE, DAVID | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 066 WALNUT ST, 06, SOMERVILLE MA 00000-0000 | MALE | WHITE NON-HISPANIC | 06/28/1980 | 28 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-09 | 190 | N/A | DARK BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-759-7777 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| 2 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | UCHA, ARCHVZ | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 096 BUSSEY STREET, DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 08/15/1978 | 29 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-11 | 178 | N/A | BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (408)-627-9561 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| 3 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | KHUBE, JASHVILI RUSO | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 096 BUSSEY STREET, DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 02/21/1984 | 24 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-10 | 170 | N/A | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-777-7700 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| 4 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| REPORTER | DET. WINDELL C, JOSEY | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 1708 CENTRE STREET, W. ROXBURY MA 00000-0000 | | | | 0 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| | | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-343-4595 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| 5 | TYPE | | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. |
|---|------|--|------------------------|--|----------|--|-------------|--|-----------|
| | OFFENDER | | TKHILAISHVILI,DAVID | | 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 | | 80049705 | | |
| | ALIAS | | ADDRESS | | GENDER | RACE | | | DOB | AGE |
| | | | 95 GROVE ST 8, WEST ROXBURY MA 02132-0000 | | MALE | WHITE NON-HISPANIC | | | 09/21/1980 | 27 |

| HEIGHT | WEIGHT | BUILD | | HAIR | | EYES |
|--------|--------|-------|--|------|--|------|
| 6-00 | 180 | MEDIUM | | DARK BROWN | | BROWN |

| OCCUPATION | | MARITAL STATUS | | CONTACT #1 | | CONTACT #2 |
|------------|--|----------------|--|-----------|--|-----------|
| | | | | | | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| STATUS | | REG. STATE | REG. NO. | | PLATE TYPE | | YEAR(EXP) | MODEL |
|--------|--|------------|----------|--|-----------|--|-----------|-------|
| Used In Crime | | MA | | | UNKNOWN | | 0 | |
| VEHICLE MAKE YEAR | | V.I.N. | | | STYLE | | COLOR TOP-BOTTOM | |
| HONDA - 0 | | | | | MINIVAN | | | |
| OPERATOR'S NAME | | LICENSE NO. | | | STATE | | OPERATOR'S ADDRESS | |
| TKHILAISHVILI, DAVID | | S16837062 | | | 23 | | 095 GROVE STREET, W. ROXBURY 02132-0000 | |
| OWNER'S NAME | | | | | OWNER'S ADDRESS | | | |

| STATUS | | TYPE OR PROPERTY | | SERIAL | | BRAND NAME / DESCRIPTION | | MODEL | | VALUE |
|--------|--|------------------|--|--------|--|--------------------------|--|-------|--|-------|
| SEIZED | | FIREARMS | | SA132224 | | SIG SAUER | | P239 | | $500.00 |

NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 20:00 HRS DET. WINDELL C. JOSEY (E-808) WAS DIRECTED BY SGT. DET. FREEMAN (E-983) TO CONDUCT A FOLLOW-UP INVESTIGATION OF A PRIOR INCIDENT OF AN ASSAULT BY MEANS OF A DANGEROUS WEAPON (FIRE ARM) AT GROVE @ WASHINGTON STREET, WEST ROXBURY. THE TIME OF THE PRIOR INCIDENT WAS ABOUT 15:34 HRS ON 7/12/2008. ABOUT 20:05 HRS CONTACT VICTIM #1 (DZIDZIKASHVILLE) VIA THE TELEPHONE. VICTIM STATED THAT THE SUSPECT HAD POINTED A HAND GUN AT HIM (VICTIM #1) AND VICTIMS #2 AND #3, AT LEAST THREE TIMES. VICTIM #1, DESCRIBED THE FIRE-ARM AS A BLACK COLORED SEMI-AUTO HANDGUN AS BEING A GLOCK OR SIG SAUER. FURTHER MORE, (DZIDZIKASHVILLE) GAVE DETECTIVE JOSEY THE SUSPECT'S NAME AS DAVID TKHILAISHVILI (SPELLING THE SUSPECT'S NAME). ALSO VICTIM #1, STATED THAT THE SUSPECT LIVED AT 95 GROVE ST. APT # 8 AND THAT HE (SUSPECT) OWNED THE COMPANY OF DNJ TRANSPORTATION. FURTHERMORE, THE VICTIM STATED THAT THE SUSPECT WORKED/OWNED CLASSIC PIZZA OUT OF TAUNT ON.

ABOUT 20:30 HRS UNDER THE DIRECT SUPERVISION OF SGT. DET. FREEMAN ALONG WITH DET. FRED FONTAINE (E-815), OFFICERS DUNNE AND DOIRON (EK01-F) AND I (DET. JOSEY) RESPONDED TO 95 GROVE STREET, APARTMENT # 8. ON ARRIVAL OFFICERS KNOCKED ON THE APT # 8 DOOR AND ANNOUNCED OUR OFFICE. A FEMALE OPENED THE DOOR AND AN INQUIRY WAS MADE AS TO THE SUSPECT PRESENCE. AT THAT TIME SUSPECT CAME FROM A ROOM IN THE REAR OF THE APARTMENT AND SUSPECT WAS ASKED TO STEP INTO THE HALLWAY. SUSPECT WAS TAKEN INTO CUSTODY. AN INQUIRY WAS MADE AS TO HIM HAVING A LICENSE TO CARRY A FIRE ARM WHICH SUSPECT STATED "YES, I HAVE ONE". HE WAS THEN ASKED IF HE HAD A FIRE-ARM. SUSPECT'S RESPONSE WAS "YES, I WILL GET IT FOR YOU". THE SUSPECT WAS INFORMED TO TELL THE OFFICERS WHERE THE FIRE ARM WAS. SUSPECT RESPONDED "I WILL SHOW YOU." SUSPECT LEAD OFFICER TO A REAR BEDROOM AND IT DID TAKE THE SUSPECT SEVERAL ATTEMPTS TO RECALL THE LOCATION OF THE FIRE ARM. AT SOME POINT THE SUSPECT INFORMED OFFICERS TO LOOK UNDER SOME BEDDING ON A BED WHERE THE FIRE ARM (DESCRIBED ABOVE) WAS LOCATED. SAID FIRE ARM DID HAVE (8) EIGHT ROUNDS OF AMMO IN THE MAG AND WAS NOT LOCKED OR PROPERLY SECURED WHEN RECOVERED. SAID FIRE ARM WAS SEIZED AS EVIDENCE AND LOGGED IN AT DISTRICT E/5 GUN LOCKER PAGE # 24. SUSPECT WAS TRANSPORTED BY E-103 F (BUTLER AND RIVERA) TO E/5 POLICE STATION AND ADVISED OF RIGHTS AND BOOKED. ALSO, LICENSE TO CARRY # 12194268A, WAS SEIZED.

| UNIT ASSIGNED | SHIFT | REPORTING OFFICER'S NAME | | REPORTING OFFICER'S ID | PARTNER'S ID |
|---------------|-------|--------------------------|--|------------------------|--------------|
| E 808 | 3 | WINDELL C JOSEY | | 9292 | 8846 |

SPECIAL UNITS NOTIFIED(REPORTING)

Area E-5

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|----------------|----------------|---------------------------|-------------------------|
| 07/12/2008 | 11:23 PM | JOHN A KLOKMAN | 8312 |

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK,ss.                          WEST ROXBURY DISTRICT COURT
                                     DOCKET NO. 0806CR002062

COMMONWEALTH            )
                        )
V.                      ) MOTION TO SUPPRESS PHYSICAL
                        ) EVIDENCE AND STATEMENTS
DAVID TKHILAISHVILI     )
                        )

## MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

 Now comes the Defendant in the above-entitled matter and hereby respectfully moves
this Honorable Court, pursuant to Mass.R.Crim.Pro.13 to suppress all evidence and
statements against him and all items seized by the Boston Police Department as a result
of the warrantless search in violation of the Defendant's rights under the Fourth and
Fourteenth Amendments to the U.S. Constitution, and Articles XII and XIV of the
Massachusetts Declaration of Rights.

   **WHEREFORE,** the defendant requests this Honorable Court to suppress all physical
evidence seized.

                              DAVID TKHILAISHVILI
                              Respectfully submitted by
                              Defendant's Attorney,

Dated:  September 17th, 2008

                              Joseph F. Hennessey, Esq.
                              Defilippis, Kalois & Hennessey, LLP
                              28 Salem Street
                              Bradford, Massachusetts 01835
                              Tel: 508 872-3144
                              BBO# 669552

9-17-08 in hand in Ct.
MMS

<u>Certificate of Service</u>

I, Joseph F. Hennessey, hereby certify that I served a true copy of the above Motion to Suppress all evidence to the Prosecutor, By In-Hand Delivery this _17th_ day of September, 2008.

Joseph F. Hennessey, Esq.
Defilippis, Kaldis & Hennessey, LLP
28 Salem Street
Bradford, Massachusetts 01835
Tel: 508 872-3144
BBO# 669552

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK,ss.                                    WEST ROXBURY DISTRICT COURT
                                               DOCKET NO. 0806CR002062

---

COMMONWEALTH                        )
                                    )
                                    )
V.                                  )
                                    )
DAVID TKHILAISHVILI                 )
                                    )

---

### ATTORNEY AFFIDAVIT

### AFFIDAVIT

NOW COMES Attorney Joseph F. Hennessey and states under the penalties of

perjury as follows:

1. My name is Joseph F. Hennessey.

2. I am the attorney of record in the above-captioned matter.

3. I am an attorney in good standing in the Commonwealth of Massachusetts and

   have concentrated my practice in the area of criminal defense for

   approximately eight months.

4. I have met with my client and have reviewed the facts of this case and believe

   that all evidence and statements should be suppressed as a result of an

   unlawful arrest and search.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _17th_ DAY OF

September, 2008.

_____
Joseph F. Hennessey, Esq.

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK,ss.                                WEST ROXBURY DISTRICT COURT
                                           DOCKET NO. 0806CR002062

COMMONWEALTH       )
                           )
                           )
V.                         )
                           )
DAVID TKHILAISHVILI    )
                           )

### DEFENDANT'S AFFIDAVIT

1. My name is David Tkhilaishvili, age 27, and I reside at 95 Grove Street, West Roxbury, Suffolk County, Massachusetts.

2. On the evening of July 12, 2008 at approximately 8:30pm Officers from the Boston Police Department knocked on my door.

3. The door was opened by a friend of my brothers who does not reside at my residence

4. The officers entered my apartment without permission and placed me under arrest without an arrest or search warrant.

5. The officers then conducted a search of my bedroom and found my handgun, which I was properly licensed to carry on that date.

6. I did not knowingly, freely or voluntarily consent to a search of my apartment.

7. I was not advised of my rights under Miranda.

8. As a result, all evidence and statements made a result of this unlawful arrest should be suppressed as fruit of the poisonous tree.

_DTKhuy_
David Tkhilaishvili

September __17__, 2008

COMMONWEALTH OF MASSACHUSETTS

08 CR 2062

| DEFENDANT'S NAME AND ADDRESS (INCLUDE ANY ALIAS) | TERMS OF RELEASE | NAME AND ADDRESS OF COURT |
|---|---|---|
| DAVID TKHILAISHVILI | | WEST ROXBURY DISTRICT COURT |
| 95 GROVE ST. #8 | ☐ PERSONAL RECOGNIZANCE (Promise to Appear) $_____ | 445 ARBORWAY JAMAICA PLAIN, MA |
| WEST ROXBURY MA | ☑ BAIL | |

(Promise to Appear)

☑ BAIL
  ☑ CASH AS SURETY $1000
  ☐ BOND AS SURETY $_____
  ☐ OTHER SURETY $_____
    (Please Specify)

THE DEFENDANT MUST APPEAR AT THIS COURT ADDRESS ON THE DATE AND TIME SPECIFIED HEREIN

DATE AND TIME OF APPEARANCE

7/14/08 AT 9:00 ☑ A.M. ☐ P.M.
DATE        TIME

SOCIAL SECURITY NUMBER 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
DATE OF BIRTH 9/21/1980

SURETY/SURETIES NAME AND ADDRESS

ARREST ON WARRANT
☐ YES
☑ NO

OFFENSE(S)
ASSAULT BY MEANS OF A DANGEROUS WEAPON

I, as defendant, charged by complaint with the crime(s) listed above, understand that I am being released from custody according to the terms of release specified. I will personally appear before the above named court at the date and time indicated, and I will appear for any continuance until the final decree, sentence or order, and I will abide by it and not depart without leave. Further, I will appear before any court to which the charges may be transferred or appealed, or to any sitting of the Superior Court to which I may be bound over or indicted to answer to any indictment, and I will appear for any continuance until the final decree, sentence or order, and I will abide by it and not depart without leave.

I understand and acknowledge that if I fail without sufficient excuse to appear in accordance with the foregoing promise, I will be liable, jointly and severally if a surety has been required, to the Commonwealth of Massachusetts for the dollar amount specified in the terms of release.

SIGNED (DEFENDANT)
X DTKung

DATE 7/12/08

I, as surety, understand and acknowledge that if the above named defendant fails to appear and abide by all orders of the court according to the foregoing promise, I will be liable, jointly and severally, with the defendant to the Commonwealth of Massachusetts for the dollar amount specified in the terms of the release.

SIGNED (SURETY)
X

SIGNED (PERSON AUTHORIZED TO TAKE BAIL)

☑ Clerk–Magistrate
☐ Assistant Clerk
☐ Bail Commissioner

Subscribed and sworn to before me, the defendant having been furnished a copy of this recognizance.

A. RELEASE AUTHORIZED FROM
E.5 POLICE STATION

B. JURISDICTION OF MAGISTRATE

(Complete when appearance is being required outside of your jurisdiction)

BAIL FEE RECEIVED
$ 40.00

DATE AND TIME SIGNED
7/12/08 ☐ A.M. ☐ P.M.

## NOTICE TO DEFENDANT & SURETY

Bail shall not be released until the Legal Counsel Fee is satisfied in accordance with G.L. c. 211D, § 2½.

### Penalty for failure to appear in court after release on bail or recognizance

A defendant who fails without sufficient excuse to appear in court after release on bail or recognizance may be punished by a fine of $10,000 or by imprisonment for a year, or both, in the case of a misdemeanor, and by a fine of $50,000 or imprisonment for five years, or both, in the case of a felony.

### Penalty for committing a crime while on release on bail or recognizance

A defendant who is charged with another crime while on release on bail or recognizance may have the terms of this release revoked, and the defendant may be held without bail for a period not to exceed 60 days.

## RECEIPT–RECORD OF PAYMENT OF CASH BAIL          ☐ NOT APPLICABLE

| DATE | RECEIVED FROM SURETY (NAME AND ADDRESS) | DEFENDANT | AMOUNT |
|---|---|---|---|
| 7/12/08 | DAVID TKHILAISHVILI 95 GROVE ST. #8 WEST ROXBURY MA | DAVID TKHILAISHVILI | 1000 |
| | | CASE NUMBER 08 CR 2062 | DISTRICT COURT WEST ROXBURY |

RECEIVED BY

CR-5 (8/04)

# NOTICE OF ASSIGNMENT OF COUNSEL
## COUNSEL
### COURT FILE COPY

**DOCKET NUMBER**
0806CR002062

Trial Court of Massachusetts
**District Court Department**

| DATE OF ASSIGNMENT | NAME OF ASSIGNING JUDGE | NO. OF COUNTS |
|---|---|---|
| 07/14/2008 | Hon. Mary Ann Driscoll | 4 |

COURT NAME AND ADDRESS

WEST ROXBURY DISTRICT COURT
445 ARBORWAY
JAMAICA PLAIN, MA 02130-3688

NAME AND ADDRESS OF PERSON FOR WHOM COUNSEL IS ASSIGNED

DAVID TKHILAISHVILI
95 GROVE ST #8
W ROXBURY, MA 02132

(617)971-1200

| DEFENDANT DATE OF BIRTH | DEFENDANT PHONE |
|---|---|
| 09/21/1980 | ()- |

| ATTORNEY BBO NUMBER | ATTORNEY PHONE |
|---|---|
| 644433 | (617)364-5299 |

NAME AND ADDRESS OF ATTORNEY ASSIGNED

TIMOTHY JAY LOWNEY
Lawyers Unlimited
1234 Hyde Park Avenue
Suite 102
HYDE PARK, MA 02136

INCARCERATION STATUS IN THIS CASE     BAIL

DEFENDANT RELEASED

PURPOSE OF ASSIGNMENT (IF POST-TRIAL)

| NEXT EVENT | NEXT EVENT DATE & TIME | ROOM / SESSION |
|---|---|---|
| PRETRIAL HEARING | 07/21/2008 09:00 a.m. | 3rd Session |

**FIRST FIFTEEN OFFENSE COUNTS**

| COUNT | CODE | OFFENSE DESCRIPTION | OFFENSE DATE |
|---|---|---|---|
| 1 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 2 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 3 | 265/15B/A | ASSAULT W/DANGEROUS WEAPON c265 §15B(b) | 07/12/2008 |
| 4 | 140/131L/A | FIREARM, STORE IMPROP c140 §131L(a)&(b) | 07/12/2008 |

The Court has appointed the above attorney or organization to represent the person named above.

Basis for Appointment : **FOR BAIL ONLY**

AUTHORIZED SIGNATURE

 X

CRIMINAL COMPLAINT
POLICE COPY
Case 1:10-cr-10134-DPW Document 11 Filed 05/17/10 Page 123 of 211
DOCKET NUMBER
0806CR002062
PAGE
1 of 1
Trial Court of Massachusetts
District Court Department

| DEFENDANT NAME & ADDRESS | COURT NAME & ADDRESS |
|---|---|
| DAVID TKHILAISHVILI 95 GROVE ST #8 W ROXBURY, MA 02132 | WEST ROXBURY DISTRICT COURT 445 ARBORWAY JAMAICA PLAIN, MA 02130-3688 (617)971-1200 |

| DEFENDANT DOB | OFFENSE DATE | DATE COMPLAINT ISSUED | NO. OF COUNTS | FIRST SCHEDULED EVENT | |
|---|---|---|---|---|---|
| 09/21/1980 | 07/12/2008 | 07/14/2008 | 4 | ARRAIGNMENT | |
| POLICE DEPARTMENT | POLICE INCIDENT NUMBER | | | FIRST SCHEDULED EVENT DATE & TIME | |
| BOSTON P.D. -AREA E- | 080401088 | | | 07/14/2008 02:00 PM | A |
| OFFENSE ADDRESS | OFFENSE CITY / TOWN | | | ROOM / SESSION | |
| GROVE/WASHINGTON DET JOSEY | W ROXBURY | | | 1st Session | |

The undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date(s) indicated below the defendant committed the offense(s) listed below and on any attached pages.

| COUNT | CODE | DESCRIPTION |
|---|---|---|

265/15B/A  ASSAULT W/DANGEROUS WEAPON c265 §15B(b)

On 07/12/2008 did, by means of a dangerous weapon, a gun, assault David Dzidzikashville, in violation of G.L. c.265, §15B(b). (PENALTY: state prison not more than 5 years; or jail not more than 2½ years; or not more than $1000 fine.)

265/15B/A  ASSAULT W/DANGEROUS WEAPON c265 §15B(b)

On 07/12/2008 did, by means of a dangerous weapon, a gun, assault Archvz Ucha, in violation of G.L. c.265, §15B(b). (PENALTY: state prison not more than 5 years; or jail not more than 2½ years; or not more than $1000 fine.)

265/15B/A  ASSAULT W/DANGEROUS WEAPON c265 §15B(b)

On 07/12/2008 did, by means of a dangerous weapon, a gun, assault Jashvik Rusokhube, in violation of G.L. c.265, §15B(b). (PENALTY: state prison not more than 5 years; or jail not more than 2½ years; or not more than $1000 fine.)

140/131L/A  FIREARM, STORE IMPROP c140 §131L(a)&(b)

On 07/12/2008 did store or keep a firearm, rifle or shotgun that was not a large capacity weapon, as such terms are defined in G.L. c.140, §121, and that was not secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user, in violation of G.L. c.140, §131L(a) & (b). (PENALTY: imprisonment not more than 1 year; or not less than $500, not more than $5000 fine; or both.)

| SIGNATURE OF COMPLAINANT | SWORN TO BEFORE CLERK-MAGISTRATE/ASST. CLERK/DEP. ASST. CLERK X | DATE |
|---|---|---|
| NAME OF COMPLAINANT | A TRUE COPY ATTEST CLERK-MAGISTRATE/ASST.CLERK X | DATE |

| TENDER OF PLEA OR ADMISSION WAIVER OF RIGHTS | DOCKET NO. 0906CR2062 | NO. OF COUNTS 4 | Trial Court of Massachusetts District Court Department |
|---|---|---|---|

| INSTRUCTIONS: This form must be typed or printed clearly, completed prior to the Pretrial Hearing, signed by both counsel and submitted to the court by the defendant at or before the Pretrial Hearing. | NAME OF DEFENDANT DAVID TKHAISHVILI | COURT DIVISION W. Roxbury District Court 445 Arborway Jamaica Plain, Ma. 02130 |
|---|---|---|

## SECTION I. TENDER OF PLEA

Defendant in this case hereby tenders the following: PLEA OF GUILTY ___ ADMISSION TO FACTS SUFFICIENT FOR A FINDING OF GUILTY conditioned on the dispositional terms indicated below. Include all proposed terms (guilty finding, finding of sufficient facts, continued without finding, dismissal, fine, costs, probation period and supervision terms, restitution amount including the identification of the recipient of restitution, and any sentence of incarceration, split sentence or suspended sentence, etc.). Number each count and specify terms for each count separately.

| COUNT NO. | DEFENDANT'S DISPOSITIONAL TERMS (Check "Yes" if Prosecution agrees – Check "No" if Prosecution disagrees) | PROSECUTOR'S RECOMMENDATION (Required if Prosecutor disagrees with terms) |
|---|---|---|
| 1 | CWOF 18 MOS. _YES_ Stay Away order to A + Vics _NO_ | |
| 2 | CWOF 18 MOS. _YES_ _NO_ | |
| 3 | CWOF 18 MOS. _YES_ _NO_ | |
| 4 | CWOF 18 MOS. _YES_ _NO_ | |
| | _YES_ _NO_ | |

WE HAVE CONSULTED WITH THE PROBATION DEPARTMENT REGARDING ANY PROBATION TERMS SET FORTH ABOVE.

| SIGNATURE OF DEFENSE COUNSEL X | DATE 2/25/09 | SIGNATURE OF PROSECUTING OFFICER X | DATE 2/25/09 |
|---|---|---|---|

## SECTION II. PLEA OR ADMISSION ACCEPTED BY THE COURT

The Court ☑ ACCEPTS the tendered Plea or Admission on defendant's terms set forth in Section I, and will impose sentence in accordance with said terms, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

## SECTION III. PLEA OR ADMISSION REJECTED BY THE COURT

| The Court ☐ REJECTS the defendant's dispositional terms set forth above and, in accordance with Mass. R. Crim. P. 12(c)(6), has set forth to the defendant the dispositional terms it would find acceptable, to wit: | DEFENDANT'S DECISION IF COURT REJECTS TENDERED PLEA OR ADMISSION: ___ Defendant WITHDRAWS the tendered Plea or Admission; the parties must complete and file a Pretrial Conference Report, a Pretrial Hearing must be conducted and a trial date scheduled, if necessary. ___ Defendant ACCEPTS terms set forth by the Court, a Plea or Admission will be accepted by the court and said dispositional terms imposed, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS. |
|---|---|

| SIGNATURE OF JUDGE ACCEPTING OR REJECTING PLEA OR ADMISSION X | DATE 2/18/09 | SIGNATURE OF DEFENSE COUNSEL (if rejection decision made) X | DATE |
|---|---|---|---|

DC-CR 22 (8/96)

| TENDER OF PLEA OR ADMISSION WAIVER OF RIGHTS | DOCKET NO. | NO. OF COUNTS 4 | Trial Court of Massachusetts District Court Department |
|---|---|---|---|

INSTRUCTIONS: This form must be typed or printed clearly, completed prior to the Pretrial Hearing, signed by both counsel and submitted to the court by the defendant at or before the Pretrial Hearing.

NAME OF DEFENDANT
DAVID TKHILAISHVILI

COURT DIVISION
W. Roxbury District Court
445 Arborway
Jamaica Plain, Ma. 02130

## SECTION I — TENDER OF PLEA

Defendant in this case hereby tenders the following: ___ PLEA OF GUILTY ___ ADMISSION TO FACTS SUFFICIENT FOR A FINDING OF GUILTY conditioned on the dispositional terms indicated below. *Include all proposed terms (guilty finding, finding of sufficient facts, continued without finding, dismissal, fine, costs, probation period and supervision terms, restitution amount including the identification of the recipient of restitution, and any sentence of incarceration, split sentence or suspended sentence, etc.). Number each count and specify terms for each count separately.*

| COUNT NO. | DEFENDANT'S DISPOSITIONAL TERMS (Check "Yes" if Prosecution agrees – Check "No" If Prosecution disagrees) | PROSECUTOR'S RECOMMENDATION (Required if Prosecutor disagrees with terms) |
|---|---|---|
| 1 | CWOF 18 Mos. Stay Away order to A+ Vics — (YES) — NO | |
| 2 | CWOF 18 Mos. — (YES) — NO | |
| 3 | CWOF 18 Mos. — (YES) — NO | |
| 4 | CWOF 18 Mos. — (YES) — NO | |
| | — YES — NO | |

WE HAVE CONSULTED WITH THE PROBATION DEPARTMENT REGARDING ANY PROBATION TERMS SET FORTH ABOVE.

| SIGNATURE OF DEFENSE COUNSEL X | DATE 2/25/09 | SIGNATURE OF PROSECUTING OFFICER X | DATE 2/25/09 |
|---|---|---|---|

## SECTION II — PLEA OR ADMISSION ACCEPTED BY THE COURT

The Court ___ ACCEPTS the tendered Plea or Admission on defendant's terms set forth in Section I, and will impose sentence in accordance with said terms, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

## SECTION III — PLEA OR ADMISSION REJECTED BY THE COURT

The Court ___ REJECTS the defendant's dispositional terms set forth above and, in accordance with Mass. R. Crim. P. 12(c)(6), has set forth to the defendant the dispositional terms it would find acceptable, to wit:

DEFENDANT'S DECISION IF COURT REJECTS TENDERED PLEA OR ADMISSION:

— Defendant WITHDRAWS the tendered Plea or Admission; the parties must complete and file a Pretrial Conference Report, a Pretrial Hearing must be conducted and a trial date scheduled, if necessary.

— Defendant ACCEPTS terms set forth by the Court, a Plea or Admission will be accepted by the court and said dispositional terms imposed, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

| SIGNATURE OF JUDGE ACCEPTING OR REJECTING PLEA OR ADMISSION X | DATE 2/15/09 | SIGNATURE OF DEFENSE COUNSEL (if rejection decision made) X | DATE |
|---|---|---|---|

DC-CR 22 (8/96)

## SECTION IV    DEFENDANT'S WAIVER OF RIGHTS (G. L. c. 263 § 6; & ALIEN RIGHTS NOTICE G.L. c. 278, § 29D)

I, the undersigned defendant, understand, understand and acknowledge that I am voluntarily giving up the right to be tried by a jury or a judge without a jury on these charges.

I have discussed my constitutional and other rights with my attorney. I understand that the jury would consist of six jurors chosen at random from the community, and that I could participate in selecting those jurors, who would determine unanimously whether I was guilty or not guilty. I understand that by entering my plea of guilty or admission, I will also be giving up my right to confront, cross-examine, and compel the attendance of witnesses; to present evidence in my defense; to remain silent and refuse to testify or provide evidence against myself by asserting my privilege against self-incrimination, all with the assistance of my defense attorney; and to be presumed innocent until proven guilty by the prosecution beyond a reasonable doubt.

I am aware of the nature and elements of the charge or charges to which I am entering my guilty plea or admission. I am also aware of the nature and range of the possible sentence or sentences.

My guilty plea or admission is not the result of force or threats. It is not the result of assurances or promises, other than any agreed-upon recommendation by the prosecution, as set forth in Section I of this form. I have decided to plead guilty, or admit to sufficient facts, voluntarily and freely.

I am not now under the influence of any drug, medication, liquor or other substance that would impair my ability to fully understand the constitutional and statutory rights that I am waiving when I plead guilty, or admit to sufficient facts to support a finding of guilty.

I understand that if I am not a citizen of the United States, conviction of this offense may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF DEFENDANT | DATE |
|---|---|
| DTKing | 25/02/09 |

## SECTION V    DEFENSE COUNSEL'S CERTIFICATE (G.L. c. 218, § 26A)

As required by G.L. c. 218, § 26A, I certify that as legal counsel to the defendant in this case, I have explained to the defendant the above-stated provisions of law regarding the defendant's waiver of jury trial and other rights so as to enable the defendant to tender his or her plea of guilty or admission knowingly, intelligently and voluntarily.

| SIGNATURE OF DEFENSE COUNSEL | B.B.O. NO. | DATE |
|---|---|---|
| | 669552 | 2/25/09 |

## SECTION VI    JUDGE'S CERTIFICATION

I, the undersigned Justice of the District Court, addressed the defendant directly in open court. I made appropriate inquiry into the education and background of the defendant and am satisfied that he or she fully understands all of his or her rights as set forth in Section IV of this form, and that he or she is not under the influence of any drug, medication, liquor or other substance that would impair his or her ability to fully understand those rights. I find, after an oral colloquy with the defendant, that the defendant has knowingly, intelligently and voluntarily waived all of his or her rights as explained during these proceedings and as set forth in this form.

After a hearing, I have found a factual basis for the charge(s) to which the defendant is pleading guilty or admitting and I have found that the facts as related by the prosecution and admitted by the defendant would support a conviction on the charges to which the plea or admission is made.

I further certify that the defendant was informed and advised that if he or she is not a citizen of the United States, a conviction of the offense with which he or she was charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF JUDGE | DATE |
|---|---|
| | 2/25/09 |

# PRETRIAL CONFERENCE REPORT

DOCKET NUMBER
*0806CR2062*

**Trial Court of Massachusetts
District Court Department**

COURT DIVISION

W. Roxbury District Court
445 Arborway
Jamaica Plain, Ma. 02130

COMMONWEALTH VS *DAVID TshKiliavili*
NAME OF DEFENDANT

## PRETRIAL CONFERENCE REPORT

A pretrial conference between the parties was conducted on *Dec 4, 2008* with the following results:

**1. MANDATORY DISCOVERY FOR THE DEFENDANT.** See Mass. R. Crim. P. 14(a)(1). The Commonwealth has provided (will provide by _____ ) the following if relevant and within the possession, custody or control of the prosecutor:

✓ written or recorded statements of the defendant
✓ any facts of an exculpatory nature

See Mass. R. Crim. P. 14(a)(2). The defendant has been permitted (will be permitted by _____ ) to discover, inspect, and/or copy the following if within the possession, custody, or control of the prosecutor or persons under the prosecutor's direction and control:

✓ any material and relevant physical evidence and documents
   (specify)_____
✓ statements of persons as defined by Rule 14(d)
✓ reports of physical or mental examinations of any persons
✓ reports of scientific tests or experiments
✓ names, addresses and dates of birth of prospective witnesses

COMPLETED: YES ✓ NO____ COMPLIANCE DATE:_____

**2. ADDITIONAL DISCOVERY FOR THE DEFENDANT.** The defendant has been permitted (will be permitted by _____ ) to discover, inspect, and/or copy the following if within the possession, custody, or control of the prosecutor:

Agreed  Ordered

✓ _____ substance of any oral statements made by the defendant
✓ _____ written or recorded statements of the co-defendant
✓ _____ substance of any oral statements made by the co-defendant
✓ _____ any promises, rewards, or inducements made to any witness
✓ _____ copies of search warrants with the return and affidavits
✓ _____ names and addresses of expert witnesses and field of expertise
✓ _____ identification procedures
✓ _____ police reports

COMPLETED: YES ✓ NO____ COMPLIANCE DATE:_____

**3. RECIPROCAL DISCOVERY FOR THE PROSECUTION.** See Mass R. Crim. P. 14(a)(3). The prosecution has been permitted (will be permitted by _____ ) to discover, inspect, and copy the following:

Agreed  Ordered

✓ _____ any material and relevant physical evidence and documents
   (specify)_____
✓ _____ statements of persons as defined by Rule 14(d)
✓ _____ reports of physical or mental examinations of any persons
✓ _____ reports of scientific tests or experiments.
✓ _____ names, addresses and dates of birth of prospective witnesses

COMPLETED: YES ✓ NO____ COMPLIANCE DATE: *Jan 28, 2008*

*Copy of transcripts
+ of witnesses
List of
Dates of birth
+ issues testifying
to (D)*

**4. NOTICE OF ALIBI.** See Mass. R. Crim. P. 14(b)(1). The Commonwealth hereby notifies the defendant that the time, date and place of the alleged offense was as follows:

*N/A*

DC-CR-23 (1/94)                    (over)

Defendant agrees, if an alibi defense will be offered, to notify the Commonwealth in writing on or before _____, 19_____ of the place or places at which the defendant claims to have been at the time of the alleged offense and the names, addresses and dates of birth of the defendant's alibi witnesses or may here so state. _____

_____

The Commonwealth agrees to notify the defendant in writing on or before _____, 19_____ of the names, addresses and dates of birth of witnesses on which it relies to establish defendant's presence at the scene of the alleged offense or otherwise to rebut defendant's alibi defense.

**5. NOTICE OF OTHER DEFENSES,** Mass. R. Crim. P. 14(b)(2),(3). If the defendant intends to rely upon the defense of lack of criminal responsibility or upon a defense based upon a license, claim of authority or ownership, or exemption, defendant must notify the Commonwealth within seven days of today or may here so state.

*Self Defense, Defense of Others, Defense of property*

**6. OTHER DISCOVERY AGREEMENTS.** The parties agree to the following other matters relating to discovery:

*N/A*

**7. MOTIONS.** Matters upon which the parties have not reached agreement which are to be the subject of motions:

*Motion to Suppress Statements + Evidence*

**8. STIPULATIONS OF FACT:**

_____

_____

**9. STATUS OF DEFENDANT.** The defendant (is)(is not) presently in custody at _____

**10. INTERPRETER.** A *Georgian* interpreter will be needed.

**11. STATUS OF CASE. (NOT BINDING)**
Estimated length of trial: _____
No. of Witnesses: Pros. _____ Def. *7*
Jury ✓ Jury Waived_____ (Not binding)

**12. SUBSEQUENTLY DISCOVERED MATERIAL.** The undersigned acknowledge their continuing duties regarding discovery under Mass. R. Crim. P. 14 (a)(4).

**13. CERTIFICATION.** The undersigned certify that the above Pre-Trial Conference Report was agreed to on *Dec 4*, 19*2008* and that each party is bound by this report. This report shall control the subsequent course of the proceedings.

_____
Ass't. District Attorney
Police Prosecutor

_____
Defense Counsel

*DTKM*
_____
Defendant

**THIS REPORT HAS BEEN SUBMITTED IN ITS ENTIRETY AND ACCEPTED BY THE COURT. THE MATTER IS SCHEDULED FOR TRIAL ON**

*2/25/09*, 19____ IN *WRDC* _____
Court

_____
Signature of Justice

*12-4-08*
Date

*All o/s dis. by   2/11/09*

# EXHIBIT J

## To Affidavit of Vahagn Victor Torosyan

# CRIMINAL DOCKET

| DOCKET NUMBER | NO. OF COUNTS | Trial Court of Massachusetts |
|---|---|---|
| 0806CR002857 | 6 | District Court Department |

| FENDANT NAME AND ADDRESS | DOB | GENDER | COURT NAME AND ADDRESS |
|---|---|---|---|
| AVID TKHILAISHVILI<br>GROVE ST #8<br>ROXBURY, MA 02132 | 09/21/1980 | MALE | WEST ROXBURY DISTRICT COURT<br>445 ARBORWAY<br>JAMAICA PLAIN, MA 02130-3688<br>(617)971-1200 |
| | DATE COMPLAINT ISSUED<br>09/10/2008 | | |
| | PRECOMPLAINT ARREST DATE | INTERPRETER REQUIRED<br>RUSSIAN | |

## ST FIVE OFFENSE COUNTS

| UNT | CODE | OFFENSE DESCRIPTION | OFFENSE DATE |
|---|---|---|---|
| | 268/13B/A | WITNESS, INTIMIDATE c268 § 13B | 07/12/2008 |
| | 268/13B/A | WITNESS, INTIMIDATE c268 § 13B | 07/12/2008 |
| | 268/13B/A | WITNESS, INTIMIDATE c268 § 13B | 07/12/2008 |
| | 275/2 | THREAT TO COMMIT CRIME c275 §2 | 07/12/2008 |
| | 275/2 | THREAT TO COMMIT CRIME c275 §2 | 07/12/2008 |

| FENSE ATTORNEY (PVT) | OFFENSE CITY/TOWN | POLICE DEPARTMENT |
|---|---|---|
| Joseph Hennessey | W ROXBURY | BOSTON P.D. -AREA E- |

| DATE & JUDGE | DOCKET ENTRY | DATE & JUDGE | FEES IMPOSED | |
|---|---|---|---|---|
| EP 1 7 2008<br>Driscoll | ☑ Attorney appointed (SJC R. 3:10)<br>☐ Atty denied & Deft. Advised per 211 D §2A<br>☐ Waiver of Counsel found after colloquy | SEP 1 7 2008<br>Driscoll | Legal Counsel Fee (211D § 2A¶2)<br>$ (PVT) | ☐ WAIVED |
| | | | Legal Counsel Contribution (211 D § 2)<br>$ | ☐ WAIVED |
| 1 7 2008<br>Driscoll | Terms of<br>release set: | ☐ PR  ☑ Bail  10,000<br>☑ See Docket for special conditions<br>☐ Held (276 §58A) | | Default Warrant Assessment Fee (276 § 30 ¶2)<br>$ | ☐ WAIVED |
| | | | | Default Warrant Removal Fee (276 § 30 ¶1)<br>$ | ☐ WAIVED |
| 1 7 2008<br>Driscoll | Arraigned and<br>advised: | ☑ Potential of bail revocation (276 §58)<br>☑ Right to bail to review (276 §58)<br>☐ Right to drug exam (111E § 10) | 2-25-09<br>Fiandaca | Probation Supervision Fee (276 § 37A)<br>$ | ☐ WAIVED |
| -25-09<br>undaca | Advised of right<br>to jury trial | ☐ Waiver of jury found after colloquy<br>☐ Does not waive | | Ball Order Forfeited | |
| | Advised of trial rights as pro se (Dist. Ct. Supp.R.4) | | | | |
| | Advised of right of appeal to Appeals Ct. (M.R. Crim.P.R. 28) | | | | |

## SCHEDULING HISTORY

| SCHEDULED DATE | EVENT | RESULT | | JUDGE | TAPE START/STOP |
|---|---|---|---|---|---|
| 09/17/2008 | ARR | ☐ Held | ☑ Cont'd  Reg. Inter. | | |
| 10-20-08 | PTH | ☐ Held | ☐ Cont'd | | |
| 12-4-08 | " | ☐ Held | ☐ Cont'd  Russian Int. — S. reg. w. 10/20/8 | | |
| 2-25-09 | PTD | ☐ Held | ☐ Cont'd  Georgia Interpreter | | |
| 8-25-10 | Cont— | ☐ Held | ☐ Cont'd | | |
| | | ☐ Held | ☐ Cont'd | | |
| | | ☐ Held | ☐ Cont'd | | |
| | | ☐ Held | ☐ Cont'd | | |
| | | ☐ Held | ☐ Cont'd | | |
| | | ☐ Held | ☐ Cont'd | | |

## ROVED ABBREVIATIONS

= Arraignment   PT= Pretrial hearing   CE = Discovery compliance & jury selection   T = Bench trial   JT = Jury trial   PC = Probable cause hearing   M = Motion hearing   SR = Status review
= Status review of payments   FA = First appearance in jury session   S = Sentencing   CW = Continuance-without-finding scheduled to terminate   P = Probation scheduled to terminate
= Defendant failed to appear & was defaulted   WAR = Warrant Issued   WARD = Default warrant issued   WR = Warrant or default warrant recalled   PV = probation violation hearing

| TRUE<br>COPY<br>TEST: | CLERK-MAGISTRATE / ASST CLERK<br>X | TOTAL NO. OF PAGES | ON (DATE) |
|---|---|---|---|

| CRIMINAL DOCKET | DEFENDANT | DOCKET NUMBER |
|---|---|---|
| DOCKET ENTRIES | DAVID TKHILAISHVILI | 0806CR002857 |

| DATE | DOCKET ENTRIES |
|---|---|
| 9-17-08 | no contact and stay away from alleged victim Driscoll MMS |
| 9-17-08 | $1,000.00 Cash bail recvd in Somrvl LW |
| 12-4-08 | reargnmn hrt Requested for It on 02-25-08 sd |
| 2-25-09 | Ideportation warning given Fiandaca MMS |
|  |  |
|  | DATE: 2/25/09 |
|  | $ 1000    BAIL RETURNED TO SURETY |
|  | CK# 02 092 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

APPROVED ABBERIVATIONS
ARR = Arraignment    PT= Pretrial hearing    CE = Discovery compliance & jury selection    T = Bench trial    JT = Jury trial    PC = Probable cause hearing M = Motion hearing    · SR= Status review
SRP = Status review of payments    FA = First appearance in jury session    S = Sentencing    CW = Continuance-without-finding scheduled to terminate    P = Probation scheduled to terminate
FA = Defendant failed to appear & was defaulted    WAR = Warrant Issued    WARD = Default warrant Issued    WR = Warrant or default warrant recalled    PR = probation revocation hearing

| COUNT / OFFENSE 1 | WITNESS, INTIMIDATE c268 § 13B | | | | | DISPOSITION DATE AND JUDGE 2-25-09 Fiandaca | | |
|---|---|---|---|---|---|---|---|---|
| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☐ WAIVED | OTHER |

**DISPOSITION METHOD**
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☑ Dismissed upon:
  ☑ Request of Commonwealth ☐ Request of Victim
  ☐ Request of Defendant ☐ Failure to prosecute
  ☑ Other:
☑ Filed with Defendant's consent
☐ Nolle Prosequi
☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
☐ Sufficient facts found but continued without a finding until:
☐ Defendant placed on probation until:
☐ Defendant placed on pretrial probation (276 §87) until:
☐ To be dismissed if court costs / restitution paid by:

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☐ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | | |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE 2 | WITNESS, INTIMIDATE c268 § 13B | | | | | DISPOSITION DATE AND JUDGE 2-25-09 Fiandaca | | |
|---|---|---|---|---|---|---|---|---|
| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☐ WAIVED | OTHER |

**DISPOSITION METHOD**
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☑ Dismissed upon:
  ☑ Request of Commonwealth ☐ Request of Victim
  ☐ Request of Defendant ☐ Failure to prosecute
  ☐ Other:
☑ Filed with Defendant's consent
☐ Nolle Prosequi
☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
☐ Sufficient facts found but continued without a finding until:
☐ Defendant placed on probation until:
☐ Defendant placed on pretrial probation (276 §87) until:
☐ To be dismissed if court costs / restitution paid by:

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☐ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | | |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

| COUNT / OFFENSE 3 | WITNESS, INTIMIDATE c268 § 13B | | | | | DISPOSITION DATE AND JUDGE 2-25-09 Fiandaca | | |
|---|---|---|---|---|---|---|---|---|
| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT ☐ WAIVED | OTHER |

**DISPOSITION METHOD**
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☑ Dismissed upon:
  ☑ Request of Commonwealth ☐ Request of Victim
  ☐ Request of Defendant ☐ Failure to prosecute
  ☐ Other:
☑ Filed with Defendant's consent
☐ Nolle Prosequi
☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
☐ Sufficient facts found but continued without a finding until:
☐ Defendant placed on probation until:
☐ Defendant placed on pretrial probation (276 §87) until:
☐ To be dismissed if court costs / restitution paid by:

| FINDING | | FINAL DISPOSITION | JUDGE | DATE |
|---|---|---|---|---|
| ☐ Guilty | ☐ Not Guilty | ☐ Dismissed on recommendation of Probation Dept. | | |
| ☐ Responsible | ☐ Not Responsible | ☐ Probation terminated: defendant discharged | | |
| ☐ Probable Cause | ☐ No Probable Cause | ☐ Sentence or disposition revoked (see cont'd page) | | |

# CRIMINAL DOCKET - OFFENSES

DAVID TKHILAISHVILI

0806CR002857

| COUNT / OFFENSE | | DISPOSITION DATE AND JUDGE |
|---|---|---|
| 4 THREAT TO COMMIT CRIME c275 §2 | | 2-25-09 Mandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 50 ☐ WAIVED | |

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth ☐ Request of Victim
  - ☐ Request of Defendant ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

1.) stay away/no contact from victim
2.) admin

**FINDING**
- ☐ Guilty ☐ Not Guilty
- ☐ Responsible ☐ Not Responsible
- ☐ Probable Cause ☐ No Probable Cause

**FINAL DISPOSITION**
- ☑ Dismissed on recommendation of Probation Dept.
- ☐ Probation terminated; defendant discharged
- ☐ Sentence or disposition revoked (see cont'd page)

JUDGE / DATE: 8-30-2010 Hon. Faison

| COUNT / OFFENSE | | DISPOSITION DATE AND JUDGE |
|---|---|---|
| 5 THREAT TO COMMIT CRIME c275 §2 | | 2-25-09 Mandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ WAIVED | |

**DISPOSITION METHOD**
- ☑ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth ☐ Request of Victim
  - ☐ Request of Defendant ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

**FINDING**
- ☐ Guilty ☐ Not Guilty
- ☐ Responsible ☐ Not Responsible
- ☐ Probable Cause ☐ No Probable Cause

**FINAL DISPOSITION**
- ☑ Dismissed on recommendation of Probation Dept.
- ☐ Probation terminated; defendant discharged
- ☐ Sentence or disposition revoked (see cont'd page)

JUDGE / DATE: Hon. Faison Aug. 30, 2010

| COUNT / OFFENSE | | DISPOSITION DATE AND JUDGE |
|---|---|---|
| 6 THREAT TO COMMIT CRIME c275 §2 | | 2-25-09 Mandaca |

| FINE/ASSESSMENT | SURFINE | COSTS | OUI STATE FEE | OUI VICTIMS ASMT | HEAD INJURY FEE | RESTITUTION | V/W ASSESSMENT | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ WAIVED | |

**DISPOSITION METHOD**
- ☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Dismissed upon:
  - ☐ Request of Commonwealth ☐ Request of Victim
  - ☐ Request of Defendant ☐ Failure to prosecute
  - ☐ Other:
- ☐ Filed with Defendant's consent
- ☐ Nolle Prosequi
- ☐ Decriminalized (277 §70 C)

**SENTENCE OR OTHER DISPOSITION**
- ☑ Sufficient facts found but continued without a finding until: 8-25-10
- ☐ Defendant placed on probation until:
- ☐ Defendant placed on pretrial probation (276 §87) until:
- ☐ To be dismissed if court costs / restitution paid by:

**FINDING**
- ☐ Guilty ☐ Not Guilty
- ☐ Responsible ☐ Not Responsible
- ☐ Probable Cause ☐ No Probable Cause

**FINAL DISPOSITION**
- ☑ Dismissed on recommendation of Probation Dept.
- ☐ Probation terminated; defendant discharged
- ☐ Sentence or disposition revoked (see cont'd page)

JUDGE / DATE: Hon. Faison 8/30/2010

| CRIMINAL COMPLAINT<br>POLICE COPY | DOCKET NUMBER<br>0806CR002857 | PAGE<br>1 of 2 | Trial Court of Massachusetts<br>District Court Department |
|---|---|---|---|

| DEFENDANT NAME & ADDRESS | COURT NAME & ADDRESS |
|---|---|
| DAVID TKHILAISHVILI<br>95 GROVE ST #8<br>W ROXBURY, MA 02132 | WEST ROXBURY DISTRICT COURT<br>445 ARBORWAY<br>JAMAICA PLAIN, MA 02130-3688<br><br>(617)971-1200 |

| DEFENDANT DOB<br>09/21/1980 | OFFENSE DATE<br>07/12/2008 | DATE COMPLAINT ISSUED<br>09/10/2008 | NO. OF COUNTS<br>6 | FIRST SCHEDULED EVENT<br>ARRAIGNMENT |
|---|---|---|---|---|
| POLICE DEPARTMENT<br>BOSTON P.D. -AREA E- | | POLICE INCIDENT NUMBER<br>080401088 | | FIRST SCHEDULED EVENT DATE & TIME<br>09/17/2008 09:00 AM |
| OFFENSE ADDRESS<br>GROVE/WASHINGTON   DET JOSEY | | OFFENSE CITY / TOWN<br>W ROXBURY | | ROOM / SESSION<br>1st Session |

The undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date(s) indicated below the defendant committed the offense(s) listed below and on any attached pages.

COUNT   CODE         DESCRIPTION

1     268/13B/A       WITNESS, INTIMIDATE c268 § 13B
On 07/12/2008 did directly or indirectly, willfully; threaten, attempt or cause physical injury, emotional injury, economic injury, or property damage; or did convey a gift, offer or promise of anything of value; or did mislead, intimidate or harass another person who is: a witness or potential witness at any stage of a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type; or a person who is aware of information, records, documents or objects that relate to a violation of criminal statute, or a violation of conditions of probation, parole or bail; or a person who is a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator,defense attorney, clerk, court officer, probation officer or parole officer; or a person who is or was furthering a criminal investigation, grand jury proceeding, trial or other crimianl proceeding of any type; or a person who is or was attending or had made know his intention to attend a grand jury proceeding, trial or other criminal proceeding of any type; with the intent to impede, obstruct, delay, harm, punish or otherwise interfere with a criminal investigation, grand jury proceeding, trial, or other criminal proceeding of any type; in violation of G.L. c.268, § 13B(1). (PENALTY: state prison not more than ten years; or jail or house of correction for not more than 2 ½ years; or not less than $1,000 and not more than $5,000 fine. District Court has final jurisdiction under G.L. c.218 §26.)

2     268/13B/A       WITNESS, INTIMIDATE c268 § 13B
On 07/12/2008 did directly or indirectly, willfully; threaten, attempt or cause physical injury, emotional injury, economic injury, or property damage; or did convey a gift, offer or promise of anything of value; or did mislead, intimidate or harass another person who is: a witness or potential witness at any stage of a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type; or a person who is aware of information, records, documents or objects that relate to a violation of criminal statute, or a violation of conditions of probation, parole or bail; or a person who is a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator,defense attorney, clerk, court officer, probation officer or parole officer; or a person who is or was furthering a criminal investigation, grand jury proceeding, trial or other crimianl proceeding of any type; or a person who is or was attending or had made know his intention to attend a grand jury proceeding, trial or other criminal proceeding of any type; with the intent to impede, obstruct, delay, harm, punish or otherwise interfere with a criminal investigation, grand jury proceeding, trial, or other criminal proceeding of any type; in violation of G.L. c.268, § 13B(1). (PENALTY: state prison not more than ten years; or jail or house of correction for not more than 2 ½ years; or not less than $1,000 and not more than $5,000 fine. District Court has final jurisdiction under G.L. c.218 §26.)

| SIGNATURE OF COMPLAINANT<br>X | SWORN TO BEFORE CLERK-MAGISTRATE/ASST.CLERK/DEP. ASST. CLERK<br>X | DATE |
|---|---|---|
| NAME OF COMPLAINANT | CLERK-MAGISTRATE/ASST.CLERK<br>X | DATE |

te / Time Printed 9/10/2008 11:23am

| COUNT | CODE | DESCRIPTION |
| --- | --- | --- |

.3     268/13B/A     **WITNESS, INTIMIDATE c268 § 13B**

On 07/12/2008 did directly or indirectly, willfully; threaten, attempt or cause physical injury, emotional injury, economic injury, or property damage; or did convey a gift, offer or promise of anything of value; or did mislead, intimidate or harass another person who is: a witness or potential witness at any stage of a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type; or a person who is aware of information, records, documents or objects that relate to a violation of criminal statute, or a violation of conditions of probation, parole or bail; or a person who is a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator, defense attorney, clerk, court officer, probation officer or parole officer; or a person who is or was furthering a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type; or a person who is or was attending or had made know his intention to attend a grand jury proceeding, trial or other criminal proceeding of any type; with the intent to impede, obstruct, delay, harm, punish or otherwise interfere with a criminal investigation, grand jury proceeding, trial, or other criminal proceeding of any type; in violation of G.L. c.268, § 13B(1). (PENALTY: state prison not more than ten years; or jail or house of correction for not more than 2 ½ years; or not less than $1,000 and not more than $5,000 fine. District Court has final jurisdiction under G.L. c.218 §26.)

4     275/2     **THREAT TO COMMIT CRIME c275 §2**

On 07/12/2008 did threaten to commit a crime against the person or property of another, to wit: to do bodily harm, in violation of G.L. c.275, §2. (PENALTY from §4: imprisonment not more than 6 months; or not more than $100 fine; or recognizance to keep the peace for up to 6 months.)

5     275/2     **THREAT TO COMMIT CRIME c275 §2**

On 07/12/2008 did threaten to commit a crime against the person or property of another, to wit: bodily harm, in violation of G.L. c.275, §2. (PENALTY from §4: imprisonment not more than 6 months; or not more than $100 fine; or recognizance to keep the peace for up to 6 months.)

6     275/2     **THREAT TO COMMIT CRIME c275 §2**

On 07/12/2008 did threaten to commit a crime against the person or property of another, to wit: bodily harm, in violation of G.L. c.275, §2. (PENALTY from §4: imprisonment not more than 6 months; or not more than $100 fine; or recognizance to keep the peace for up to 6 months.)

# APPLICATION FOR CRIMINAL COMPLAINT

APPLICATION NO. (COURT USE ONLY) 08-285Y

PAGE 1 of 2

Trial Court of Massachusetts
District Court Department

Boston Municipal Court
West Roxbury Division
445 Arborway
Jamaica Plain, MA 02130

I, the undersigned complainant, request that a criminal complaint issue against the accused charging the offense(s) listed below. If the accused **HAS NOT BEEN ARRESTED** and the charges involve:

☐ ONLY MISDEMEANOR(S), I request a hearing ☐ **WITHOUT NOTICE** because of an imminent threat of
  ☐ BODILY INJURY ☐ COMMISSION OF A CRIME ☐ FLIGHT ☐ **WITH NOTICE** to accused.
☐ ONE OR MORE FELONIES, I request a hearing ☐ **WITHOUT NOTICE** ☐ **WITH NOTICE** to accused.

☐ **WARRANT** is requested because prosecutor represents that accused may not appear unless arrested.

ARREST STATUS OF ACCUSED
☐ HAS  ☒ HAS NOT been arrested

## INFORMATION ABOUT ACCUSED

NAME (FIRST MI LAST) AND ADDRESS
David Tkhilaishvili
95 Grove St #8
W. Roxb MA

BIRTH DATE 9-21-80
PCF NO.

SOCIAL SECURITY NUMBER 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
MARITAL STATUS

DRIVERS LICENSE NO.
STATE

GENDER MALE   HEIGHT 6-   WEIGHT 180   EYES BRN

HAIR BRN   RACE WN   COMPLEXION Lgsht   SCARS/MARKS/TATTOOS

BIRTH STATE OR COUNTRY Batumi, Rus
DAY PHONE

EMPLOYER/SCHOOL

MOTHER'S MAIDEN NAME (FIRST MI LAST) Dodo Kachibaia

FATHER'S NAME (FIRST MI LAST) Temuri Tkhilaishvili

## CASE INFORMATION

COMPLAINANT NAME (FIRST MI LAST)
Det. Winden C. Josey

ADDRESS
B.P.D. District E-5
1708 Centre St
W. Roxb. MA

COMPLAINANT TYPE
☒ POLICE ☐ CITIZEN ☐ OTHER

PD

PLACE OF OFFENCE (96 Bussei St, Dedham) Grove St @ Wash, W.Roxb.

INCIDENT REPORT NO. 080401088
OBTN

CITATION NO(S).

| OFFENSE CODE | DESCRIPTION | | OFFENSE DATE |
|---|---|---|---|
| 272-5 | Threats | | |
| VARIABLES (e.g. victim name, controlled substance, type and value of property, other variable information; see Complaint Language Manual) David Dzidzikashvile 66 Walnut St #6, Somerville, MA | | | |
| 272-5 | Threats | | |
| VARIABLES Archvz Ucha 96 Bussey St Dedham MA | | | |
| 275-2 | THREATS | | |
| VARIABLES Tashvili Ruso Khube 96 Bussey St Dedham MA | | | |

MARKS

COMPLAINANT'S SIGNATURE
X

DATE FILED

COURT USE ONLY → A HEARING UPON THIS COMPLAINT APPLICATION WILL BE HELD AT THE ABOVE COURT ADDRESS ON

DATE OF HEARING    TIME OF HEARING    AT

COURT USE ONLY

## PROCESSING OF NON-ARREST APPLICATION (COURT USE ONLY)

DATE    CLERK/JUDGE

NOTICE SENT OF CLERK'S HEARING SCHEDULED ON:

NOTICE SENT OF JUDGE'S HEARING SCHEDULED ON:

HEARING CONTINUED TO:

APPLICATION DECIDED WITHOUT NOTICE TO ACCUSED BECAUSE:
☐ IMMINENT THREAT OF ☐ BODILY INJURY ☐ CRIME ☐ FLIGHT  BY ACCUSED
☐ FELONY CHARGED AND POLICE DO NOT REQUEST NOTICE
☐ FELONY CHARGED BY CIVILIAN; NO NOTICE AT CLERK'S DISCRETION

## COMPLAINT TO ISSUE / COMPLAINT DENIED

DATE  10-08

☒ PROBABLE CAUSE FOUND FOR ABOVE OFFENSE(S)
NO(S). ☒ 1. ☒ 2. ☐ 3.  BASED ON
☒ FACTS SET FORTH IN ATTACHED STATEMENT(S)
☐ TESTIMONY RECORDED: TAPE NO.
  START NO. _____ END NO. _____
☐ WARRANT ☒ SUMMONS TO ISSUE  9-11-08
ARRAIGNMENT DATE:

☐ NO PROBABLE CAUSE FOUND
☐ REQUEST OF COMPLAINANT
☐ FAILURE TO PROSECUTE
☐ AGREEMENT OF BOTH PARTIES
☐ OTHER:
COMMENT

CLERK/JUDGE



*Edward F Davis, Police Commissioner*

## INCIDENT REPORT

ORIGINAL                                                                                                 STATUS: APPROVED

| KEY SITUATIONS | | COMPLAINT NO. | RPT DIST. | | CAD RA | | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|---|---|---|
| Gun | | 080401088 | E5 | | 713 | | 713 | E5 |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION. | STATUS | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|
| ASSAULT D/W - GUN | INTIMIDATING WITNESS | Cleared By Arrest | 07/12/2008 | 07/12/2008 |

| LOCATION OF INCIDENT. | APT | DISPATCH TIME | TIME OCCURRED FROM. | TIME OCCURRED TO |
|---|---|---|---|---|
| 00 GROVE ST/ WASHINGTON ST | | 03:34 PM | 03:34 PM | 03:34 PM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| WEST ROXBURY | ROADWAY | | SUNNY - DAY | OUTSIDE - DAY |

| TYPE OF WEAPON-TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | | SUSPECT RELATIONSHIP TO VICTIM |
|---|---|---|---|---|
| HANDGUN | CAR | DRVING | | KOWN |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR

POINTED A HAND GUN AT DRIVER

| PERSONS | 1 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | VICTIM | DZIDZIKASHVILLE, DAVID | | | 0 | | | |

| | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
|---|---|---|---|---|---|---|---|---|
| | | 66 WALNUT ST 6, SOMERVILLE MA 00000-0000 | | MALE | WHITE NON-HISPANIC | | 06/28/1980 | 28 |

| HEIGHT | WEIGHT | BUILD | HAIR | | EYES | |
|---|---|---|---|---|---|---|
| 5-09 | 190 | N/A | DARK BROWN | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | Unknown | (617)-759-7777 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 2 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | VICTIM | UCHA, ARCHVZ | | | 0 | | | |

| | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
|---|---|---|---|---|---|---|---|---|
| | | 96 BUSSEY ST , DEDHAM MA 00000-0000 | | N/A | WHITE NON-HISPANIC | | 08/15/1978 | 29 |

| HEIGHT | WEIGHT | BUILD | HAIR | | EYES | |
|---|---|---|---|---|---|---|
| 5-11 | 178 | N/A | BROWN | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (408)-627-9561 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 3 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | VICTIM | KHUBE, JASHVILI, RUSO | | | 0 | | | |

| | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
|---|---|---|---|---|---|---|---|---|
| | | 96 BUSSEY ST , DEDHAM MA 00000-0000 | | MALE | WHITE NON-HISPANIC | | 02/21/1984 | 24 |

| HEIGHT | WEIGHT | BUILD | HAIR | | EYES | |
|---|---|---|---|---|---|---|
| 5-10 | 170 | N/A | | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-777-7700 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 4 | TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | | DOCKET NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | | OFFENDER | UNKOWN | | 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 | 0 | | | |

| | ALIAS | ADDRESS | | GENDER | RACE | | DOB | AGE |
|---|---|---|---|---|---|---|---|---|
| | | 95 GROVE ST 8, WEST ROXBURY MA | | MALE | WHITE HISPANIC | | | 35 |

| HEIGHT | WEIGHT | BUILD | HAIR | | EYES | |
|---|---|---|---|---|---|---|
| | | STOCKY | PART GREY | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

POINTED A HAND GUN AT VITICMS.

| VEHICLES | STATUS | | REG.STATE | REG.NO. | PLATE TYPE | | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|---|---|
| | | | MA | 87D76H | OTHER | | 0 | ODYSSEY |
| | VEHICLE MAKE YEAR | | V.I.N. | | STYLE | | COLOR(TOP-BOTTOM) | |
| | HONDA - 0 | | | | MINIVAN | | GREY - GREY | |
| | OPERATOR'S NAME | | LICENSE NO. | | STATE | OPERATOR'S ADDRESS | | |
| | | | | | | | | |
| | OWNER'S NAME | | | | OWNER ADDRESS | | | |
| | N N J TRANSPORTATION | | | | 95 GROVE ST WEST ROXBURY MA | | | |

NARRATIVE AND ADDITIONAL INFORMATION:

On 7/12/2008 about 3:15 PM the E626D PTL Hawkins was approached by the diver of a GREY Honda Accord Mass plate 47EZ86. David zldzikashvile stated a few minutes earlier at Grove and Washington streets West Roxbury, a white Male mid 30"s with grey and brown hair round face pointed a black hand gun at him and the passengers in his car. Suspect car 2001 to 2003   Honda Grey Odyssey van Mass plates Lv 87D76H with DNJ Transportation on the windows. The passenger in the mini van was a White male thin face slim build he did not show any weapons.  One of the victims Ucha Archvz recognized the suspect from Pizza delivery's, Area E units Made a check at 95 Grove street apt no one was home.

| UNIT ASSIGNED | SHIFT | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID |
|---|---|---|---|---|
| E626D | 2 | JAMES D HAWKINS | 8010 | 0 |

SPECIAL UNITS NOTIFIED(REPORTING):

Area E-5

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|---|---|---|---|
| 07/12/2008 | 05:24 PM | JAMES R LYNCH | 8469 |



Edward F Davis, Police Commissioner

## INCIDENT REPORT

SUPPLEMENT NO. 1 OF 2                                                                              STATUS: APPROVED

| KEY SITUATIONS | | COMPLAINT NO. | RPT DIST. | CAD RA | | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|---|---|
| Gun | | 080401088 | E5 | 713 | | 0 | E5 |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | STATUS | | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|---|
| ASSAULT D/W - GUN | INTIMIDATING WITNESS | Cleared By Arrest | | 07/12/2008 | 07/12/2008 |

| LOCATION OF INCIDENT | | APT | DISPATCH TIME | TIME OCCURRED FROM | TIME OCCURRED TO |
|---|---|---|---|---|---|
| 095 GROVE ST | | 08 | | 08:30 PM | 08:30 PM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| WEST ROXBURY | N/A | | SUNNY-- DAY | OUTSIDE - DAY |

| TYPE OF WEAPON-TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | SUSPECT RELATIONSHIP TO VICTIM |
|---|---|---|---|
| HANDGUN | CAR | | ACQUAINTANCE |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR

SEE NARRATIVE

### PERSONS

| 1 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | DZIDZIKASHVILLE, DAVID | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 066 WALNUT ST. 06, SOMERVILLE MA 00000-0000 | MALE | WHITE NON-HISPANIC | 06/28/1980 | 28 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-09 | 190 | N/A | DARK BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-759-7777 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS

| 2 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | UCHA, ARCHVZ | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 096 BUSSEY STREET , DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 08/15/1978 | 29 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-11 | 178 | N/A | BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (408)-627-9561 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS

| 3 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | KHUBE, JASHVILI  RUSO | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 096 BUSSEY STREET , DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 02/21/1984 | 24 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-10 | 170 | N/A | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-777-7700 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS

| 4 TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| REPORTER | DET. WINDELL C. JOSEY | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 1708 CENTRE STREET , W. ROXBURY MA 00000-0000 | | | | 0 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| | | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-343-4595 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 5 TYPE | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|---|---|
| | OFFENDER | TKHILAISHVILI,DAVID | | 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 | 80049705 | |
| | ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE |

| ALIAS | ADDRESS | | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|---|
| | 95 GROVE ST 8, WEST ROXBURY MA 02132-0000 | | MALE | WHITE NON-HISPANIC | 09/21/1980 | 27 |

| HEIGHT | WEIGHT | BUILD | | HAIR | | EYES | |
|---|---|---|---|---|---|---|---|
| 6-00 | 180 | MEDIUM | | DARK BROWN | | BROWN | |

| OCCUPATION | | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|---|
| | | | | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| VEHICLES | STATUS | | REG.STATE | REG.NO. | | PLATE TYPE | | YEAR(EXP). | MODEL |
|---|---|---|---|---|---|---|---|---|---|
| | Used In Crime | | MA | | | UNKNOWN | | 0 | |
| | VEHICLE MAKE YEAR | | V.I.N. | | | STYLE | | COLOR(TOP-BOTTOM) | |
| | HONDA - 0 | | | | | MINIVAN | | - | |

| OPERATOR'S NAME | | LICENSE NO. | | STATE | OPERATOR'S ADDRESS | |
|---|---|---|---|---|---|---|
| TKHILAISHVILI, DAVID | | S18837062 | | 23 | 095 GROVE STREET W. ROXBURY 02132-0000 | |
| OWNER'S NAME | | | | OWNER ADDRESS | | |

| PROPERTY | STATUS | TYPE OF PROPERTY | SERIAL | BRAND NAME - DESCRIPTION | MODEL | VALUE |
|---|---|---|---|---|---|---|
| | SEIZED | FIREARMS | SA132224 | SIG SAUER - | P239 | $500.00 |

NARRATIVE AND ADDITIONAL INFORMATION:

ABOUT 20:00 HRS DET. WINDELL C. JOSEY (E-808) WAS DIRECTED BY SGT. DET. FREEMAN (E-983) TO CONDUCT A FOLLOW-UP INVESTIGATION OF A PRIOR INCIDENT OF AN ASSAULT BY MEANS OF A DANGEROUS WEAPON (FIRE ARM) AT GROVE @ WASHINGTON STREET, WEST ROXBURY. THE TIME OF THE PRIOR INCIDENT WAS ABOUT 15:34 HRS ON 7/12/2008. ABOUT 20:05 HRS CONTACT VICTIM #1 (DZIDZKASHVILE) VIA THE TELEPHONE. VICTIM STATED THAT THE SUSPECT HAD POINTED A HANDGUN AT HIM (VICTIM # 1) AND VICTIMS #2 AND # 3, AT LEAST THREE TIMES. VICTIM # 1, DESCRIBED THE FIRE-ARM AS A BLACK COLORED SEMI-AUTO HANDGUN, AS BEING A GLOCK OR SIG SAUER. FURTHER MORE, (DZIDZIKASHVILLE) GAVE DETECTIVE JOSEY THE SUSPECT'S NAME AS DAVID TKHILASHVILI (SPELLING THE SUSPECT'S NAME). ALSO VICTIM #1, STATED THAT THE SUSPECT LIVED AT 95 GROVE ST. APT # 8 AND THAT HE (SUSPECT) OWNED THE COMPANY OF DNJ TRANSPORTATION. FURTHERMORE, THE VICTIM STATED THAT THE SUSPECT WORKED/OWNED CLASSIC PIZZA OUT OF TAUNT ON.

ABOUT 20:30 HRS UNDER THE DIRECT SUPERVISION OF SGT. DET. FREEMAN ALONG WITH DET. FRED FONTAINE (E-815), OFFICERS DUNNE AND DOIRON (EK01-F) AND I (DET. JOSEY)RESPONDED TO 95 GROVE STREET, APARTMENT # 8. ON ARRIVAL OFFICERS KNOCKED ON THE APT # 8 DOOR AND ANNOUNCED OUR OFFICE. A FEMALE OPENED THE DOOR AND AN INQUIRY WAS MADE AS TO THE SUSPECT PRESENCE. AT THAT TIME SUSPECT CAME FROM A ROOM IN THE REAR OF THE APARTMENT AND SUSPECT WAS ASKED TO STEP INTO THE HALLWAY. SUSPECT WAS TAKEN INTO CUSTODY. AN INQUIRY WAS MADE AS TO HIM HAVING A LICENSES TO CARRY A FIRE ARM WHICH SUSPECT STATED "YES, I HAVE ONE". HE WAS THEN ASKED IF HE HAD A FIRE-ARM. SUSPECT'S RESPONSE WAS "YES, I WILL GET IT FOR YOU." THE SUSPECT WAS INFORMED TO TELL THE OFFICERS WHERE THE FIRE ARM WAS. SUSPECT RESPONDED "I WILL SHOW YOU." SUSPECT LEAD OFFICER TO A REAR BEDROOM AND IT DID TAKE THE SUSPECT SEVERAL ATTEMPTS TO RECALL THE LOCATION OF THE FIRE ARM. AT SOME POINT THE SUSPECT INFORMED OFFICERS TO LOOK UNDER SOME BEDDING ON A BED WHERE THE FIRE ARM (DESCRIBED ABOVE) WAS LOCATED. SAID FIRE ARM DID HAVE (8) EIGHT ROUNDS OF AMMO IN THE MAG AND WAS NOT LOCKED OR PROPERLY SECURED WHEN RECOVERED. SAID FIRE ARM WAS SEIZED AS EVIDENCE AND LOGGED IN AT DISTRICT E/5 GUN LOCKER PAGE # 24. SUSPECT WAS TRANSPORTED BY E-103 F (BUTLER AND RIVERA) TO E/5 POLICE STATION AND ADVISED OF RIGHTS AND BOOKED. ALSO, LICENSE TO CARRY # 12194268A, WAS SEIZED.

| UNIT ASSIGNED | SHIFT | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID |
|---|---|---|---|---|
| E 808 | 3 | WINDELL C JOSEY | 9292 | 8846 |

SPECIAL UNITS NOTIFIED(REPORTING)

Area E-5

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|---|---|---|---|
| 07/12/2008 | 11:23 PM | JOHN A KLOKMAN | 8312 |



Edward F Davis, Police Commissioner

## INCIDENT REPORT

SUPPLEMENT NO. 2 OF 2              STATUS: APPROVED

| KEY SITUATIONS | | COMPLAINT NO. | RPT DIST. | CAD RA | RPT RA | CLEAR. DIST. |
|---|---|---|---|---|---|---|
| Others | | 080401088 | E5 | 713 | 0 | E5 |

| UCR INCIDENT DESCRIPTION | UCR FINAL INCIDENT DESCRIPTION | STATUS | DATE OCCURRED FROM | DATE OCCURRED TO |
|---|---|---|---|---|
| INTIMIDATING WITNESS | INTIMIDATING WITNESS | Cleared By Arrest | 07/12/2008 | 07/12/2008 |

| LOCATION OF INCIDENT | APT | DISPATCH TIME | TIME OCCURRED FROM | TIME OCCURRED TO |
|---|---|---|---|---|
| 95 GROVE ST | | | 04:30 PM | 04:30 PM |

| NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | WEATHER | LIGHTING |
|---|---|---|---|---|
| WEST ROXBURY | | | | |

| TYPE OF WEAPON-TOOL | SUSPECT MODE OF TRANSPORTATION | VICTIM'S ACTIVITY | | SUSPECT RELATIONSHIP TO VICTIM |
|---|---|---|---|---|
| | | | | |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR

SEE NARRATIVE

### PERSONS 1

| TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | DZIDZIKASHVILLE, DAVID | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 66 WALNUT ST. 06, SOMERVILLE MA 00000-0000 | MALE | WHITE NON-HISPANIC | 06/28/1980 | 28 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-09 | 190 | N/A | DARK BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-759-7777 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS 2

| TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | UCHA, ARCHVZ | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 096 BUSSEY STREET , DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 08/15/1978 | 30 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-11 | 178 | MEDIUM | BROWN | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (408)-627-9561 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS 3

| TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| VICTIM | KHUBE, JASHVILI | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 098 BUSSEY STREET , DEDHAM MA 00000-0000 | MALE | WHITE NON-HISPANIC | 02/21/1984 | 24 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 5-10 | 170 | MEDIUM | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-777-7700 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

### PERSONS 4

| TYPE | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | DOCKET NO. |
|---|---|---|---|---|
| REPORTER | DET. WINDELL C. JOSEY | | 0 | |

| ALIAS | ADDRESS | GENDER | RACE | DOB | AGE |
|---|---|---|---|---|---|
| | 1708 CENTRE STREET , W. ROXBURY MA | | | | 0 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| | | | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (617)-343-4595 | (000)-000-0000 |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 5 | TYPE | | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OFFENDER | | TKHILAISHVILI, DAVID | | 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 | | 0 | | | | |
| | | ALIAS | | ADDRESS | | GENDER | | RACE | | | DOB | AGE |
| | | | | 095 GROVE STREET 08, W.ROXB MA 00000-0000 | | MALE | | WHITE NON-HISPANIC | | | 09/21/1980 | 27 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| 6-00 | 180 | MEDIUM | DARK BROWN | BROWN |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (000)-000-0000 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

| PERSONS | 6 | TYPE | | NAME (LAST, FIRST, MI) | | S.S. NO. | | BOOKING NO. | | DOCKET NO. | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OFFENDER | | SIKHARULIDZE, GIORGI | | 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 | | 0 | | | | |
| | | ALIAS | | ADDRESS | | GENDER | | RACE | | | DOB | AGE |
| | | | | 095 GROVE STREET 08, W.ROXB MA 00000-0000 | | N/A | | N/A | | | | 0 |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| | | N/A | | |

| OCCUPATION | MARITAL STATUS | CONTACT #1 | CONTACT #2 |
|---|---|---|---|
| | | (000)-000-0000 | |

SPECIAL CHARACTERISTICS(INCLUDING CLOTHING)

NARRATIVE AND ADDITIONAL INFORMATION:

FOLLOW-UP: ON 7/13/2008 VICTIMS REPORTED TO THE DEDHAM POLICE (INCIDENT # 2008000006537) ABOUT INTIMIDATION OF WITNESS AND THREATS AT 96 BUSSEY STREET. DEDHAM. VICTIMS HAD REPORTED THAT THE SUSPECT #1 (TKHILAISHVILI) DID COMMIT AN A/DW (GUN) THAT OCCURRED ABOUT 3:34 PM, ON 7/12/2008 AT GROVE @ WASHINGTON ST. WEST ROXBURY. VICTIMS REPORTED THAT ON RETURNING HOME AT 96 BUSSEY STREET, DEDHAM. ON THEIR ARRIVAL LEARNED THAT SUSPECT # 1 AND #2 (SIKHARULIDZE) HAD LEFT A VOICE MESSAGE AT THE RESIDENCE THREATENING TO DO HARM TO THE VICTIMS. A COPY OF THE VOICE MESSAGE WAS MADE BY THE VICTIM'S AND COPY GIVEN TO DET. JOSEY AS EVIDENCE. COMPLAINTS TO BE SOUGHT.

| UNIT ASSIGNED | SHIFT | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID |
|---|---|---|---|---|
| E 808 | 3 | WINDELL C JOSEY | 9292 | 0 |

SPECIAL UNITS NOTIFIED(REPORTING)

| DATE OF REPORT | TIME COMPLETED | APPROVING SUPERVISOR NAME | APPROVING SUPERVISOR ID |
|---|---|---|---|
| 09/04/2008 | 06:52 PM | JOHN E TEVNAN | 9805 |

# Dedham Police Department

600 High Street
Dedham, MA 02026
(781) 751-9300

## Incident Report



Incident Number: 2008000006528
File No: N/A
Dispatch Incident Number: 2008000006537
Print Date: July 16, 2008
Printed By: jnolan

### Incident Information

| Occurred On/From | Day of Week | Date | Time | Occurred | Day of Week | Date | Time | Reported On | Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sun | 07/13/2008 | 8:25:16PM | | Sun | 07/13/2008 | 8:25:16PM | | 7/13/2008 | 8:25:16PM |

| Reported As | Incident Type - Primary | Arresting Officer |
|---|---|---|
| Threats | THREATS | |

| Incident Address | Reporting Officer |
|---|---|
| 96 BUSSEY ST, DEDHAM, MA 02026 | Patrolman Keith Kennedy |

| Sector | Stat. Area | Sub Stat. Area | Census Tract | Landmark |
|---|---|---|---|---|
| 624 | | | | |

| Business Name | Incident Types - Other |
|---|---|
| N/A | |

### Associated Persons Summary

| Type | Name(Last, First, MI) | Date of Birth | Sex | Home Phone # | Cell Phone # | Work Phone # |
|---|---|---|---|---|---|---|
| Suspect | TKHILAISHVILI, DAVID | 9/21/1980 | M | N/A | N/A | N/A |
| Address: | 95 GROVE STREET, Apt #: 8, WEST ROXBURY, MA 02132 | | | | | |
| Suspect | SIKHARULIDZE, GIORGI | N/A | M | N/A | N/A | N/A |
| Address: | 95 GROVE ST, Apt #: 8, WEST ROXBURY, MA 02132 | | | | | |
| Victim | DZIDZIKASHVILLE, DAVID | 6/28/1980 | M | N/A | (617) 759-7777 | N/A |
| Address: | 66 WALNUT ST, Apt #: 6, SOMERVILLE, MA | | | | | |
| Victim | ARCHVZ, UCHA | 8/15/1978 | M | N/A | (408) 627-9561 | N/A |
| Address: | 96 BUSSEY ST, Apt #: 2, DEDHAM, MA 02026 | | | | | |
| Victim | KHUBEJASHVILI, RUSO | 2/21/1984 | U | N/A | (617) 777-7700 | N/A |
| Address: | 96 BUSSEY ST, Apt #: 2, DEDHAM, MA 02026 | | | | | |

### Associated Businesses Summary

| Type | Name | Primary Phone # | Secondary Phone # |
|---|---|---|---|
| No Associated Persons reported for Incident #: 2008000006528 | | | |

### IBR/UCR Offenses

| Offense Number | IBR Type | Chapter | Section | Statute ID / IBR Type Description | Counts |
|---|---|---|---|---|---|
| No Incident Offenses Recorded for Incident #: 2008000006528 | | | | | |

### Arrest Offenses

| Seq # | Chapter | Section | Name(Last, First, MI) | Description of Offense | Counts |
|---|---|---|---|---|---|
| No Arrest Offenses Recorded for Incident #: 2008000006528 | | | | | |

### Arrestee Seq. # 1

| Suspect Type | Suspect Name | Alias/Nickname | Occupation | Probation Central File | SSN |
|---|---|---|---|---|---|
| No Arrest Data Available for Incident #: 2008000006528 | | | | | |

# Dedham Police Department
600 High Street
Dedham, MA 02026
(781) 751-9300

# Incident Report



Incident Number: 2008000006528

File No: N/A

Dispatch Incident Number: 2008000006537

Print Date: July 16, 2008

Printed By: jnolan

| Suspect Seq.# 1 | | | | | | |
|---|---|---|---|---|---|---|
| Suspect Type | Suspect Name | Alias/Nickname | Occupation | Probation Central File | | SSN |

| Suspect Seq.# 4 | | | | | | |
|---|---|---|---|---|---|---|
| Suspect Type | Suspect Name | Alias/Nickname | Occupation | Probation Central File | | SSN |
| N/A | SIKHARULIDZE, GIORGI | N/A | N/A | N/A | | N/A |

| Date of Birth | Age | Sex | Race | Ethnicity | Skin Tone | Height | Weight | Eye Color | Hair Color |
|---|---|---|---|---|---|---|---|---|---|
| N/A | — | Male | N/A | N/A | N/A | 0' 0" | N/A | N/A | N/A |

Scars / Marks / Tattoos / Other Physical Characteristics:

No Physical Characteristic Data Reported

| Suspect Seq.# 5 | | | | | | |
|---|---|---|---|---|---|---|
| Suspect Type | Suspect Name | Alias/Nickname | Occupation | Probation Central File | | SSN |
| N/A | TKHILAISHVILI, DAVID | N/A | N/A | N/A | | N/A |

| Date of Birth | Age | Sex | Race | Ethnicity | Skin Tone | Height | Weight | Eye Color | Hair Color |
|---|---|---|---|---|---|---|---|---|---|
| 9/21/1980 | 27 | Male | Caucasian | N/A | N/A | 0' 0" | N/A | N/A | N/A |

Scars / Marks / Tattoos / Other Physical Characteristics:

No Physical Characteristic Data Reported

## Victims

| Victim Type | Victim Name | Sex | Race | Ethnic Origin | Hospital Destination | Transport Description |
|---|---|---|---|---|---|---|
| N/A | KHUBEJASHVILI, RUSO | Unknown | N/A | N/A | N/A | N/A |
| N/A | ARCHVZ, UCHA | Male | N/A | N/A | N/A | N/A |
| N/A | ZIDZIKASHVILLE, DAVI | Male | N/A | N/A | N/A | N/A |

## Vehicle Info

| Vehicle No. | Vehicle Make | Vehicle Model | Vehicle Year | VIN | Primary Color | Secondary Color | Plate No. | State |
|---|---|---|---|---|---|---|---|---|
| No Vehicle Info Recorded for Incident #: 2008000006528 | | | | | | | | |

## Property

No Property Info reported for Incident #: 2008000006528

## Citations

| Citation No | Code | Date | Status | Statute | Description |
|---|---|---|---|---|---|
| No Citations reported for Incident #: 2008000006528 | | | | | |

# Dedham Police Department

600 High Street
Dedham, MA 02026
(781) 751-9300

## Incident Report



Incident Number: 2008000006528
File No: N/A
Dispatch Incident Number: 2008000006537
Print Date: July 16, 2008
Printed By: jnolan

Narratives for Incident Number 2008000006528 ?   Yes
Other Narratives not authorized for print?   None
Narrative this user authorized to print:

Narrative by: Patrolman Keith Kennedy   Division: OPERATIONS

| Date & Time | Narrative Description | Entered by | Status | Reviewed by | Last Edit Date |
|---|---|---|---|---|---|
| 07/13/2008 23:21 | | Patrolman Keith Kennedy | Open | | 07/13/2008 |

  On Sunday July 13, 2008, I was on uniformed patrol in marked cruiser 624. At approximately 1930 hours, I returned to the station to take a report of threats. On arrival I met the walk in, DZIDZIKASHVILI, David. He wanted to report threats made over the phone.

  David explained that on 7/12/08 at approximately 1430 hours, there was an incident that occurred in Boston. The incident involved him and his 2 friends being threatened by another man, armed with a handgun. As a result of that incident, a male party identified as, TKHILAISHVILI, David, was arrested by Boston Police for assault by means of a dangerous weapon. The other 2 parties involved were, KHUBEJASHVILI, Ruso and ARCHUBZ, Ucha. Both of these men live at 96 Bussey St in Dedham. When they returned home after the incident yesterday, Ruso noticed a message on his cell phone, which he left in his apartment. The message was from TKHILAISHVILI, and his roommate, SIKHARULIDZE, Giorgi, and was threatening in nature. I was provided with a CD copy of the message, which was spoken in Georgian, the native tongue of the suspects. David provided me with a printout, translating the threat. The threat was made towards Ucha, and they made several comments and threatened to, "Put a fucking bullet in his head." They also stated that if they spoke to the police, they would, "Screw all of their families up." The threats were made by both suspects, and were aimed at all of the victims.

  After hearing the threat, David immediately reported this to the Boston Police. They referred him to the Dedham Police, because the phone was in Ucha's apartment in Dedham. I will speak to Lieutenant Nedder in regards to this incident, and charges may be pending.


Officer Keith Kennedy #202


_____
*Signature - Reporting Officer*

_____
*Signature - Reviewing Officer*

-------------------------------------------------------------------------------------------------------

## Incident Notes:

Create User ID:

Date & Time
 No Incident Notes Listed

# APPEARANCE OF COUNSEL

**Trial Court of Massachusetts**
**District Court Department**

DOCKET NUMBER:

| 08 | 06 | CR | 2857 |
|---|---|---|---|
| YEAR* | COURT NUMBER | CASE TYPE** | CASE NUMBER |

*e.g. '93", "94" etc.
**e.g. "CR", "CV" etc.

COURT NAME AND ADDRESS

Boston Municipal Court
West Roxbury Division
445 Arborway
Jamaica Plain, MA 02130

**To the Clerk - Magistrate:**

Please enter my appearance as attorney for _David TKhilaishvili_

in the above numbered court action.

| TTORNEY NAME | B.B.O. NUMBER (Required) |
|---|---|
| Joseph F. Hennessey | 669552 |

| TTORNEY FIRM | TELEPHONE NUMBER |
|---|---|
| DeFilippis, Kaldis + Hennessey LLP | (508) 872 3144 |

| TREET ADDRESS | | |
|---|---|---|
| 78 Salem St. | | |

| ITY/TOWN | STATE | ZIP CODE |
|---|---|---|
| Bradford | MA | 01835 |

X _____ 9-17-08
SIGNATURE OF ATTORNEY    DATE

C-CR-19   (5/94)

| TENDER OF PLEA OR ADMISSION WAIVER OF RIGHTS | DOCKET NO. 0806CR5854 | NO. OF COUNTS 6 | Commonwealth of Massachusetts District Court Department |
|---|---|---|---|

| INSTRUCTIONS: This form must be typed or printed clearly, completed prior to the Pretrial Hearing, signed by both counsel and submitted to the court by the defendant at or before the Pretrial Hearing. | NAME OF DEFENDANT DAVID Tkhaishvili | COURT DIVISION W. Roxbury District Court 445 Arborway Jamaica Plain, Ma. 02130 |
|---|---|---|

## SECTION I TENDER OF PLEA

Defendant in this case hereby tenders the following: ___ PLEA OF GUILTY ___ ADMISSION TO FACTS SUFFICIENT FOR A FINDING OF GUILTY conditioned on the dispositional terms indicated below. *Include all proposed terms (guilty finding, finding of sufficient facts, continued without finding, dismissal, fine, costs, probation period and supervision terms, restitution amount including the identification of the recipient of restitution, and any sentence of incarceration, split sentence or suspended sentence, etc.). Number each count and specify terms for each count separately.*

| COUNT NO. | DEFENDANT'S DISPOSITIONAL TERMS (Check "Yes" if Prosecution agrees -- Check "No" if Prosecution disagrees) | PROSECUTOR'S RECOMMENDATION (Required if Prosecutor disagrees with terms) |
|---|---|---|
| 1 | Dismissed / Stayaway order — YES | |
| 2 | Dismissed — YES | |
| 3 | Dismissed — YES | |
| 4 | CWOF 18 mos. / Stay away order to D + Vics — YES | |
| 5 | CWOF 18 mos. — YES | |
| 6 | CWOF 18 mos. — YES | |

WE HAVE CONSULTED WITH THE PROBATION DEPARTMENT REGARDING ANY PROBATION TERMS SET FORTH ABOVE.

SIGNATURE OF DEFENSE COUNSEL X ____ DATE 2/25/09   SIGNATURE OF PROSECUTING OFFICER X ____ DATE 2/25/09

## SECTION II PLEA OR ADMISSION ACCEPTED BY THE COURT

The Court ✓ ACCEPTS the tendered Plea or Admission on defendant's terms set forth in Section I, and will impose sentence in accordance with said terms, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

## SECTION III PLEA OR ADMISSION REJECTED BY THE COURT

The Court ☐ REJECTS the defendant's dispositional terms set forth above and, in accordance with Mass. R. Crim. P. 12(c)(6), has set forth to the defendant the dispositional terms it would find acceptable, to wit:

DEFENDANT'S DECISION IF COURT REJECTS TENDERED PLEA OR ADMISSION:

— Defendant WITHDRAWS the tendered Plea or Admission; the parties must complete and file a Pretrial Conference Report, a Pretrial Hearing must be conducted and a trial date scheduled, if necessary.

— Defendant ACCEPTS terms set forth by the Court, a Plea or Admission will be accepted by the court and said dispositional terms imposed, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

SIGNATURE OF JUDGE ACCEPTING OR REJECTING PLEA OR ADMISSION X ____ DATE 2/25/09   SIGNATURE OF DEFENSE COUNSEL (if rejection decision made) X ____ DATE

DC-CR 22 (8/96)

## SECTION IV — DEFENDANT'S WAIVER OF RIGHTS (G.L. c. 263 §§ 6 and 6; c. 278 §§ 18, 24, 29; § 29D)

I, the undersigned defendant, understand and acknowledge that I am voluntarily giving up the right to be tried by a jury or a judge without a jury on these charges.

I have discussed my constitutional and other rights with my attorney. I understand that the jury would consist of six jurors chosen at random from the community, and that I could participate in selecting those jurors, who would determine unanimously whether I was guilty or not guilty. I understand that by entering my plea of guilty or admission, I will also be giving up my right to confront, cross-examine, and compel the attendance of witnesses; to present evidence in my defense; to remain silent and refuse to testify or provide evidence against myself by asserting my privilege against self-incrimination, all with the assistance of my defense attorney; and to be presumed innocent until proven guilty by the prosecution beyond a reasonable doubt.

I am aware of the nature and elements of the charge or charges to which I am entering my guilty plea or admission. I am also aware of the nature and range of the possible sentence or sentences.

My guilty plea or admission is not the result of force or threats. It is not the result of assurances or promises, other than any agreed-upon recommendation by the prosecution, as set forth in Section I of this form. I have decided to plead guilty, or admit to sufficient facts, voluntarily and freely.

I am not now under the influence of any drug, medication, liquor or other substance that would impair my ability to fully understand the constitutional and statutory rights that I am waiving when I plead guilty, or admit to sufficient facts to support a finding of guilty.

I understand that if I am not a citizen of the United States, conviction of this offense may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF DEFENDANT | DATE |
|---|---|
| X  DTKhuy | 25/02/09 |

## SECTION V — DEFENSE COUNSEL'S CERTIFICATE (G.L. c. 218 § 26A)

As required by G.L. c. 218, § 26A, I certify that as legal counsel to the defendant in this case, I have explained to the defendant the above-stated provisions of law regarding the defendant's waiver of jury trial and other rights so as to enable the defendant to tender his or her plea of guilty or admission knowingly, intelligently and voluntarily.

| SIGNATURE OF DEFENSE COUNSEL | B.B.O. NO. | DATE |
|---|---|---|
| X | 669552 | 2/25/09 |

## SECTION VI — JUDGE'S CERTIFICATION

I, the undersigned Justice of the District Court, addressed the defendant directly in open court. I made appropriate inquiry into the education and background of the defendant and am satisfied that he or she fully understands all of his or her rights as set forth in Section IV of this form, and that he or she is not under the influence of any drug, medication, liquor or other substance that would impair his or her ability to fully understand those rights. I find, after an oral colloquy with the defendant, that the defendant has knowingly, intelligently and voluntarily waived all of his or her rights as explained during these proceedings and as set forth in this form.

After a hearing, I have found a factual basis for the charge(s) to which the defendant is pleading guilty or admitting and I have found that the facts as related by the prosecution and admitted by the defendant would support a conviction on the charges to which the plea or admission is made.

I further certify that the defendant was informed and advised that if he or she is not a citizen of the United States, a conviction of the offense with which he or she was charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF JUDGE | DATE |
|---|---|
| X | 2/25/09 |

# EXHIBIT K

## To Affidavit of Vahagn Victor Torosyan

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT
                                                NOCV2014-00612

DAVIS HEALTH, P.C.,                    )
        Plaintiff                      )
                                       )
v.                                     )
                                       )
DAVIS CLINIC MANAGEMENT, INC.,         )
DAVID TKHILAISHVILI, and               )
KRISTINA URSOVA,                       )
        Defendants                     )

## AMENDED VERIFIED COMPLAINT

Plaintiff Davis Health is a clinic that treats about 400 individuals for dependency on pain
medication.  The patients need to be seen from one to two times per week up to every two weeks.
Defendants have breached their contract to provide management services to Davis Health.  They
have stripped the clinic of all its funds and are currently behind on the rent and payroll.  They
have stopped submitting bills to insurers and communicate with their client only to demand more
money or to threaten the medical staff and the doctor who owns the company.  Davis Health
seeks damages and injunctive relief to prevent an interruption in patient care.

## PARTIES

1.      Plaintiff Davis Health, P.C. ("Davis Health") is a Massachusetts professional
corporation with a principal place of business at 21 School Street, Ste. 1, Quincy, Norfolk
County, Massachusetts.

2.      Defendant Davis Clinic Management, Inc. ("Management") is a Massachusetts
corporation with a principal place of business at 21 School Street, Ste. 1, Quincy, Norfolk
County, Massachusetts.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

3.      Defendant David Tkhilaishvili is a natural person whose address is unknown and is the president of Management.

4.      Defendant Kristina Ursova is a natural person whose address is unknown and is the secretary of Management.

## FACTS

5.      Davis Health is in the business of helping over 400 patients overcome addiction to painkillers. Many of its patients are treated with suboxone. Suboxone is a powerful tool for maintenance treatment of opioid dependence, but levels must be carefully monitored and patients must be seen one to two times per week.

6.      Davis Health employs four doctors, two of whom are shareholders.

7.      The president and medical director of Davis Health is Dr. Kurt Fabrick. Dr. Fabrick has an M.D. from Columbia and a Masters in Public Health from Harvard. In addition to his work at Davis Health, he is a staff physician at Beth Israel Deaconess Medical Center.

## The Agreement

8.      On January 11, 2013, Davis Health signed a contract with Management. ("Agreement," attached as Exhibit A.)

9.      Tkhilaishvili represented, and the Agreement stated, that Management "possesses an expertise in developing and managing the business aspects of medical practice." (Agreement, p. 1.)

10.     Dr. Fabrick signed the Agreement in reliance upon the representations of Tkhilaishvili.

11.     Under the Agreement, Management was to provide financial and management services to Davis Health. Seventy-five percent of the Davis' Health's net fees were to be

invoiced by Management to Davis Health and "paid in monthly installments on the 1st day of each month." Management was responsible for paying Davis Health and Management's expenses from the seventy-five percent of Davis Health's net fees, including physician salaries, malpractice insurance, recruiter fees, and salaries for Davis Health's and Management's payrolls. Davis Health would keep the remaining twenty-five percent of net fees.

12.     Among other things, the Agreement required Management to:

a.     provide "a full spectrum of managerial and clerical support indispensable for professional organization of medical practice, including, inter alia, establishing and maintaining payment procedures for all aspects of [Davis Health's] business activities, as well as paying rent, utilities, etc.;"

b.     sublease the premises to Davis Health if Davis Health desired;

c.     provide medical billing for services provided by Davis Health;

d.     establish "standard accounting procedures enabling effective coordination and functioning of both Parties' accounting practices;" and

e.     provide Davis Health with a cumulative accounting statement on a bimonthly basis.

## Taking Control of the Finances

13.     Soon after signing the Agreement, Tkhilaishvili began to place himself in a position to convert the funds of Davis Health.

14.     On January 22, 2013, Tkhilaishvili set up online access to Davis Health's bank account, representing that he was the company's authorized agent. (Application, Exhibit B.)

15.     On November 12, 2013, Tkhilaishvili filed a certificate of amendment of Davis Health's Articles of Organization falsely stating that he was the president of the company. (Articles, Exhibit C.)

16.     Tkhilaishvili insisted that, contrary to Part Three of the Agreement, 100 percent of gross fees received by Davis Health go directly to Management.

<u>Administrative Mismanagement</u>

17.     Tkhilaishvili has never managed a medical clinic, nor does he possess any degree or credential that qualifies him to manage a medical clinic.

18.     Tkhilaishvili used funds generated by Davis Health to hire unqualified individuals who were personal friends of his.

19.     Management's secretary was Kristina Ursova, a close friend of Tkhilaishvili. On information and belief she has minimal experience or training in the medical field.

20.     Clinic's operations manager, who supervised the front desk and clerical staff, was Olga Dorofyeyeva. She has a marketing background and, on information and belief, minimal training or experience in the medical field. Among other compensation, Clinic leased a new Lexus RX 350 for Dorofyeyeva. (Lease, Attached as Exhibit D.)

21.     The clerical and administrative personnel hired by Clinic are, by and large, untrained and unqualified to provide the services required by Davis Health's doctors and medical personnel.

22.     Management has interfered with the operating of Davis Health by, among other things:

a.     refusing routine requests from doctors and permitting its staff to be insubordinate;

b.     juggling the doctors's schedules, so that there is no orderly flow of patients;

c.     locking the doctors out of the examination rooms;

4

d.      refusing to provide access to patient records and credentialing information;

e.      requiring doctors to work with unqualified assistants and refusing to allow them to work with the assistants of their choice;

f.      signing doctors' names without authorization;

g.      denying breaks to Davis Health employees who work more than six hours.

23.      Management has permitted individuals, who were not employees of either company, to access the labs and the computer systems of Davis Health.

<u>Financial Mismanagement</u>

24.      Between May 2013 and March 2014, Management and Tkhilaishvili have received approximately $763,000 generated by Davis Health. Ursova has also received over $50,000 in March and April 2014.

25.      Tkhilaishvili has never provided the cumulative bimonthly accounting required by the Agreement, ignoring repeated requests by Dr. Fabrick.

26.      Management has never made any payment to Davis Health for the 25 percent of net fees required by the Agreement.

27.      Davis Health employees are paid every two weeks. Payroll checks did not arrive on March 21 and April 4, 2014, the regular pay dates. Management attributed this to "some delays with the payroll company."

28.      Davis Health employees did not receive any paychecks on April 18, 2014 or at any time thereafter. Dr. Fabrick was forced to pay the rank and file employees out of his own funds. Neither Dr. Fabrick nor any other doctor or management employee of Davis Health has received the salary that was due on April 18.

29.     On information and belief, Management is not current with its payments for rent or build-out costs due under its lease.

30.     On information and belief, or about April 29, 2014, Tkhilaishvili or persons under his control, stole an insurance check from Network Health Plan in the amount of approximately $7,186.31, made out to Davis Health, negotiated it with an unauthorized or forged signature, and took the money.

<div align="center">Threats and Intimidation</div>

31.     Dr. Fabrick demanded that Management comply with its obligations under the Agreement, meet payroll and other expenses, and permit Davis Health to serve its patients. Tkhilaishvili retaliated by defaming and undermining Dr. Fabrick.

32.     Beginning in or about late March 2014, Tkhilaishvili stopped talking to Dr. Fabrick and refused to accept or return his telephone calls. He now communicates with Dr. Fabrick only via email, generally to demand money.

33.     Tkhilaishvili approached one or more employees of the practice and offered significant sums of money for cooperating in removing Dr. Fabrick from his position.

34.     Tkhilaishvili asked at least one employee of the practice to make false and defamatory statements about Dr. Fabrick, offering the employee(s) a position as an officer of Davis Health and substantial sums of money.

35.     Tkhilaishvili and another individual, not an employee of Davis Health, entered an area where patient records were in view and directed Dr. Fabrick's subordinates not to follow his orders. They said they would make sure that Dr. Fabrick would never be able to practice medicine anywhere in America.

<div align="center">6</div>

36. Tkhilaishvili and his friend told the employees that Dr. Fabrick was "going down" and anyone associated with Dr. Fabrick was "going down with him." The employees felt threatened and intimidated.

37. The conduct of Tkhilaishvili has the potential to place Davis Health in violation of the law and threatens the continuity of patient care.

## COUNT I
### Breach of Contract

38. Davis Health restates and incorporates by references all of the allegations in paragraphs 1 through 37 as if set forth fully herein.

39. Management and Davis Health entered into a contract upon valid consideration.

40. Davis Health has complied with its requirements under the contract.

41. Management has breached the contract, causing Davis Health to suffer damages.

## COUNT II
### Breach of Fiduciary Duty

42. Davis Health restates and incorporates by references all of the allegations in paragraphs 1 through 41 as if set forth fully herein.

43. Tkhilaishvili and Management have been entrusted with the funds, records, and accounts of Davis Health and occupy a position of trust and confidence.

44. Tkhilaishvili and Management have breached their fiduciary duty by, among other things, self-dealing, failing to make required disclosures, and conversion.

45. As a proximate result of defendants' breach, Davis Health has suffered harm.

## COUNT III
### Fraud

46. Davis Health restates and incorporates by references all of the allegations in paragraphs 1 through 45 as if set forth fully herein.

47.    Tkhilaishvili and Management made statements of fact, including the statement that Management "possesses an expertise in developing and managing the business aspects of medical practice."

48.    Davis Health reasonably and foreseeably relied upon those material statements.

49.    The statements were false and Tkhilaishvili knew they were false.

50.    As a proximate result, Davis Health suffered damages.

<div align="center">

COUNT IV
Conversion
</div>

51.    Davis Health restates and incorporates by references all of the allegations in paragraphs 1 through 50 as if set forth fully herein.

52.    Tkhilaishvili, Ursova, and Management intentionally and wrongfully exercised ownership, control, and dominion over Davis Health funds, property to which Defendants had no right of possession, proximately causing damages.

<div align="center">

COUNT V
G.L. c. 93A, § 11
</div>

53.    Davis Health restates and incorporates by references all of the allegations in paragraphs 1 through 52 as if set forth fully herein.

54.    Management and Davis Health are engaged in trade or commerce.

55.    Tkhilaishvili and Management willfully committed unfair and deceptive acts or practices substantially within the Commonwealth.

<div align="center">

RELIEF REQUESTED
</div>

Davis Health requests the following relief:

1.    Sufficient damages to compensate it for losses sustained pursuant to Counts I-IV;

2.    That Tkhilaishvili and Management provide an accounting;

<div align="center">8</div>

3.      Rescission of the Agreement;

4.      A Temporary Restraining Order and, after hearing, a preliminary injunction, enjoining and restraining Tkhilaishvili and Management and their officers, employees, agents, and associates from interfering with Davis Health or its officers, employees, agents and associates, and specifically ordering defendants to:

a.      account for all funds received from or on behalf of Davis Health and all expenditures made utilizing said funds;

b.      not come onto the business premises of Davis Health and have no contact with Davis Health or its owners or employees;

c.      turn over to Davis Health all records and information of or pertaining to Davis Health, including but not limited to patient and insurance information;

d.      provide access to all areas of the Davis Health premises and provide passwords and access to all computers containing Davis Health information;

e.      sublease, or assign, the existing lease to Davis Health; and

f.      pay all arrearages due to or on behalf of Davis Health, including rent, build-out expense, and payroll to employees, management, and doctors.

5.      Award triple damages and attorneys' fees under G.L. c. 93A on Count V due to unfair and deceptive acts or practices by Management; and

6.      Such other and further relief as justice requires.

9

Respectfully submitted,
DAVIS HEALTH, P.C.
By its attorneys,


William J. Lovett (BBO #643525)
wlovett@collorallp.com
Lauren A. Graber (BBO #679226)
lgraber@collorallp.com
Collora LLP
100 High Street, 20th Floor
Boston, MA  02110
(617) 371-1000

Dated: June 11, 2014

## VERIFICATION

I, Kurt Fabrick, M.D., state that I have read the above verified complaint and that the facts averred are true to the best of my knowledge and, as to those facts alleged on information and belief, I believe they are true.

*Kurt C. Fabrick, MD*

KURT FABRICK, M.D.

# EXHIBIT L

## To Affidavit of Vahagn Victor Torosyan

*Execution Copy*

HEALTH MANAGEMENT GROUP, LLC

AMENDED AND RESTATED
OPERATING AGREEMENT

Dated:  As of September 11, 2015

THE INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT
BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR
UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH INTERESTS MAY
NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY
TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR
EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER
SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

1

# TABLE OF CONTENTS

ARTICLE I     Organization and Powers .................................................................2
    1.01    Organization ..........................................................................2
    1.02    Powers. .................................................................................2
    1.03    Designation of Managers ........................................................3
    1.04    Principal Place of Business .....................................................3
ARTICLE II     Membership ...........................................................................3
    2.01    Representations and Warranties ...............................................3
    2.02    Capital Accounts. ...................................................................3
    2.03    Capital Contributions .............................................................3
    2.04    No Withdrawal of or Interest on Capital ..................................4
    2.05    The Manager as Member ........................................................4
    2.06    Liability of Members ..............................................................4
    2.07    Indemnification ......................................................................4
ARTICLE III     Additional Capital ................................................................5
    3.01    Funding Capital Requirements ................................................5
    3.02    Third Party Liabilities ............................................................5
ARTICLE IV     Distributions; Profits and Losses ............................................5
    4.01    Distributions .........................................................................5
    4.02    Distribution Upon Dissolution ................................................6
    4.03    Distribution of Assets in Kind ................................................6
    4.04    Allocation of Profits and Losses .............................................6
    4.05    Required Regulatory Allocations ............................................7
    4.06    Curative Allocations ..............................................................9
    4.07    Tax Allocations and Book Allocations ..................................10
    4.08    General Allocation and Distribution Rules .............................10
    4.09    Tax Withholding ..................................................................11
ARTICLE V     Management ........................................................................11
    5.01    Management of the LLC ........................................................11
    5.02    Member Consent Requirements .............................................12
    5.03    Binding the LLC ..................................................................14
    5.04    Compensation of the Manager ...............................................14
    5.05    Indemnification ....................................................................14
    5.06    Contracts with Members .......................................................14
    5.07    Other Activities ...................................................................15
ARTICLE VI     Fiscal Matters ....................................................................15
    6.01    Books and Records ...............................................................15
    6.02    Bank Accounts .....................................................................15
    6.03    Fiscal Year ..........................................................................15
    6.04    Tax Matters Partner ..............................................................16
ARTICLE VII     Transfers of Interests; LLC Purchase of Interests ...................16
    7.01    Restrictions on Transfer ........................................................16
    7.02    Conditions to Transfer ..........................................................16

i

7.03    Conditions to Admission as Member ........................................................................17
7.04    Right of First Refusal ..............................................................................................18
7.05    Option to Purchase ..................................................................................................19
7.06    Triggering Events ....................................................................................................19
7.07    Agreement Price ......................................................................................................19
7.08    Agreement Terms .....................................................................................................20
ARTICLE VIII    Dissolution and Termination ....................................................................20
8.01    Events Causing Dissolution .....................................................................................20
8.02    Procedures on Dissolution .......................................................................................20
ARTICLE IX    General Provisions .....................................................................................21
9.01    Notices .....................................................................................................................21
9.02    Word Meanings .......................................................................................................21
9.03    Binding Provisions ..................................................................................................21
9.04    Applicable Law ........................................................................................................21
9.05    Counterparts .............................................................................................................21
9.06    Separability of Provisions .......................................................................................21
9.07    Section Titles ...........................................................................................................21
9.08    Entire Agreement .....................................................................................................21
9.09    Survival of Certain Provisions ................................................................................22
9.10    Amendments .............................................................................................................22
9.11    Waiver ......................................................................................................................22
9.12    Investment Representation .......................................................................................22
9.09    Survival of Certain Provisions ................................................................................22
ARTICLE X    Mediation ....................................................................................................23
10.1 Dispute Resolution and Matters Which May Be Mediated ......................................23
10.2 Selection of Mediator ...............................................................................................23
10.3    Decision; Procedure ................................................................................................23
10.4 Fees and Expenses .....................................................................................................24
10.5 Confidential and Inadmissible for Purposes of Arbitration .....................................24
ARTICLE XI    Binding Arbitration ...................................................................................24
11.1 Matters Which May Be Arbitrated ............................................................................24
11.2 Selection of Arbitrators .............................................................................................24
11.3 Decision; Procedure ..................................................................................................25
11.4 Fees and Expenses .....................................................................................................25
ARTICLE XII    Definitions ...............................................................................................25

# HEALTH MANAGEMENT GROUP, LLC
## AMENDED AND RESTATED OPERATING AGREEMENT

AGREEMENT dated as of the eleventh day of September, 2015 between David Tkhilaishvili and Vahagn Victor Torosyan (collectively, the "Class A Members" and each individually, a "Class A Member"); and Kenton Fabrick, Jambulat Tkhilaishvili, Olga Dorofyeyeva, David Tkhilaishvili and Vahagn Victor Torosyan (collectively, the "Class B Members" and each, individually, a "Class B Member") (the Class A Members and the Class B Members collectively are referred to herein as the "Members" and each a "Member"). David Tkhilaishvili and Vahagn Victor Torosyan also join this Agreement as the "Managers" of the LLC.

WHEREAS, the parties have formed Health Management Group, LLC (the "LLC") as a limited liability company under the laws of the Commonwealth of Massachusetts pursuant to the Act by the filing a Certificate of Organization in the office of the Secretary of State of the Commonwealth of Massachusetts on August 1, 2014;

WHEREAS, on December 12, 2014, David Tkhilaishvili and Vahagn Victor Torosyan executed a Letter Agreement ("Letter Agreement") which stated, among other terms, that (i) the Class A Members of the LLC shall be David Tkhilaishvili and Vahagn Victor Torosyan, (ii) the Operating Agreement of the LLC can be amended only with the approval of both Class A Members, and (iii) notwithstanding clause (ii), until Vahagn Victor Torosyan recovers his entire investment in the LLC and Allied Health Clinic, LLC, in the event of a dispute between David Tkhilaishvili and Vahagn Victor Torosyan, Vahagn Victor Torosyan will have the authority to decide the matter based on his reasonable judgment regarding what is in the best interests of the LLC ("Vahagn Authority");

WHEREAS, at the first organizational meeting ("Meeting") of the LLC on May 3, 2015 at 6:00 pm at the location of 7 Seaport Drive, Suite #608, Quincy, MA 02169, the Letter Agreement was presented to all Members and all Members (including David Tkhilaishvili) acknowledged and agreed that the Letter Agreement was the Operating Agreement of the LLC and documented such acknowledgement and agreement by executing a copy of the minutes of the Meeting;

WHEREAS, as of the date hereof, Vahagn Victor Torosyan has not yet recovered his entire investment in the LLC and Allied Health Clinic, LLC, and Vahagn Victor Torosyan has determined in his reasonable judgment, with advice of legal counsel, that executing this Agreement is in the best interests of the LLC;

WHEREAS, based on the Vahagn Authority, as confirmed and ratified by the Members at the Meeting, in the event of a dispute between David Tkhilaishvili and Vahagn Victor Torosyan concerning the amendment of the Operating Agreement of the LLC, Vahagn Victor Torosyan is authorized to amend the Operating Agreement of the LLC, and thereby adopt this Agreement, without the signature of David Tkhilaishvili; and

WHEREAS, the Managers and the Members wish to set out fully their respective rights, obligations and duties with respect to the LLC and its assets;

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

<div align="center">

ARTICLE I
Organization and Powers

</div>

1.01   Organization.  The Managers shall file such certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the LLC shall conduct business and shall continue to file such certificates and documents for as long as the LLC conducts business therein.  The LLC may establish places of business within and without the Commonwealth of Massachusetts, as and when required by its business and in furtherance of its purposes set forth in Section 1.02 hereof, and may appoint agents for service of process in all jurisdictions in which the LLC shall conduct business.  The LLC may from time to time change its name, its resident agent for service of process, the location of its registered office and/or any other matter described in the Certificate.  The Managers shall have no obligation to deliver or mail a copy of the Certificate or any amendment thereto to the Members.

1.02   Powers.  The general character of the business of the LLC, as set forth in the Certificate of Organization, is to provide management, operational and administrative services for clinics providing substance abuse services (including, without limitation, Allied Health Clinic, LLC), and to engage in any other activities allowed by a limited liability company organized under the Act and to carry on any related or unrelated lawful business, trade, purpose or activity, including without limitation:

(a)   To enter into, execute, modify, amend, supplement, acknowledge, deliver, perform and carry out contracts of any kind, including operating agreements of limited liability companies, whether as a member or manager, contracts with Affiliated Persons, guarantees and joint ventures, limited and general partnership agreements and contracts establishing business arrangements or organizations, necessary to, in connection with, or incidental to the accomplishment of the purposes of the LLC, and to secure the same by mortgages, pledges or other liens.

(b)   To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the LLC, and to secure the same by mortgages, pledges, or other liens.

(c)   To the extent that funds of the LLC are available, to pay all expenses, debts and obligations of the LLC.

<div align="center">2</div>

(d)     To enter into or engage in any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of the LLC, so long as said activities may be lawfully carried on or performed by a limited liability company under the laws of the Commonwealth of Massachusetts.

(e)     To take any other action not prohibited under the Act or other applicable law.

1.03    Designation of Managers.  Vahagn Victor Torosyan and David Tkhilaishvili are hereby designated as the Managers of the LLC.  The Managers may be removed by only by Consent of the Class A Members.  A Manager shall serve until his death, incapacity (as determined by the Manager's personal physician), retirement, resignation or removal as a Manager.  In the event of a vacancy in the office of one of the Managers, a new Manager to fill such vacancy will be designated and appointed by the Consent of the Class A Members, and the power and authority of such person or entity to participate in the management of the LLC (other than as Member, if applicable) shall be terminated.

1.04    Fiduciary Duty of Managers.  The Managers shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty will be grounds for immediate removal as a Manager by the Consent of the Class A Members.  No Manager may encumber the LLC in any way (including, but not limited to, by loan, credit agreement, or otherwise) for personal reasons, borrow any funds from the LLC, transact any business with the LLC, use LLC funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the LLC's assets as collateral for a loan), or in any way transfer to the LLC any personal debt or the debt of any business in which such Manager is involved, in each case, without the approval of both Class A Members.

1.05    Principal Place of Business.  The principal place of business of the LLC, unless otherwise designated by the Managers, shall be 21 School Street, Suite #1, Quincy, MA 02169.

## ARTICLE II
### Membership

2.01    Representations and Warranties.  Each Member hereby represents and warrants to the LLC and to each other Member that (i) the Member has full power and authority to execute and agree to this Agreement and to perform his or her obligations hereunder; (ii) the Member has duly executed and delivered this Agreement; and (iii) the Member's authorization, execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which the Member is a party or by which that Member is bound.

2.02    Capital Accounts.  A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the LLC.

2.03    Capital Contributions.

3

(a)      Each Member has made a Capital Contribution to the LLC as set forth opposite his or her name in Schedule I.

(b)      Except as set forth in Article III, neither the Members nor Managers shall be entitled, obligated or required to make any Capital Contribution in addition to their Capital Contribution made under Section 2.03(a), or any loan, to the LLC, even if the failure to do so would result in a default of any of the LLC's obligations or the loss or termination of all or any part of the LLC's assets or business. No loan made to the LLC by any Member or Manager shall constitute a Capital Contribution to the LLC for any purpose.

2.04   No Withdrawal of or Interest on Capital.   No Member shall have the right to resign and receive any distribution from the LLC as a result of such resignation, and no Member shall have the right to receive the return of all or any part of his or her Capital Contribution or Capital Account, or any other distribution, except as provided in Sections 4.01, 4.02 and 8.02. No Member shall have any right to demand and receive property of the LLC in exchange for all or any portion of his or her Capital Contribution or Capital Account, except as provided in Sections 4.02 and 8.02 upon dissolution and liquidation of the LLC. No interest or prior or preferred return shall accrue or be paid on any Capital Contribution or Capital Account or any loan from a Member or Manager to the LLC, except pursuant to Sections 3.01, 4.01, 4.02 and 8.02.

2.05   Manager as Member.   A Manager may hold an interest in the LLC as Member, and such party's rights and interest as a Manager shall be distinct and separate from such party's rights and interest as a Member.

2.06   Liability of Members.   No Member, in his or her capacity as a Member, shall have any liability to restore any negative balance in his or her Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the LLC, or to restore any amounts distributed from the LLC, except as may be required under the Act or other applicable law. In no event shall any Member, in his or her capacity as a Member, be personally liable for any liabilities or obligations of the LLC.

2.07   Indemnification.   Each Member shall be entitled to indemnity from the LLC for any liability incurred and/or for any act performed by him or her within the scope of the authority conferred on him, her or it, by this Agreement, and/or for any act omitted to be performed except for his or her gross negligence or willful misconduct, which indemnification shall include all reasonable expenses incurred, including reasonable legal and other professional fees and expenses.

2.08   Duty of Loyalty.   The Members shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty by a Member will be grounds for forfeiture of such Member's entire Interest upon the Consent of the Class A Members. No Member may encumber

4

the LLC in any way (including, but not limited to, by loan, credit agreement, or otherwise) for personal reasons, borrow any funds from the LLC, transact any business with the LLC, use LLC funds, resources, employees, or assets for personal reasons (including, but not limited to, by pledging the LLC's assets as collateral for a loan), or in any way transfer to the LLC any personal debt or the debt of any business in which such Member is involved, in each case, without the approval of both Class A Members.

<div align="center">

ARTICLE III
Additional Capital

</div>

3.01    Funding Capital Requirements.

(a)    In the event that the LLC requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the LLC may borrow funds from such lender(s), including the Managers and Members, on such terms and conditions as are determined by the Managers.

(b)    No Member or Manager shall have any obligation to give notice of an existing or potential default of any obligation of the LLC to any of the Members or the Managers.

3.02    Third Party Liabilities.  The provisions of this Article III are not intended to be for the benefit of any creditor or other Person (other than a Member in his or her capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the LLC or any of the Members.  Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article III, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the LLC or any Member.

<div align="center">

ARTICLE IV
Distributions; Profits and Losses

</div>

4.01    Distributions.  Except as provided in Section 4.02 and Section 4.09, all LLC funds, which are determined by the Consent of the Class A Members to be available for distribution, shall be distributed to the Interest Holders as follows:

(i)    First, to repay any loans from the Members (including, but not limited to, the Torosyan Loans) or their Affiliated Persons;

(ii)    Second, to the Interest Holders, if any, with positive balances in their respective Capital Accounts, to eliminate and in proportion to such positive balances, after reflecting in such Capital Accounts all adjustments thereto necessitated by all other LLC transactions

<div align="center">5</div>

(distributions and allocations of Profits and Losses and items of income, gain, deduction and loss);

(iii)     Third, the balance to the Interest Holders, in proportion to their Percentage Interests.

4.02     Distribution Upon Dissolution.

(a)  Proceeds from a Liquidating Capital Transaction and amounts available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the LLC, and liquidation of any remaining assets of the LLC, shall be distributed and applied in the following priority:

(i)      First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by the Managers, provided that, upon the expiration of such period of time as the Managers shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section 4.02(a);

(ii)     Second, to the Interest Holders, if any, with positive balances in their respective Capital Accounts, to eliminate and in proportion to such positive balances, after reflecting in such Capital Accounts all adjustments thereto necessitated by all other LLC transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss), and such Liquidating Capital Transaction; and

(iii)    Third, any remaining assets shall be distributed to the Interest Holders in proportion to their respective Percentage Interests as set forth in Section 4.01(iii).

4.03     Distribution of Assets in Kind.

No Interest Holder shall have the right to require any distribution of any assets of the LLC in kind.  If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Managers.  Any Interest Holder entitled to any interest in such assets shall, unless otherwise determined by the Managers, receive separate assets of the LLC and not an interest as tenant-in-common, with other Interest Holders so entitled, in each asset being distributed.

4.04     Allocation of Profits and Losses.

(a)      After giving effect to the allocations set forth in Sections 4.05 and 4.06, Profits shall be allocated in the following order and priority:

6

(i)    First, to the extent Losses have previously been allocated pursuant to clauses (ii) or (iii) of Section 4.04(b) for any prior period, Profits shall be allocated to the Interest Holders first to offset any Losses allocated pursuant to said clause (iii) of Section 4.04(b), and then to offset any Losses allocated pursuant to said clause (ii) of Section 4.04(b), (in each case pro rata among the Interest Holders in proportion to their shares of the Losses to be offset under such clause), and to the extent any allocations of Losses are offset pursuant to this clause First, such allocations of Losses shall be disregarded for purposes of computing subsequent allocations pursuant to this clause First; and

(ii)    Second, any remaining Profits shall be allocated among the Interest Holders in proportion to their respective Percentage Interests as specified in Section 4.01(iii) of this Agreement.

(b)    After giving effect to the allocations set forth in Sections 4.05 and 4.06, Losses shall be allocated in the following order and priority:

(i)    First, to the extent Profits have previously been allocated pursuant to clause (ii) of Section 4.04(a) for any prior period, Losses shall be allocated to the Interest Holders first to offset any Profits allocated pursuant to said clause (ii) of Section 4.04(a), (in each case pro rata among the Interest Holders in proportion to their shares of the Profits to be offset under such clause), and to the extent any allocations of Profits are offset pursuant to this clause such allocations of Profits shall be disregarded for purposes of computing subsequent allocations pursuant to this clause First;

(ii)    Second, Losses shall be allocated among the Interest Holders in proportion to the respective amounts of their Capital Accounts until the cumulative Losses allocated pursuant to this clause (ii) of Section 4.04(b) are equal to the aggregate amount of all such Capital Accounts; and

(iii)    Third, any remaining Losses shall be allocated among the Interest Holders in proportion to their respective Percentage Interests as set forth in Section 4.01(iii) of this Agreement.

4.05    Required Regulatory Allocations.

(a)    Limitation on and Reallocation of Losses. At no time shall any allocations of Losses, or any item of loss or deduction, be made to an Interest Holder if and to the

7

extent such allocation would cause such Interest Holder to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Interest Holder at the end of any fiscal year. To the extent any Losses or items of loss or deduction are not allocated to one or more Interest Holders pursuant to the preceding sentence, such Losses or items of loss or deduction shall be allocated to the Interest Holders to which such Losses or items of loss or deduction may be allocated without violation of this Section 4.05(a).

(b)     <u>Minimum Gain</u>. If there is a net decrease in the Minimum Gain of the LLC during any fiscal year, then items of income or gain of the LLC for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Interest Holder in an amount equal to such Interest Holder's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d). An Interest Holder's share of the net decrease in the Minimum Gain of the LLC shall be determined in accordance with Regulations Section 1.704-2(g). The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-(2)(j)(2)(i).

(c)     <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any fiscal year or other period (not including any Partner Nonrecourse Deductions allocated pursuant to Section 4.05(d)) shall be allocated among the Interest Holders in proportion to their respective Percentage Interests. Solely for purposes of determining each Interest Holder's proportionate share of the "excess nonrecourse liabilities" of the LLC, within the meaning of Regulations Section 1.752-3(a)(3), each Interest Holder's interest in Profits shall be equal to his or her Percentage Interest. The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)     <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Interest Holder who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4) to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e)     <u>Partner Minimum Gain Chargeback</u>. Notwithstanding any contrary provisions of this Article IV, other than Section 4.05(b) above, if there is a net decrease in Partner Minimum Gain attributable to Partner Nonrecourse Debt during any fiscal year, then each Interest Holder who has a share of such Partner Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the LLC, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Interest Holder's share of the net decrease in such Partner Minimum Gain, determined in accordance with Regulations Section 1.704-(2)(i)(3) and 2(i)(5).

8

(f)     Qualified Income Offset. If any Interest Holder unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Interest Holder in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Interest Holder, provided that an allocation pursuant to this Section 4.05(f) shall be made if and only to the extent that such Interest Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.05(f) were not in the Agreement.

(g)     Basis Adjustment. To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to either of Code Sections 734 or 743 is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(h)     Gross Income Allocation. In the event any Interest Holder has a Capital Account deficit at the end of any LLC fiscal year, which is in excess of the sum of the items to be credited to an Interest Holder's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Interest Holder shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 4.05(h) shall be made if and only to the extent that such Interest Holder would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.05(h) were not in this Agreement. As among Interest Holders having such excess if there are not sufficient items of income and gain to eliminate all such excesses, such allocations shall be made in proportion to the amount of any such excess.

4.06    Curative Allocations.

The allocations set forth in Section 4.05 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Interest Holders intend to divide LLC distributions and to make Profit and Loss allocations. Accordingly, as determined by the Managers, other allocations of Profits, Losses and items thereof shall be divided among the Interest Holders so as to prevent the allocations in Section 4.05 from distorting the manner in which LLC distributions will be divided among the Interest Holders pursuant to Sections 4.01 and 4.02 hereof. In general, the Interest Holders anticipate that this will be accomplished by specially allocating other Profits, Losses and items of income, gain, loss and deduction among the Interest Holders so that the net amount of allocations under Section 4.05 and allocations

9

under this Section 4.06 to each such Interest Holder is zero. However, the Managers shall have discretion to accomplish this result in any reasonable manner.

### 4.07   Tax Allocations and Book Allocations.

Except as otherwise provided in this Section 4.07, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Interest Holders in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article IV.

In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its Book Value, such allocation to be made by the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

In the event the Book Value of any property of the LLC is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such assets for federal income tax purposes and its Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

Allocations pursuant to this Section 4.07 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Interest Holder's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

### 4.08   General Allocation and Distribution Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managers using any permissible method under Code Section 706 and the Regulations thereunder. Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocable among the Interest Holders in the same proportions as the Profits and Losses for the fiscal year in which such item is included is allocated.

(b)     Upon the admission of a new Interest Holder or the Transfer of all or part of an Interest, the new and old Interest Holders or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or Transferred

10

Interest was held by the new and old Interest Holders, or the transferor and transferee, respectively. For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the LLC shall close its books on an interim basis on the last day of the previous calendar month.

4.09   Tax Withholding. If the LLC incurs a withholding tax obligation with respect to the share of income allocated to any Interest Holder, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Interest Holder and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Interest Holder, and (b) any amount which is so paid over by the LLC, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Interest Holder, shall be treated as an interest-free advance to such Interest Holder. Amounts treated as advanced to any Interest Holder pursuant to this Section 4.09 shall be repaid by such Interest Holder to the LLC within 30 days after the Managers, acting by Consent of the Class A Members, give notice to such Interest Holder making demand therefor. Any amounts so advanced and not timely repaid shall bear interest, commencing on the expiration of said 30 day period, compounded monthly on unpaid balances, at an annual rate equal to the Applicable Federal Rate as of such expiration date. The LLC shall collect any unpaid amounts from any LLC distributions that would otherwise be made to such Interest Holder.

<div align="center">ARTICLE V<br>Management</div>

5.01   Management of the LLC. Subject to the provisions of this Agreement, including, without limitation, Section 5.02, the overall management and control of the business and affairs of the LLC shall be vested in the Managers who may each act individually on behalf of the LLC. The Managers shall devote such time to the affairs of the LLC as may be reasonably necessary for performance by the Managers of their duties. Notwithstanding anything to the contrary herein, any dispute between the Managers that occurs prior to return of the Torosyan Capital and repayment of the Torosyan Loans will be decided by Vahagn Victor Torosyan in his sole discretion.

All management and other responsibilities not specifically reserved to the Class A Members in this Agreement shall be vested in the Managers, and the Members shall have no voting rights except as specifically provided in this Agreement. Specifically, but not by way of limitation, and subject to all other provisions of this Agreement (including without limitation, Sections 1.03 and 5.02), the Managers shall be authorized in the name of and on behalf of the LLC, to do all things necessary or appropriate to carry on the business and purposes of the LLC, including, without limitation, the following:

<div align="center">11</div>

(i)     to determine the appropriate accounting method or methods to be used by the LLC;

(ii)    to cause the LLC to make or revoke any of the elections referred to in I.R.C. §§ 108, 704, 709, 754 and 1017 and any similar provisions enacted in lieu thereof, and in any other section of the Code;

(iii)   to establish and maintain reserves for such purposes and in such amounts as the Managers deems appropriate from time to time;

(iv)    to engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of the purposes of the LLC;

(v)     to exercise all powers and authority granted by the Act to managers, except as otherwise provided in this Agreement;

(vi)    to cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed on any of the assets of the LLC unless the same are contested by the Managers; and

(vii)   to perform any other act the Managers may deem necessary, convenient or desirable for the LLC or the conduct of the LLC's business.

5.02    Class A Member Consent Requirements. Notwithstanding the provisions of Section 5.01, Consent of the Class A Members shall be required to cause the LLC to take the following actions, except as otherwise provided in this Agreement:

(i)     engage in any activity that is not consistent with the purposes of the LLC as set forth herein, including entering a new line of business;

(ii)    approve strategic plans for the LLC;

(iii)   approve annual capital and operating budgets for the LLC, and authorize any expenditure not included in the annual budget;

(iv)    except as provided in Section 9.10, approve any amendment, modification, revision, supplement, or rescission this Agreement;

(v)     identify new management opportunities, including the recruitment of investors to establish new outpatient treatment facilities to be managed by the LLC;

(vi)    acquire, by purchase or otherwise, any equity interests in another entity;

(vii)   cause or permit the LLC to extend credit or make any loans to, or to become a surety, guarantor, endorser, or accommodation endorser for, any Person, in an amount exceeding $1,000;

(viii)  obtain, increase, modify, consolidate, or extend any loan, whether secured or unsecured, affecting the LLC;

(ix)    incur Indebtedness in excess of $1,000;

12

(x)     accept a loan from a Member on behalf of the LLC (excluding the Torosyan Loans);

(xi)    sell, lease, transfer, pledge, mortgage, or otherwise dispose of, or refinance any asset of the LLC valued in excess of $1,000;

(xii)   merge or consolidate with, or acquire all or substantially all of the assets or equity securities of, another Person;

(xiii)  liquidate, reorganize or dissolve the LLC;

(xiv)   engagement of legal counsel for the LLC;

(xv)    expenditures in excess of $1,000 individually;

(xvi)   confess a judgment or settle a claim against the LLC in an amount in excess of applicable insurance coverage;

(xvii)  initiate litigation or arbitration of any of the LLC's disputes or controversies with third parties;

(xviii) release, compromise, assign, or transfer any claims, rights, or benefits of the LLC;

(xix)   obtain, increase, modify, consolidate, or extend any loan, whether secured or unsecured, affecting the LLC;

(xx)    employ, engage or retain persons to act as employees or agents;

(xxi)   determine salary or bonuses for employees;

(xxii)  determine health and dental insurance and other benefits for employees;

(xxiii) determine compensation of the Managers;

(xxiv)  appoint or remove a Manager as provided in Section 1.03;

(xxv)   do any act in contravention of this Agreement;

(xxvi)  perform any act that would subject any Member to personal liability in any jurisdiction;

(xxvii) acquire, by purchase, lease, or otherwise, any real property or construct any new capital improvements or replace an existing capital improvement following completion of construction thereof;

(xxviii) give or grant any options, rights of first refusal, deeds of trust, mortgages, pledges, ground leases, security interests, easements or similar rights or interests;

(xxix)  change principal place of business and appoint agent for service of process;

(xxx)   take any action that results in Bankruptcy;

(xxxi)  request additional capital contributions;

(xxxii) indemnify against or guarantee any act, debt, default or misconduct of any person or entity;

13

(xxxiii)grant permission to any Manager, Member, officer or employee to pursue an independent or competitive business opportunity;

(xxxiv)issue new membership interests or repurchase or redeem membership interest on behalf of the LLC; or

(xxxv) acquire and enter into any contract of insurance for the protection of the LLC, any Member or Manager.

Notwithstanding the foregoing and the definition of "Consent of the Class A Members," the following actions shall require the approval of both Vahagn Victor Torosyan and David Tkhilaishvili in each instance (regardless of whether the Torosyan Capital and Torosyan Loans have been returned or repaid, as applicable):

(1) the decisions listed in Section 5.02(x) and (xxxiii) above;

(2) transactions or contracts with Members or Affiliates of Members of the LLC;

(3) the use of the assets, resources, employees, or funds of the LLC for personal reasons by the Members; or

(4) the transfer of personal debts of any of the Members or their Affiliates to the LLC.

5.03   Binding the LLC.  Any action taken by any Manager acting as a Manager of the LLC shall bind the LLC and shall be deemed to be the action of the LLC, and no third party need look to any other evidence or require joinder or consent of any other party.

5.04   Compensation of the Manager.  A Manager shall be entitled to reimbursement from the LLC for all expenses incurred by such Manager in managing and conducting the business and affairs of the LLC and may receive compensation from the LLC for services rendered to the LLC as an employee, consultant or otherwise.  The Managers, acting by approval by both Managers, shall determine which expenses, if any, are allocable to the LLC in a manner which is fair and reasonable to the Managers and the LLC, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

5.05   Indemnification.  The Managers shall be entitled to indemnity from the LLC for any liability incurred and/or for any act performed by him or her within the scope of the authority conferred on him or her, by this Agreement, and/or for any act omitted to be performed except for his or her gross negligence or willful misconduct, which indemnification shall include all reasonable expenses incurred, including reasonable legal and other professional fees and expenses.  The doing of any act or failure to do any act by the Manager, the effect of which may cause or result in loss or damage to the LLC, shall not subject the Manager to any liability to the Members.

5.06   Contracts with Members.  With the Consent of the Class A Members in each case, the LLC may engage in business with, or enter into one or more agreements, leases, contracts or

14

other arrangements for the furnishing to or by the LLC of goods, services or space with any Interest Holder, and may pay compensation in connection with such business, goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those that would be payable to unaffiliated persons under similar agreements.

5.07   Other Activities.  For so long as they are Members of the LLC, each Member shall devote his full time and best efforts to the business of the LLC.  Each Member shall be entitled to the vacations, sick leave, personal leave, health, disability and dental insurance and other such benefits and leave as determined by the Consent of the Class A Members from time to time.  The Members, the Managers and their Affiliates may not engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of the LLC or Allied Health Clinic, LLC, where such business ventures or investment opportunities are in competition with the business of the LLC or Allied Health Clinic, LLC (including without limitation, medical businesses, satellite clinics or clinics providing outpatient opioid addiction services or treatments), without the approval of Victor Torosyan and David Tkhilaishvili.

## ARTICLE VI
### Fiscal Matters

6.01   Books and Records.  The Managers shall keep or cause to be kept complete and accurate books and records of the LLC, using the same methods of accounting which are used in preparing the federal income tax returns of the LLC to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied.  Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the LLC for examination and copying by any Member or the Manager, or his or her duly authorized representative, at his or her reasonable request and at his or her expense during ordinary business hours.  A current list of the full name and last known address of each Member and Manager, a copy of this Agreement, any amendments thereto and the Certificate, including all certificates of amendment thereto, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, the Certificate or any certificate of amendment has been executed, copies of the LLC's federal, state and local income tax returns and reports, if any, for the three most recent years, shall be maintained at the registered office of the LLC required by Section 5 of the Act.  Any Member may, at any time, at his or her own expense, cause an audit or review of the LLC books to be made by a certified public accountant of his or her own selection.

6.02   Bank Accounts.  Bank accounts and/or other accounts of the LLC shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Managers and withdrawals shall be made and other activity conducted on such signature or signatures as determined by the Managers.

6.03   Fiscal Year.  The fiscal year of the LLC shall end on December 31st of each year.

15

6.04    Tax Matters Partner.  David Tkhilaishvili is hereby designated as the "tax matters partner." The "tax matters partner" is hereby authorized to and shall perform all duties of a "tax matters partner" under the Code and shall serve as "tax matters partner" until his resignation or until the designation of his successor by the Managers, whichever occurs sooner.

ARTICLE VII
Transfers of Interests; Option to Purchase

7.01    Restrictions on Transfer.  Each Interest Holder agrees that he or she will not encumber or permit to be encumbered and that he or she will not Transfer or permit to be Transferred, all or any portion of his Interest in the LLC, except as provided herein. Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any interest in the LLC, and shall not bind, or be recognized by, or on the books of, the LLC, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member or an Interest Holder for any purpose. In the event any Interest Holder shall at any time Transfer an Interest in the LLC in contravention of any of the provisions of this Agreement, then each Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Interest Holder shall not plead in defense thereto that there would be an adequate remedy at law, it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach of threatened breach of the provisions concerning such transactions set forth in the Agreement.

7.02    Conditions to Transfer.  A Transfer that is otherwise permitted by this Article VII shall not bind or be recognized by, or on the books of the LLC and the transferee or assignee in such transaction shall not be, or be treated as, or deemed to be, an Interest Holder or a Member for any purpose until the following conditions are satisfied:

(a)    No Transfer of any Interest in the LLC may be made if such Transfer would cause or result in a breach of any agreement binding upon the LLC or of then applicable rules and regulations of any governmental authority having jurisdiction over such Transfer. The Managers may require as a condition of any Transfer that the transferor furnish an opinion of counsel, satisfactory to the LLC (both as to counsel and as to the substance of the opinion), that the proposed Transfer is exempt from applicable registration requirements, complies with applicable law, including federal and state securities laws, and does not cause the LLC to be an investment company as such term is defined in the Investment Company Act of 1940, as amended.

(b)    The transferor and transferee shall execute and deliver to the LLC such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the LLC to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement. The LLC shall be reimbursed by the transferor and/or the transferee for all costs and expenses that the LLC reasonably occurs in connection with the Transfer.

16

(c)     If required by the Managers, the transferor shall furnish the LLC an opinion of counsel, which counsel and opinion shall be satisfactory to the LLC, that the Transfer shall not cause the LLC to terminate for federal income tax purposes.

(d)     The transferor and transferee shall furnish the LLC with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the interest that has been Transferred, and any other information reasonably necessary to permit the LLC to file all required federal and state income tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the LLC shall not be required to make any distribution otherwise provided for in this Agreement with respect to an Interest that has been Transferred until it has received such information.

(e)     Unless the Managers have specifically approved otherwise in writing, a transferor of an Interest shall not be relieved of liability under this Agreement with respect to the Transferred interest arising or accruing on or after the effective date of the Transfer, except to the extent of the payments made in the transferor's place by any transferee of the Interest; and the LLC may proceed to collect any amount due from the transferor as and when due, together with interest thereon from the date for payment stated herein at the rate of 18 percent per annum, compounded monthly (but not exceeding the maximum rate permitted by law) and all costs and expenses of collection incurred by the LLC (including reasonable fees and disbursements of counsel).

(f)     Any person who acquires in any manner whatsoever an Interest, whether or not such person has assumed in writing the terms and provisions of this Agreement shall be deemed, by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such Interest.

7.03    Conditions to Admission as Member.

(a)     A transferee of an Interest in the LLC, or any portion thereof, shall become an additional or substituted Member entitled to all of the rights of a Member, if the Transfer is in accordance with this Agreement and if and only if:

(i)     the transferor gives the transferee such right;

(ii)    the addition or substitution is approved by Consent of the Class A Members;

(iii)   the transferee pays to the LLC all costs and expenses incurred in connection with such addition or substitution, including, specifically, without limitation, cost incurred in the review and processing of the assignment and in amending the Agreement, and the Certificate if required;

(iv)    the transferee executes and delivers an amendment to this Agreement (and to the Certificate, if required), which amendment shall be executed by the Managers and such

17

transferee, and such other instruments, in form and substance satisfactory to the Managers, as may be necessary, appropriate or desirable to effect such substitution or addition, and to confirm the agreement of the transferee to be bound by the terms and provisions of this Agreement.

(c)     The Managers may require, as a condition to the admission to the LLC as a Member of any transferee who is not a Member, that such transferee demonstrate to the reasonable satisfaction of the Managers that he, she or it is either a financially responsible person or has one or more financially responsible persons who have affirmatively assumed the financial obligations of the transferee under this Agreement, if any, on his, her or its behalf.

(d)     Unless a transferee becomes a substituted or additional Member in accordance with the provisions of this Section 7.03, the transferee shall not be entitled to any of the rights granted to a Member hereunder, other than the right as an Interest Holder to receive all or part of the share of the Profits and Losses (and items hereof), and distributions o to which the transferor would otherwise be entitled in respect of the Interest Transferred, pursuant to Sections 4.01 and 4.02.

7.04   Right of First Refusal.

(a)     The Class A Members shall have a right of first refusal if a Member (including, but not limited to, a Class A Member) desires to Transfer all or any part of such Member's Interests, unless the Member receives the written consent of each Class A Member waiving such right.

(b)     Before Transferring any Interest, the Member must first provide to the Class A Members prior written notice of such Member's intention to make a disposition of such Member's Interest or any part thereof (the "Disposition Notice"). In the Disposition Notice, the Member shall specify the price at which the Interest is proposed to be transferred, the Interest (or any part thereof) to be transferred, the identity of the proposed purchaser or transferee, and the terms and conditions of the proposed transaction.

(c)     Any or all of the Class A Members may elect, by giving written notice to the other Class A Members and to the Member seeking to sell his Interest within thirty (30) days after receiving the Disposition Notice, to purchase the Interest proposed to be transferred by the Member at the proposed price as contained in the Disposition Notice. If more than one Class A Member so elects to purchase the Interest, then each electing Class A Member shall purchase a portion of the Interest offered for sale in proportion to their Interest and each shall pay the proportionate share of the cost of such purchase. If only one Class A Member so elects to purchase such Interest within the time frame specified herein, the electing party shall have the right to purchase the entire Interest and shall pay the entire cost of such purchase. The terms and conditions of the transfer shall be the terms and conditions of the proposed transaction, as set forth in the Disposition Notice. If, after the expiration of the thirty-day period, no Class A Member has elected to purchase all of the Interest, the LLC may elect, in its sole discretion by giving written notice to the Member within seventy-five (75) days after receiving the Disposition Notice, to purchase any remaining Interest not otherwise purchased by the Class A Members pursuant to this paragraph. The terms and conditions of the

transfer shall be the terms and conditions of the proposed transaction, as set forth in the Disposition Notice.

(d)     If the LLC shall not have purchased all of the Interest (or portion thereof) covered by the Disposition Notice as provided in the foregoing, within one hundred twenty (120) days of sending the Disposition Notice, the Member may transfer to persons other than the LLC, provided that any transfer must be made on the terms and conditions and to the party specified in the Disposition Notice and must be consummated within the one hundred fifty (150) days of LLC receiving the Disposition Notice.

7.05     Option to Purchase .  In the event of the occurrence of any one or more Triggering Events (as defined in Section 7.06) with respect to a person or entity holding an interest in the LLC, such person or entity (the "Offering Interest Holder") shall promptly send notice of the Triggering Event to the LLC and to the Class A Member(s) or the other Class A Member(s), if the Offering Interest Holder is a Class A Member (the "Other Class A Members") and offer or, if notice is not sent, be deemed to have offered, to sell some or all of the Offering Interest Holder's interest in the LLC (the "Offered Interest") to the LLC and the Other Class A Members at the Agreement Price and on the Agreement Terms, as further described below:

(a) The LLC shall have thirty (30) days from the date it becomes aware of the Triggering Event in which to elect to buy all or any of the Offered Interest by notice to the Offering Interest Holder.  In the event that the LLC declines to elect to purchase all of the Offered Interest during the thirty (30) day period, the LLC shall so notify the Other Class A Members, and upon receipt of such notice or in the event that the LLC does not in fact purchase within thirty (30) days of its election to purchase, the Other Class A Member may accept such offer or deemed offer and may buy all of the Offered Interest at the Agreement Price and on the Agreement Terms.  If more than one Other Class A Member accepts such offer, then the Other Class A Members electing to purchase the Offered Interest may purchase the Offered Interest in proportion to their Interest.

7.06     Triggering Events.  Each of the events described below (collectively, the "Triggering Events" and each a "Triggering Event") shall trigger an offer or deemed offer pursuant to Section 7.05 of this Agreement:

(i)     the Involuntary Transfer of an Interest or any portion thereof;

(ii)    the termination of a Member's employment with the LLC for any reason;

(iii)   the disability of a Member, as determined by the Member's personal physician; or

(iv)    the Transfer of some or all of an Interest in the LLC to a Person in violation of this Agreement.

7.07     Agreement Price.  With respect to an offer or deemed offer described in Section 7.05, the Agreement Price means the Book Value of the interest in the LLC or portion thereof purchased by the LLC.

19

7.08    Agreement Terms.  The purchase of the Offered Interest pursuant to this Agreement shall take place at a closing held at 1:00 p.m. on the thirtieth (30th) day after notice to the Offering Interest Holder of the acceptance of his or her offer or deemed offer, as the case may be, at the LLC's primary place of business, or at any other place at which the parties agree. At the closing, the buyer or buyers will pay for the Offered Interests in cash and the Offering Interest Holder will deliver such documentation as the LLC shall require to effect a transfer of the Offered Interests, free and clear of all liens, claims and encumbrances, and the LLC shall adjust its books and records to reflect the transfer of the Offered Interest.  Each Interest Holder appoints the Managers and any person or entity that becomes substitute or additional Managers of the LLC, as such Interest Holder's agent and attorney in fact for the purpose of executing the documentation referred to in this Section 7.08, in the event that such documentation is not delivered to the LLC within thirty (30) days of the notice of acceptance of the Offering Interest Holder's offer or deemed offer.

<div align="center">

ARTICLE VIII
Dissolution and Termination

</div>

8.01    Events Causing Dissolution.  The LLC shall be dissolved and its affairs wound up upon:

(a)    The election to dissolve the LLC made in writing with the Consent of the Class A Members;

(b)    Any consolidation or merger of the LLC with or into any entity in which the LLC is not the resulting or surviving entity; or

(c)    Upon the occurrence of any other event specified under the laws of the Commonwealth of Massachusetts as one effecting dissolution, except when there is a written Consent of the Class A Members that the LLC immediately be reconstituted and reformed on all the applicable, terms, conditions, and provisions of this Agreement.

The LLC shall not be dissolved due to the occurrence of the death, insanity, retirement, resignation, expulsion, Bankruptcy or dissolution of a Member or any other event which terminates the membership of the Member.

8.02    Procedures on Dissolution.  Dissolution of the LLC shall be effective on the day on which the event occurs giving rise to the dissolution, but the LLC shall not terminate until the Certificate shall be canceled.  Notwithstanding the dissolution of the LLC, prior to the termination of the LLC, as aforesaid, the business and the affairs of the LLC shall be conducted so as to maintain the continuous operation of the LLC pursuant to the terms of the this Agreement.  Upon dissolution of the LLC, the Managers or, if none, a liquidator elected by the Consent of the Class A Members shall distribute the assets of the LLC pursuant to Section 4.02 of this Agreement, and cause the cancellation of the Certificate.

<div align="center">20</div>

ARTICLE IX
General Provisions

9.01    Notices.  Any and all notices under this Agreement shall be effective (a) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the LLC at its registered office under the Act, if to a Member at the last address of record on the LLC books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

9.02    Word Meanings.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

9.03    Binding Provisions.  Subject to the restrictions on Transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

9.04    Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, including the Act, as interpreted by the courts of the Commonwealth of Massachusetts, notwithstanding any rules regarding choice of law to the contrary,

9.05    Counterparts.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

9.06    Separability of Provisions.  Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to violate any existing or future law, such that they would affect those which are valid, and if for any reason any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the LLC, such provision or provisions shall be deemed void and of no effect.

9.07    Section Titles.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

9.08    Entire Agreement.  This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

21

9.09    Survival of Certain Provisions.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the LLC, including, but without limitation, the provisions of Sections 2.06, 2.07 and 5.05.  The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the LLC so as to effectuate the intended purposes and agreements of the Members shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the LLC or the execution of any document terminating this Agreement, unless such termination document specifically provides for nonsurvival by reference to this Section 9.09.

9.10    Amendments.

Except as provided in this Section 9.10, this Agreement may not be amended without the written Consent of the Class A Members.  Notwithstanding the foregoing, this Agreement may be amended by the Managers without the Consent of the Class A Members:

        (i)    To cure any ambiguity, to correct or supplement any provision hereof which may be inconsistent with any other provision hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; and

        (ii)    To change any provision of this Agreement required to be so changed by the staff of the Securities and Exchange Commission or other federal agency or by a state "Blue Sky" commissioner or similar official.

9.11    Waiver.  No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by such other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation of such Member hereunder.  Failure on the part of any Member to complain of any act or failure to act of any other Member or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of such Member of its rights hereunder.

9.12    Investment Representation.  Each of the Members represents that he or she is acquiring his or her Interest for his or her own account as an investment and not with a view to the distribution or resale thereof.

9.13    Conflict with Letter Agreement.  In the event of a conflict between the terms of this Agreement and the terms of the Letter Agreement between Vahagn Victor Torosyan and David Tkhilaishvili dated December 11, 2014, the terms of this Agreement will control; provided, however, that the Letter Agreement is hereby ratified and confirmed by the Members

with respect to its terms which do not conflict with this Agreement, including, but not limited to, terms and restrictions concerning Kenton Fabrick's role as "Administrator" of the LLC, Vahagn Victor Torosyan's role as "Advisor" of the LLC, and David Tkhilaishvili's role as manager of the day-to-day operations of the LLC (subject to Victor Torosyan's rights in the event of a disagreement).

<div align="center">

ARTICLE X
Mediation

</div>

10.1    Dispute Resolution and Matters Which May Be Mediated. In the event of claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof between the Members and/or the Managers, the disputing parties agree to negotiate in good faith (with their respective attorneys, if required) for a period of thirty (30) days.

All claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof (i) that arise prior to return of the Torosyan Capital and repayment of the Torosyan Loans and (ii) that the Members and/or the Managers are unable to resolve after such thirty-day period, shall be resolved by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC.

All claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof (i) that arise after return of the Torosyan Capital and repayment of the Torosyan Loans and (ii) that the Members and/or the Managers are unable to resolve after such thirty-day period, shall first be mediated in Boston, Massachusetts by a mediator recognized in his or her field. The mediation shall be conducted in the manner specified in this section.

10.2    Selection of Mediator. The party(ies) desiring mediation shall submit a written notice of an intention to mediate to the American Arbitration Association (the "AAA") with a copy to all of the other Members and the Manager. The notice shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and containing a request that the AAA provide a list of at least three disinterested persons of recognized competence in the field involved from whom a mediator may be appointed by agreement of the parties to the mediation. If for any reason the appointment cannot be made from such list, the AAA shall have the power to make the appointment from among the other members of its panel without the submission of additional lists. The mediator shall as promptly as possible mediate such matter. All parties shall each be entitled to present evidence and argument to the mediator.

10.3    Decision; Procedure. The determination of the mediator shall not be conclusive upon the parties unless agreed to by the parties. The parties agree to mediate in good faith. Mediation shall be conducted under the American Arbitration Association Commercial Mediation Rules in effect on the date hereof, as modified by this Agreement. Once an agreement has been reached, any enforcement of the agreement may be submitted to Superior Court in Suffolk County, Massachusetts and judgment upon the same may be entered. If any issue cannot

<div align="center">23</div>

be resolved through mediation, the disputed issue or issues may be submitted to binding arbitration, which is described in Article XI of this Agreement.

10.4   Fees and Expenses.   The provisions of this mediation procedure may be enforced by any competent Court in Suffolk County, Massachusetts, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable attorneys' fees, to be paid by the party against whom enforcement is ordered.   Each party shall pay for his or its own expenses and his or its attorney's fees and expenses.   If the mediation results in the acceptance of a position held by one or more of the parties, the other party(ies) shall pay the costs of the mediation.   If the mediation does not result in the acceptance of the position held by one or more parties, all of the parties participating in the mediation shall pay an equal amount of the fees and expenses of the mediator; provided, however, that if more than one party is taking the same position they will share in 50% of the costs of the mediation unless otherwise agreed to in mediation.

10.5   Confidential and Inadmissible for Purposes of Arbitration.   All information, offers, promises, conduct and statements whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys and by the mediator are confidential, privileged and inadmissible for any purpose, including any impeachment, and in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible as a result of mediation.   Either party may initiate arbitration, with respect to the matters submitted to mediation at any time following the initial mediation session or 45 days after the date of filing the written request for mediation, whichever occurs first.   The mediation may continue after the commencement of arbitration if the parties so desire.   Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as the arbitrator in the case.

ARTICLE XI
Binding Arbitration

11.1   Matters Which May Be Arbitrated.   After mediation (as provided in Article X hereof), all claims, disputes, and other matters in question arising out of, or relating to, this Agreement or the breach thereof may be decided by binding arbitration in Boston Massachusetts, as permitted above, conducted in the manner specified in this section.

11.2   Selection of Arbitrators.   The party(ies) desiring arbitration shall submit a written notice of an intention to arbitrate to the American Arbitration Association (the "AAA") with a copy to all of the other Members and the Manager.   The notice shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and containing a request that the AAA provide a list of at least three disinterested persons of recognized competence in the field involved from whom an arbitrator may be appointed in accordance with the AAA Commercial Arbitration Rules then in effect, as modified by this Agreement.   If, for any reason, the appointment cannot be made from such list, the AAA shall have the power to make the appointment from among the other members of its

24

panel without the submission of additional lists.  The arbitrator shall as promptly as possible arbitrate such matter.  All parties shall each be entitled to present evidence and argument to the arbitrator.

11.3   Decision: Procedure.  The determination of the arbitrator shall be conclusive upon the parties and judgment upon the same may be entered in Superior Court of Suffolk County of the Commonwealth of Massachusetts.  The arbitrator shall give written notice to the parties stating her or his determination, and shall furnish to each party a signed copy of such determination.  Arbitration proceedings shall be conducted under the American Arbitration Association Commercial Rules with Expedited Procedures in effect on the date hereof as modified by this Agreement.  There shall be no discovery or dispositive motion practice except the arbitrator(s) shall authorize such discovery as may be shown to be necessary to ensure a fair hearing, and no such discovery shall extend the time limits contained herein.  The arbitrator(s) shall not be bound by the rules of evidence or of civil procedure, but may consider such information as reasonable businesspeople would use in the conduct of their day-to-day affairs and may require the parties to submit some or all of their case by written declaration or such other manner of presentation as the arbitrator(s) may determine to be appropriate.  The parties intend to limit live testimony and cross-examination to the extent necessary to ensure a fair hearing on material issues.  Any resolution may be submitted to Superior Court of Suffolk County of the Commonwealth of Massachusetts for enforcement.

11.4   Fees and Expenses.  The parties covenant that they will participate in such arbitration in good faith.  Each party hereby agrees to pay for his or its expenses and his or its own attorney's fees and expenses and to share equally in the other costs of said arbitration, except that (a) in the discretion of the arbitrator, any award may include the cost of a party's counsel, and (b) any award shall include the costs of a party's counsel if the arbitrator expressly determines that the party against whom the award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a frivolous or dilatory action.  The provisions of this section may be enforced by the Superior Court of Suffolk County of the Commonwealth of Massachusetts.  If this is necessary, the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

<div align="center">

ARTICLE XII
Definitions

</div>

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" means the G.L. c. 156C, Massachusetts Limited Liability Company Act, in effect at the time of the initial filing of the Certificate with the office of the Secretary of the Commonwealth of Massachusetts, and as thereafter amended from time to time.

<div align="center">25</div>

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

      (a)     credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (b)     debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliated Person" or "Affiliate" means, with reference to a specified Person, any (i) Person who owns directly or indirectly 10% or more of the beneficial ownership in such Person; (ii) one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clause (i); (iii) entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (i) and (ii) owns directly or indirectly 10% or more of the beneficial ownership.

"Agreement" means this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" means the Applicable Federal Rate as that term is defined in Code Section 7872, whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury based on average market yields for relevant recent periods.

"Bankruptcy" means any of the following:

      (i)     If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her Interest (the term "acquiesce" as used herein

26

includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree); or

(ii)     If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her Interest shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty days (whether or not consecutive); or

(iii)    If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Book Value" means, with respect to any asset of the LLC, such asset's adjusted basis for federal income tax purposes, except that:

(i)     the initial Book Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset (not reduced for any liabilities to which it is subject or which the LLC assumes), as such value is determined and for which credit is given to the contributing Member under this Agreement;

(ii)    the Book Values of all assets of the LLC shall be adjusted to equal their respective gross fair market values, as determined by the Managers, at and as of the following times:

(a)     the acquisition of an additional or new Interest, or any part thereof, by a new or existing Member in exchange for other than a de minimis capital contribution by such Member, if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

27

    (b)    the distribution by the LLC to a Member of more than a <u>de minimis</u> amount of any asset of the LLC (including cash or cash equivalents) as consideration for all or any portion of an Interest, if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

    (c)    the liquidation of the LLC within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and

    (iii)    the Book Value of the assets of the LLC shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (iii) to the extent that the Managers determine that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (iii).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (i), (ii) or (iii), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses, and the amount of the adjustment shall thereafter be taken into account as gain or loss from the distribution of such asset for purposes of computing Profits and Losses.

"<u>Capital Account</u>" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Sections 704(b) and (c) of the Code. The Capital Account of each Interest Holder shall be:

    (i)    credited with all payments made to the LLC by such Interest Holder on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Interest Holder, the agreed (as between the Interest Holders) fair market value of such property, net of liabilities secured by such property and assumed by the LLC or subject to which such contributed property is taken) and by such Interest Holder's allocable share of Profits and items in the nature of income and gain of the LLC;

    (ii)    charged with the amount of any distributions to such Interest Holder (and as to any distributions of property other than cash or a promissory note of an Interest Holder or the LLC, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Interest Holder or subject to which such distributed property is taken), and

by such Interest Holder's allocable share of Losses and items in the nature of losses and deductions of the LLC;

(iii)     adjusted simultaneously with the making of any adjustment to the Book Value of the LLC's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the LLC recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

(iv)     otherwise appropriately adjusted to reflect transactions of the LLC and the Interest Holders.

"Capital Contribution" means the amount of cash and the value of any other property contributed to the LLC by an Interest Holder as set forth in Schedule I hereto.

"Certificate" means the Certificate of Organization creating the LLC, as it may, from time to time, be amended in accordance with the Act.

"Class A Member" shall refer severally to the Interest Holders named as Class A Members in this Agreement and any Person who becomes an additional, substitute or replacement Class A Member as permitted by this Agreement, in each such Person's capacity as a Class A Member of the LLC.

"Class B Member" shall refer severally to the Interest Holders named as Class B Members in this Agreement and any Person who becomes an additional, substitute or replacement Class B Member as permitted by this Agreement, in each such Person's capacity as a Class B Member of the LLC.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any subsequent federal law of similar import.

"Consent of the Class A Members" means, until such time as the Torosyan Capital has been returned in full through distribution or otherwise and the Torosyan Loans have been repaid in full, the consent or approval of both Class A Members, provided, however, that in the event that both Class A Members are not in agreement on the matter at issue, the matter shall be decided by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC. Once the Torosyan Capital has been returned in full and the Torosyan Loans have been repaid in full, "Consent of the Class A Members" shall mean the consent of both Class A Members (with disputes decided in accordance with Articles X and XI). Consent may be given verbally, in writing, or by email, unless otherwise specified herein.

"Depreciation" means, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an asset differs

29

from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by the Manager, but not less than depreciation allowable for tax purposes for such year.

"Indebtedness" means (i) any indebtedness for borrowed money or the deferred purchase price of property, as evidenced by a note, bond, or other instrument; (ii) obligations as lessee under any capital lease; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien, or charge of any kind existing on any asset owned or held by the LLC, whether or not the LLC has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and (v) obligations under direct or indirect guarantees of (including obligations, contingent or otherwise, to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), and (iv) of this sentence.

"Interest" means an equity interest in the LLC and all rights and liabilities associated therewith.

"Interest Holder" shall mean the holder of an Interest.

"Involuntary Transfer" means any sale, assignment, transfer, exchange or other disposition made on account of a court order or otherwise by operation of law, including but not limited to any sale, assignment, transfer, exchange or other disposition as a result of a Bankruptcy or divorce but excluding transfers as a result of death, whether or not it is a probate or nonprobate, testate or intestate transfer.

"LLC" means the limited liability company formed pursuant to the Certificate and this Agreement, as it may from time to time be constituted and amended.

"Legal Representative" means, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative or other legal representative appointed as a result of the death or incompetency of such individual.

"Liquidating Capital Transaction" means any event which causes the liquidation of the LLC.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Managers" shall refer to David Tkhilaishvili and Vahagn Victor Torosyan in their capacity as Managers of the LLC and any person who becomes an additional substitute or replacement Manager as permitted by this Agreement.

30

"Member" shall refer severally to the Interest Holders named as Members in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the LLC. "Members" shall refer collectively to the Persons named as Members in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the LLC.

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Partner Minimum Gain" shall mean "Partner nonrecourse debt minimum gain" as set forth in Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Debt" shall have the meaning given in Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(i)(2).

"Percentage Interest" shall be the percentage interest of an Interest Holder set forth in Article IV.

"Person" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation or other entity.

"Profits" and "Losses" means, for each year or other period, an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

(ii)    Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or loss;

31

(iii)   Gain or loss from a disposition of property of the LLC with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

(iv)   In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

(v)   Any items which are separately allocated pursuant to Sections 4.05 and/or 4.06 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the LLC's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the LLC's Profits for such year; and if negative, such amount shall be the LLC's Losses for such year.

"Regulations" means the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Torosyan Capital" means the total capital contribution of two hundred thousand dollars ($200,000) made by Vahagn Victor Torosyan to Allied Health Clinic, LLC as of or following the date of this Agreement.

"Torosyan Loans" mean one or more loan(s) from Vahagn Victor Torosyan to the LLC and/or to Allied Health Clinic, LLC entered into as of the date of this Agreement.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any Interest, whether voluntary or involuntary, by operation of law, or judicial sale, or otherwise. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

**[Signature Page Follows]**

32

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

MANAGERS:

_____
David Tkhilaishvili

_____
Vahagn Victor Torosyan

CLASS A MEMBERS:

_____
David Tkhilaishvili

_____
Vahagn Victor Torosyan

CLASS B MEMBERS:

_____
Kenton Fabrick

_____
Jambulat Tkhilaishvili

_____
Olga Dorofyeyeva

33

## SCHEDULE I

### Membership Interest

Date of Schedule: September 11, 2015

| CLASS A MEMBERS | | | |
|---|---|---|---|
| Name | Address | Percentage Interest | Capital Contribution |
| David Tkhilaishvili | 7 Seaport Drive, Apartment 608 Quincy, MA 02171 | 43% | $43.00 |
| Vahagn Victor Torosyan | | 42% | $42.00 |
| CLASS B MEMBERS | | | |
| Name | Address | Percentage Interest | Capital Contribution |
| Kenton Fabrick | | 5% | $5.00 |
| Jambulat Tkhilaishvili | | 5% | $5.00 |
| Olga Dorofyeyeva | | 5% | $5.00 |
| TOTAL | | 100% | $100.00 |

3019\0002\383366.2

# EXHIBIT M

## To Affidavit of Vahagn Victor Torosyan

# Verrill Dana LLP

## Attorneys at Law

PAUL W. SHAW
pshaw@verrilldana.com
Direct: (617) 274-2860

ONE BOSTON PLACE
SUITE 1600
BOSTON, MASSACHUSETTS 02108-4407
617-309-2600 • FAX 617-309-2601
www.verrilldana.com

January 7, 2016

**VIA OVERNIGHT DELIVERY**
**AND ELECTRONIC MAIL**

David Tkhilaishvili
7 Seaport Drive-Apt 608
Quincy, MA  02171

Jambulat Tkhilaishvili
4 Carol Avenue Apt. 2,
Brighton, MA  02135

      Re:    Allied Health Clinic, LLC
                Health Management Group LLC

Dear David and Jambulat:

      Verrill Dana is counsel to Victor Torosyan.   Pursuant to the Operating Agreements governing Allied Health Clinic, LLC (the "Clinic") and Health Management Group, LLC ("Health Management"), attached are copies of (1) the Action by Written Consent by Class A Members in Lieu of Special Meeting taken by Mr. Torosyan on behalf of the Clinic and (2) the Action by Written Consent by Class A Members in Lieu of Special Meeting taken by Mr. Torosyan on behalf of Health Management.  By reason of these Actions by Written Consent, Jambulat Tkhilaishvili has been removed as Manager of the Clinic and David Tkhilaishvili has been removed as Manager of Health Management.  In addition, Mr. Torosyan has determined on behalf of the Clinic and Health Management that David Tkhilaishvili and Jambulat Tkhilaishvili have forfeited their interests in the Clinic and in Health Management through their misconduct. The reasons for these actions are stated in the Written Consents.

January 7, 2016
Page 2

As a result of the actions, you (David Tkhilaishvili and Jambulat Tkhilaishvili) are hereby notified that:

(i)     you are prohibited from conducting any business in the name, or on behalf, of either the Clinic or Health Management;

(ii)    you are prohibited from coming onto the premises of the Clinic at 21 School Street Suite #1, Quincy, Massachusetts; and

(iii)   you are prohibited from having any contact with any employees or other personnel of the Clinic.

I suggest you consult an attorney, and have that attorney contact me if he/she has any questions.

Very truly yours,

VERRILL DANA LLP

By:_____
Paul W. Shaw

8914581_1

## HEALTH MANAGEMENT GROUP, LLC

### ACTION BY WRITTEN CONSENT BY CLASS A MEMBERS
### IN LIEU OF SPECIAL MEETING

As of January **6**, 2016

The undersigned, Vahagn Victor Torosyan ("Victor"), being one of the two Class A Members of Health Management Group, LLC (the "Company"), and having sole and absolute discretion under that certain *Amended and Restated Operating Agreement* of the Company dated as of September 11, 2015 (the "Operating Agreement"), hereby consents to the adoption of the following resolutions without a meeting and to the taking of any and all actions contemplated therein or thereby:

WHEREAS:   The Company was established in contemplation of its providing management services to the Allied Health Clinic, LLC (the "Clinic") and future clinics to be established, but otherwise has very limited assets.

WHEREAS:   David Tkhilaishvili ("David T") is a Manager of the Company and holds a 43% membership interest.

WHEREAS:   Pursuant to the Operating Agreement, "[t]he Managers shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty will be grounds for immediate removal as a Manager by the Consent of the Class A Members."

WHEREAS:   The Operating Agreement further provides, "The Members shall have a fiduciary duty of good faith and loyalty to the Company, and any violation of such duty by a Member will be grounds for forfeiture of such Member's entire Interest upon the Consent of the Class A Members."

WHEREAS:   Pursuant to the Operating Agreement, "'Consent of the Class A Members' means, until such time as the Torosyan Capital has been returned in full through distribution or otherwise and the Torosyan Loans have been repaid in full, the consent or approval of both Class A Members, provided, however, that in the event that both Class A Members are not in agreement on the matter at issue, the matter shall be decided by Vahagn Victor Torosyan, in his reasonable judgment regarding the best interests of the LLC."

WHEREAS:   The Operating Agreement provides, "Notwithstanding anything to the contrary herein, any dispute between the Managers that occurs prior to the return of the Torosyan Capital and repayment of the Torosyan Loans will be decided by Vahagn Victor Torosyan in his sole discretion."

WHEREAS:   The Torosyan Capital has not been returned in full and the Torosyan Loans have not been repaid in full.

**WHEREAS:**   David T has breached the fiduciary duty of good faith and loyalty to the Company by (i) misappropriating funds of the Clinic for his personal benefit including, without limitation, $11,000 in two checks made out to David T which he cashed to pay for a vacation and (ii) threatening to burn the Clinic down and harm Victor unless Victor agreed to Jambulat Tkhilaishvili ("Jambulat T") and David T's demands that Victor surrender his rights in the Clinic under the Operating Agreement of the Clinic and his interests in the Clinic.

**WHEREAS:**   Jambulat T is a member of the Company holding a 5% membership interest.

**WHEREAS:**   Jambulat T has breached the fiduciary duty of good faith and loyalty to the Company by (i) misappropriating funds of the Clinic for his personal benefit including payments for his personal cell phone, (ii) conspiring with his brother David T to misappropriate funds of the Clinic, including, without limitation, $11,000 in two checks made out to David T which he cashed to pay for a vacation and (iii) threatening to burn the Clinic down and harm Victor unless Victor agreed to Jambulat T and David T's demands that Victor surrender his rights in the Clinic under the Operating Agreement of the Clinic and his interests in the Clinic.

**WHEREAS:**   Victor has determined in his reasonable judgment that, in the best interests of the Company, David T should be removed as Manager of the Company and that his interests in the Company should be forfeited.

**WHEREAS:**   Victor has determined in his reasonable judgment that, in the best interests of the Company, Jambulat's interests in the Company should be forfeited.

**VOTED:**   That David T be and is hereby removed as a Manager of the Company and that his power to participate in the management of the Company be and is hereby terminated.

**VOTED:**   That David T's interests in the Company be and are hereby forfeited.

**VOTED:**   That Jambulat T's interests in the Company be and are hereby forfeited.

**VOTED:**   That this Action By Written Consent of the Class A Members In Lieu Of Special Meeting shall be filed in the Minute Book of the Company and that a copy of this Action be delivered in accordance with applicable provisions of the Operating Agreement to David T and Jambulat T.

IN WITNESS WHEREOF, the undersigned, being the Class A Member with sole and absolute discretion over the matters herein contained, has executed this instrument as of the date first set forth above.

Vahagn Victor Torosyan

8914720_1

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                                    SUPERIOR COURT

| | | |
|---|---|---|
| DAVID TKHILAISHVILI JAMBULAT TKHILAISHVILI aka JAMES TKHILAISHVILI | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 16-1268-BLS1 |
| VAHAGN VICTOR TOROSYAN | ) ) | |
| and | ) ) | |
| ALLIED HEALTH CLINIC, LLC | ) ) | |
| Defendants. | ) ) | |

### AFFIDAVIT OF LEVON JYULNAZARYAN

I, Levon Jyulnazaryan, on oath depose and state as follows:

1.      I live in Belmont, Massachusetts.

2.      I am a friend of Vahagn Victor Torosyan ("Victor").  I know Victor well.

3.      I am of Armenian origin and speak Armenian and Russian.

4.      I accompanied Victor to the Allied Health Clinic, LLC (the "Clinic") at 21 School Street in Quincy, Massachusetts on November 9, 2015.

5.      Victor was not wearing his handgun on November 9, 2015.  I know this because Victor took off his jacket to drive with me to the Clinic on that day.

6.      At the Clinic on November 9, 2015, I sat in the public waiting room while Victor had a meeting with David Tkhilaishvili ("David") and Jambulat Tkhilaishvili ("James") in a

1

private room.

7.     After their meeting on November 9, 2015, David, James, Victor and I were in the parking lot outside the Clinic. I heard David and James speaking angrily to Victor and demanding that Victor give up some of his percentages to someone.

8.     Victor answered that he would discuss it with his attorneys and get back to them. Then, James asked Victor angrily, "Are you going to go to the cops?"

Signed under the pains and penalties of perjury this $\frac{4}{\phantom{x}}$ day of May, 2016.

Levon Gyulnazaryan

2

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, SS.                                                    SUPERIOR COURT

|  |  |
|---|---|
| DAVID TKHILAISHVILI<br>JAMBULAT TKHILAISHVILI aka<br>JAMES TKHILAISHVILI<br><br>              Plaintiffs,<br>v.<br><br>VAHAGN VICTOR TOROSYAN<br><br>and<br><br>ALLIED HEALTH CLINIC, LLC<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 16-1268-BLS1<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF RICHARD ABREU**

I, Richard Abreu, on oath depose and state as follows:

1.      I live in _101 Arlington Ave_ , Massachusetts.
                              Dracut

2.      I worked as a medical assistant at the Allied Health Clinic, LLC ("Clinic") at 21

School Street in Quincy, Massachusetts from approximately August, 2015 until

_March 12, 2016_

3.      In my time working at the Clinic, James Tkhilaishvili never provided me with any

direction or assistance regarding my work. In my time working at the Clinic, I saw James

Tkhilaishvili approximately only three times. One time was at the opening party. On the other

occasions that I saw him, James dropped in only briefly to speak with his brother David

Tkhilaishvili.

1

4.      I resigned my job at the Clinic because I found a better job elsewhere.

5.      My resignation had nothing to do with the conduct or activities of Victor

Torosyan towards me or at the Clinic.

6.      I believe that Victor Torosyan is one of the best managers I have ever worked for.

Signed under the pains and penalties of perjury this ⁴ day of May, 2016.

Richard Abreu

9310203_1

2

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                              SUPERIOR COURT

| | |
|---|---|
| DAVID TKHILAISHVILI<br>JAMBULAT TKHILAISHVILI aka<br>JAMES TKHILAISHVILI<br><br>         Plaintiffs,<br>   v.<br><br>VAHAGN VICTOR TOROSYAN<br><br>  and<br><br>ALLIED HEALTH CLINIC, LLC<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CIVIL ACTION NO. 16-1268-BLS1 |

## AFFIDAVIT OF KENTON FABRICK

I, Kenton Fabrick, on oath depose and state as follows:

1.      I live in Quincy, Massachusetts.

2.      I am the Clinic Administrator at the Allied Health Clinic, LLC (the "Clinic") at 21 School Street in Quincy, Massachusetts. I have been with the Clinic since its formation on or about August 2014. I am also a member of the Clinic and hold a 4.9% interest in the Clinic.

3.      Prior to becoming involved with the Clinic, I worked for Davis Clinic Management, Inc. ("DCM") from approximately April 2013 until July 2014. DCM provided management services to Davis Health, P.C. Davis Health operated a Suboxone clinic at 21 School Street providing addiction treatment to patients. My brother, Dr. Kurt Fabrick, was the owner of Davis Health. Patient care at the 21 School Street location ended in about July 2014

1

after Davis Health brought a civil suit against DCM and David Tkhilaishvili ("David").  At about that time, Davis Health relocated.

4.     The first organizational meeting of the new Clinic was held on May 3, 2015.  I was at that meeting.  I was elected secretary of the meeting and recorded the minutes.  Victor Torosyan ("Victor") was elected chair of the meeting.  David and his brother, James Tkhilaishvili ("James"), were at the meeting.  At the meeting, the members of the Clinic agreed that the letter agreement between Victor and David dated December 2014 was the operating agreement of the Clinic.

5.     I witnessed David behaving aggressively one time at the Davis Health clinic.  On that occasion, approximately two years ago, I saw David shoving his girlfriend, Ms. Ursova, and screaming at her.

6.     Since I began working at the new Clinic, I have seen James at the Clinic on only five occasions: at the opening day party, at the Christmas party, once when James dropped in to speak with Victor, at a board meeting held at the Clinic and once when James dropped off Christmas chocolates.

7.     James has never been involved in any discussion of Clinic operations.  James has had no involvement in or made any contribution to the establishment of programs and procedures to comply with regulations of the Department of Public Health.  James' ability to speak English is very limited.  I believe that James generally speaks in Georgian or Russian.

8.     As Clinic Administrator and a member of the Clinic, I am generally aware of the finances of the Clinic.  Victor has been the only person to invest any funds in the Clinic.  No other person has invested any cash in the Clinic.  These funds from Victor have been used to renovate the Clinic premises, to obtain necessary permits and licensing and to support Clinic

operations during its start up phase.

9.      The Clinic has been incurring substantial losses during its start-up phase. During one month the Clinic incurred losses of approximately $150,000.

10.     Victor has never made any medical decisions on behalf of patients at the Clinic.

11.     Victor has never altered any drug prescriptions issued to Clinic patients by doctors at the Clinic.

12.     Victor has not been recording patient and staff conversations. As Clinic Administrator, I would be aware of this if it were occurring.

13.     Dr. Susan Johnson resigned her position at the Clinic for personal reasons. Dr. Johnson, however, is interested in returning to work at the Clinic. I have been in email communication with her about this.


Signed under the pains and penalties of perjury this 4th day of May, 2016.

Kenton Fabrick